ORIGINAL

FILED
MAR 31 2008
U.S. COURT OF FEDERAL CLAIMS

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**WASHINGTON MUTUAL, INC., AS SUCCESSOR IN INTEREST TO H.F. AHMANSON & CO. AND SUBSIDIARIES,**
**Plaintiff,**

**v.**

**THE UNITED STATES of AMERICA,**

**Defendant.**

**No. 08-211 T**

**COMPLAINT**

Plaintiff Washington Mutual, Inc. ("Washington Mutual"), as successor in interest to H.F. Ahmanson & Co. and Subsidiaries, alleges as follows:

**THE PARTIES**

1. Plaintiff Washington Mutual is a domestic corporation incorporated in the State of Washington, with its corporate headquarters at 1301 Second Avenue, Seattle, Washington, 98101. Washington Mutual's employer identification number ("EIN") is 91-1653725.

2. H.F. Ahmanson & Co. ("Ahmanson") was a domestic corporation incorporated in Delaware. Until October 1, 1998, its corporate headquarters were at 4900 Rivergrade Road, Irwindale, California, 91706. Ahmanson's EIN is 95-0479700.

3. Washington Mutual acquired Ahmanson on October 1, 1998. Washington Mutual is the successor in interest to the claims presented herein.

4. For the tax years ending December 31, 1991 and 1994, Home Savings of America ("Home") was a federally chartered savings and loan association, a wholly owned subsidiary of Ahmanson, and a member of the affiliated group for which Ahmanson was the common parent corporation.

5. Defendant is the United States of America.

## JURISDICTION

6. Washington Mutual brings this complaint in accordance with the requirements of section 7422 of the United States Internal Revenue Code (the "Code"), 26 U.S.C. § 7422, for recovery of federal income taxes erroneously collected from Ahmanson for the tax years ending December 31, 1991 and 1994 (the "years at issue").

7. This Court has jurisdiction over this action under 28 U.S.C. § 1491 and 28 U.S.C. § 1346(a).

8. Washington Mutual is filing this complaint within the period of time specified in section 6532 of the Code.

## GENERAL ALLEGATIONS

9. Washington Mutual seeks to recover the sum of at least $74,477,453, together with interest as the law provides, which sum represents an overpayment by Ahmanson of federal income taxes for the years at issue.

10. Ahmanson timely filed a federal income tax return for both of the years at issue with the Internal Revenue Service Center in Fresno, California.

11. Ahmanson paid the full amount of income taxes shown on its federal income tax returns for both of the years at issue. In both of the years at issue, Ahmanson was subsequently audited and paid the additional amounts assessed in those audits.

12. This action arises out of the attached administrative claims for refund that Plaintiff submitted for the years at issue. In those administrative claims for refund, Plaintiff claimed deductions for amortization and abandonment losses with respect to the intangible assets that Home obtained pursuant to agreements with the Federal Savings and Loan Insurance Corporation ("FSLIC"), an agency of the United States government, and with the Federal Deposit Insurance Corporation ("FDIC"), an agency of the United States government. Under those agreements, Home also acquired insolvent savings and loan associations located in Missouri, Florida, Illinois, Texas, New York, and Ohio.

13. Prior to December 17, 1981, Home was a California-chartered savings and loan association engaged in the business of taking deposits and making home loans in California.

14. From 1981 through 1989 (and before), FSLIC insured the customer deposit accounts of federal savings and loan associations, or "federal thrifts."

15. In 1985 and before, FDIC insured the customer deposit accounts of federal savings banks.

16. In the late 1970s and into the early 1980s, FSLIC faced a financial crisis. Interest rates increased during this period, requiring thrifts to pay higher rates to their depositors and other creditors. Federal thrifts also lost deposits to other financial intermediaries, such as money market mutual funds, during this period. The thrifts' income did not rise commensurately because their primary source of income was fixed-rate mortgages. Most thrifts incurred net losses during this period and many became insolvent.

17. By late 1981 FSLIC determined that it lacked the funds necessary to cover its deposit insurance liabilities with respect to insolvent federal thrifts. FSLIC decided to offer

assistance to healthy thrifts ("FSLIC Assistance") to induce them to take over insolvent federal thrifts in transactions known as "supervisory mergers." FSLIC Assistance took a variety of forms including cash, guarantees against loan losses, capital notes, loans and other favorable financing, the right to acquire, maintain, and establish branch offices ("branches") outside of the acquiring thrift's home state, and certain rights with regard to the Regulatory Accounting Principles ("RAP") that govern federal thrift accounting.

18. From 1981 through 1989, the Federal Home Loan Bank Board ("FHLBB"), another agency of the United States government, was the federal agency that regulated federal thrifts. FHLBB controlled FSLIC. FHLBB's approval was required before FSLIC could consummate a supervisory merger.

19. Prior to March 1981, FHLBB regulations generally prohibited a federal thrift from establishing branches in any state other than the state in which its home office was located. FHLBB amended its regulations in March and September 1981 to create an exception to this general prohibition that could be invoked only in supervisory mergers. That exception (1) allowed a federal thrift with its home office in one state to acquire through a supervisory merger one or more federal thrifts with home offices in a second state, and (2) allowed the acquiring thrift to establish additional branches in the state that it entered through the supervisory merger.

The Missouri-Florida Transaction

20. In December 1981, Security Federal Savings and Loan Association ("Security"), a federal savings and loan association with its home office in Missouri, was insolvent.

21. In December 1981, Hamiltonian Federal Savings and Loan Association ("Hamiltonian"), a federal savings and loan association with its home office in Missouri, was insolvent.

22. In December 1981, Southern Federal Savings and Loan Association ("Southern"), a federal savings and loan association with its home office in Florida, was insolvent.

23. On December 17, 1981, Home entered into an agreement with FSLIC to acquire the assets and liabilities of Security, Hamiltonian, and Southern through a supervisory merger (the "Missouri-Florida Transaction").

24. The Missouri-Florida Transaction was a two-step acquisition: Security and Hamiltonian merged into Southern, then Southern merged into Home. Prior to Southern's merger into Home, Home converted from a California-chartered savings and loan association to a federal savings and loan association.

25. To induce Home to acquire Security, Hamiltonian, and Southern, FSLIC executed an Assistance Agreement (the "Assistance Agreement") with Home.

26. The Assistance Agreement incorporated by reference a resolution in which the FHLBB approved the establishment by Home of branch offices in Missouri and Florida. The incorporation of this resolution into the Assistance Agreement gave Home the contractual right to maintain branches and establish additional branches in Missouri ("Missouri Branching Rights") and Florida ("Florida Branching Rights"), subject to the requirement that Home apply for and obtain the FHLBB's approval before opening any new branch.

27. The Assistance Agreement also incorporated an FHLBB resolution that approved Home's use of the "purchase method" of accounting for the supervisory merger. The incorporation of that resolution gave Home the contractual right (the "Missouri-Florida RAP Right") to treat the excess of the purchase price over the fair market value of the identifiable assets acquired from the Missouri and Florida thrifts as "supervisory goodwill," subject to amortization over 40 years, and to count the unamortized supervisory goodwill balance as capital for purposes of meeting the FHLBB's regulatory capital requirements for federal thrifts. In this case, Home paid no cash for the acquired Missouri and Florida thrifts, and the purchase price

was the assumption of the acquired thrifts' liabilities. Therefore, the Missouri-Florida RAP Right entitled Home to treat the excess of the fair market value of the acquired Missouri and Florida thrifts' liabilities over the fair market value of those thrifts' identifiable assets as supervisory goodwill, to amortize that supervisory goodwill over 40 years, and to count the unamortized supervisory goodwill balance toward meeting Home's regulatory capital requirements.

28. In addition to the Missouri and Florida Branching Rights and the Missouri-Florida RAP Right, the Assistance Agreement provided Home with a small amount of cash, a guarantee to reimburse Home in the event it incurred losses in connection with certain real estate owned by the acquired thrifts, and certain regulatory forbearances.

29. The Assistance Agreement also incorporated by reference resolutions in which the FHLBB made the findings necessary to qualify the merger of Security and Hamiltonian into Southern, and the merger of Southern into Home as tax-free reorganizations under Code sections 368(a)(1)(G) and 368(a)(3)(D)(ii).

30. Home determined the excess of the fair market value of the failed Missouri thrifts' liabilities over the fair market value of their booked assets, and reduced the amount of the excess by the amount of cash received from FSLIC in connection with the failed Missouri thrifts. Of the remaining excess, a portion — $1,243,000 — was attributed to the core deposit base of the acquired Missouri thrifts. The remaining amount of $87,385,441 was treated as supervisory goodwill.

31. Home determined the excess of the fair market value of Southern's liabilities over the fair market value of its booked assets, and reduced the amount of the excess by the amount of cash received from FSLIC in connection with Southern. Of the excess, a portion — $2,444,000 — was attributed to the core deposit base of Southern. The remaining amount of $180,118,478 was treated as supervisory goodwill.

32. Under Code section 1012 and Treasury Regulation § 1.1012-1(a), or, alternatively, under Code sections 362(b) and 597, Home had a total tax basis of $67,519,000 (cost basis) or $74,000,000 (fair market value basis) respectively in the Missouri-Florida RAP Rights.

The Illinois-Texas Transaction

33. In January 1982, Royal Federal Savings and Loan Association ("Royal"), a federal savings and loan association with its home office in Texas, was insolvent.

34. In January 1982, El Centro Federal Savings and Loan Association ("El Centro"), a federal savings and loan association with its home office in Texas, was insolvent.

35. In January 1982, Civic Federal Savings and Loan Association ("Civic"), a federal savings and loan association with its home office in Texas, was insolvent.

36. In January 1982, Republic Federal Savings and Loan Association ("Republic"), a federal savings and loan association with its home office in Texas, was insolvent.

37. In January 1982, Buffalo Federal Savings and Loan Association ("Buffalo"), a federal savings and loan association with its home office in Texas, was insolvent.

38. In January 1982, Hyde Park Federal Savings and Loan Association ("Hyde Park"), a federal savings and loan association with its home office in Illinois, was insolvent.

39. On January 15, 1982, Home entered into an agreement with FSLIC to acquire the assets and liabilities of Royal, El Centro, Civic, Republic, Buffalo, and Hyde Park through a supervisory merger (the "Illinois-Texas Transaction").

40. The Illinois-Texas Transaction was a two-step transaction. Civic, Republic, and Buffalo merged into El Centro. Royal, El Centro, and Hyde Park then merged into Home.

41. To induce Home to acquire Royal, El Centro, Civic, Republic, Buffalo, and Hyde Park, FSLIC executed an Assistance Agreement (the "Illinois-Texas Assistance Agreement") with Home.

42. The Illinois-Texas Assistance Agreement incorporated by reference a resolution and letter in which the FHLBB approved the establishment by Home of branch offices in Illinois and Texas. The incorporation of this resolution into the Illinois-Texas Assistance Agreement gave Home the contractual right to maintain branches and establish additional branches in Illinois ("Illinois Branching Rights") and Texas ("Texas Branching Rights"), subject to the requirement that Home apply for and obtain the FHLBB's approval before opening any new branch.

43. The Illinois-Texas Assistance Agreement also incorporated an FHLBB resolution that approved Home's use of the "purchase method" of accounting for the supervisory merger. The incorporation of that resolution gave Home the contractual right (the "Illinois-Texas RAP Right") to treat the excess of the purchase price over the fair market value of the identifiable assets acquired from the Illinois and Texas thrifts as "supervisory goodwill," subject to amortization over 40 years, and to count the unamortized supervisory goodwill balance as capital for purposes of meeting the FHLBB's regulatory capital requirements for federal thrifts. In this case, Home paid no cash for the acquired Illinois and Texas thrifts, and the purchase price was the assumption of the acquired thrifts' liabilities. Therefore, the Illinois-Texas RAP Right entitled Home to treat the excess of the fair market value of the acquired Illinois and Texas thrifts' liabilities over the fair market value of those acquired thrifts' identifiable assets as supervisory goodwill, to amortize that supervisory goodwill over 40 years, and to count the unamortized supervisory goodwill balance toward meeting Home's regulatory capital requirements.

44. In addition to the Illinois and Texas Branching Rights and the Illinois-Texas RAP Right, the Illinois-Texas Assistance Agreement provided Home with cash, a guarantee to

reimburse Home in the event it incurred losses in connection with certain real estate owned by the acquired thrifts, and certain regulatory forbearances.

45. The Illinois-Texas Assistance Agreement also incorporated by reference resolutions in which the FHLBB made the findings necessary to qualify the mergers of Civic, Republic, and Buffalo into El Centro, and the mergers of Royal, El Centro, and Hyde Park into Home as tax-free reorganizations under Code sections 368(a)(1)(G) and 368(a)(3)(D)(ii).

46. Home determined the excess of the fair market value of the failed Texas thrifts' liabilities over the fair market value of their booked assets. A portion of this amount — $1,555,000 — was attributed to the core deposit base of the acquired Texas thrifts. The remaining amount of $145,874,021 was treated as supervisory goodwill.

47. Home determined the excess of the fair market value of Hyde Park's liabilities over the fair market value of its booked assets. A portion of this amount — $702,000 — was attributed to the core deposit base of Hyde Park. The remaining amount of $75,806,934 was treated as supervisory goodwill.

48. Under Code section 1012 and Treasury Regulation § 1.1012-1(a) or, alternatively, under Code sections 362(b) and 597, Home had a total tax basis of $75,806,934 in the Illinois Branching Rights.

49. Under Code section 1012 and Treasury Regulation § 1.1012-1(a) or, alternatively, under Code sections 362(b) and 597, Home had a total tax basis of $145,874,021 in the Texas Branching Rights.

50. Under Code section 1012 and Treasury Regulation § 1.1012-1(a) or, alternatively, under Code sections 362(b) and 597, Home had a total tax basis of $ 221,680,955 in the Illinois-Texas RAP Right.

51. The Illinois Branching Rights that Home obtained in the transactions had an indefinite life and were not amortizable.

52. In 1993, Home's management decided to terminate its branch banking operations in Illinois.

53. In 1994, Home engaged in transactions in which Home exchanged, sold, or otherwise disposed of its branches in Illinois.

54. With the disposition of its last Illinois branch in 1994, Home exited the Illinois branch-banking market with no intention of reestablishing branch offices in Illinois.

The Century Transaction

55. In August 1984, Century Federal Savings and Loan Association ("Century"), a federal savings and loan association with its home office in New York, was insolvent.

56. On August 10, 1984, Home entered into an agreement with FSLIC to acquire the assets and liabilities of Century through a supervisory merger (the "Century Transaction").

57. To induce Home to acquire Century, FSLIC executed an Assistance Agreement (the "Century Assistance Agreement") with Home.

58. The Century Assistance Agreement incorporated by reference a resolution in which the FHLBB approved the establishment by Home of branch offices in New York. The incorporation of this resolution into the Century Assistance Agreement gave Home the contractual right to maintain branches and establish additional branches in New York ("New York Branching Rights"), subject to the requirement that Home apply for and obtain the FHLBB's approval before opening any new branch.

59. The Century Assistance Agreement also incorporated an FHLBB resolution that approved Home's use of the "purchase method" of accounting for the supervisory merger. The incorporation of that resolution gave Home the contractual right (the "Century RAP Right") to treat the excess of the purchase price over the fair market value of Century's identifiable assets as "supervisory goodwill," subject to amortization over 40 years, and to count the unamortized supervisory goodwill balance as capital for purposes of meeting the FHLBB's regulatory capital

requirements for federal thrifts. In this case, Home paid no cash for Century, and the purchase price was the assumption of Century's liabilities. Therefore, the Century RAP Right entitled Home to treat the excess of the fair market value of Century's liabilities over the fair market value of Century's identifiable assets as supervisory goodwill, to amortize that supervisory goodwill over 40 years, and to count the unamortized supervisory goodwill balance toward meeting Home's regulatory capital requirements.

60. In addition to the New York Branching Rights and the Century RAP Right, the Century Assistance Agreement provided Home with certain regulatory forbearances and favorable financing in the form of a $700 million loan at a below-market interest rate (the "Century Favorable Financing Right").

61. The Century Assistance Agreement also incorporated by reference resolutions in which the FHLBB made the findings necessary to qualify the merger of Century into Home as a tax-free reorganization under Code sections 368(a)(1)(G) and 368(a)(3)(D)(ii).

62. Home determined the excess of the fair market value of Century's liabilities over the fair market value of Century's booked assets. The excess of $126,745,842 was treated as supervisory goodwill.

63. Under Code section 1012 and Treasury Regulation § 1.1012-1(a) or, alternatively, under Code sections 362(b) and 597, Home had a total tax basis of $126,745,842 in the New York Branching Rights, the Century RAP Right, and the Century Favorable Financing Right.

<u>The Ohio Transaction</u>

64. In May 1985, Home Federal Savings and Loan Association ("Home Fed"), a federal savings and loan association with its home office in Ohio, was insolvent.

65. In May 1985, Permanent Savings and Loan Association ("Permanent"), an Ohio-chartered savings and loan association with its home office in Ohio, was insolvent.

66. In May 1985, Oxford Savings and Loan Association ("Oxford"), an Ohio-chartered savings and loan association with its home office in Ohio, was insolvent.

67. In May 1985, American Savings Bank of Worthington ("American"), an Ohio-chartered savings and loan association with its home office in Ohio, was insolvent.

68. In June 1985, Savings One Association ("Savings One"), an Ohio-chartered savings and loan association with its home office in Ohio, was insolvent.

69. On May 22, 1985, Home entered into an agreement with FSLIC to acquire the assets and liabilities of Home Fed, Permanent, Oxford, and American through a supervisory merger. On June 20, 1985, Home entered into an agreement with FSLIC to acquire the assets and liabilities of Savings One through a supervisory merger. These two transactions are referred to collectively as the "Ohio Transaction."

70. To induce Home to acquire Home Fed, Permanent, Oxford, American, and Savings One, FSLIC executed an Assistance Agreement (the "Ohio Assistance Agreement") with Home.

71. The Ohio Assistance Agreement incorporated by reference a resolution in which the FHLBB approved the establishment by Home of branch offices in Ohio. The incorporation of this resolution into the Ohio Assistance Agreement gave Home the contractual right to maintain branches and establish additional branches in Ohio ("Ohio Branching Rights"), subject to the requirement that Home apply for and obtain the FHLBB's approval before opening any new branch.

72. The Ohio Assistance Agreement also incorporated an FHLBB resolution that approved Home's use of the "purchase method" of accounting for the supervisory merger. The incorporation of that resolution gave Home the contractual right (the "Ohio RAP Right") to treat the excess of the purchase price over the fair market value of the identifiable thrift assets acquired as "supervisory goodwill," subject to amortization over 40 years, and to count the

unamortized supervisory goodwill balance as capital for purposes of meeting the FHLBB's regulatory capital requirements for federal thrifts. In this case, Home paid no cash for the acquired Ohio thrifts, and the purchase price was the assumption of the acquired Ohio thrifts' liabilities. Therefore, the Ohio RAP Right entitled Home to treat the excess of the fair market value of the acquired Ohio thrifts' liabilities over the fair market value of the Ohio thrifts' identifiable assets as supervisory goodwill, to amortize that supervisory goodwill over 40 years, and to count the unamortized supervisory goodwill balance toward meeting Home's regulatory capital requirements.

73. In addition to the Ohio Branching Rights and the Ohio RAP Right, the Ohio Assistance Agreement provided Home with certain regulatory forbearances and favorable financing in the form of a $200 million loan at a below-market interest rate (the "Ohio Favorable Financing Right").

74. The Ohio Assistance Agreement also incorporated by reference resolutions in which the FHLBB made the findings necessary to qualify the merger of Home Fed, Permanent, Oxford, and American into Home, and the merger of Savings One into Home as tax-free reorganizations under Code sections 368(a)(1)(G) and 368(a)(3)(D)(ii).

75. Home determined the excess of the fair market value of the failed Ohio thrifts' liabilities over the fair market value of their booked assets, and reduced the amount of the excess by the amount of cash received from FSLIC in connection with the failed Ohio thrifts. The remaining excess of $37,814,989 was treated as supervisory goodwill

76. Under Code section 1012 and Treasury Regulation § 1.1012-1(a) or, alternatively, under Code sections 362(b) and 597, Home had a total tax basis of $37,814,989 in the Ohio Branching Rights, the Ohio RAP Right, and the Ohio Favorable Financing Right.

The Bowery Transaction

77. In August 1985, The Bowery Savings Bank ("Old Bowery"), an FDIC-insured, New York-chartered mutual savings bank with its home office in New York, was insolvent.

78. In or around August 1985, a group of private investors (the "Investors") formed a corporation ("New Bowery") for the purpose of acquiring Old Bowery.

79. On August 7, 1985, New Bowery entered into an agreement with FDIC to acquire the assets and liabilities of Old Bowery through a supervisory merger (the "Bowery Transaction").

80. To induce New Bowery to acquire Old Bowery, FDIC executed an Assistance Agreement, dated August 7, 1985, (the "Bowery Assistance Agreement") with New Bowery.

81. The Bowery Assistance Agreement gave New Bowery the contractual right (the "Bowery RAP Right") to use the "purchase method" of accounting for the supervisory merger by treating the excess of the Old Bowery liabilities over the fair market value of the identifiable Old Bowery assets acquired as "goodwill," subject to amortization in accordance with Generally Accepted Accounting Principles ("GAAP"), and to count the unamortized goodwill balance as capital for purposes of meeting the FDIC's regulatory capital requirements.

82. In addition to the Bowery RAP Right, the Bowery Assistance Agreement provided New Bowery with approximately $170 million in cash, credit protection against losses from loans and investment securities, a $100 million loan at a below-market interest rate (the "Bowery Favorable Financing Right"), and certain regulatory forbearances.

83. On October 1, 1985, Old Bowery was converted from a mutual savings bank to a stock company and was merged into New Bowery in a tax-free reorganization under Code sections 368(a)(1)(G) and 368(a)(3)(D)(ii).

84. New Bowery determined the excess of the fair market value of Old Bowery's liabilities over the fair market value of Old Bowery's booked assets. The excess of $635,166,000 was treated as goodwill for regulatory accounting purposes.

85. Under Code section 1012 and Treasury Regulation § 1.1012-1(a), New Bowery had a total tax basis of $635,166,000 in the Bowery RAP Right and the Bowery Favorable Financing Right.

86. On January 29, 1988, Home, through a wholly owned subsidiary, acquired all the outstanding capital stock of New Bowery for a purchase price of $200 million in cash. New Bowery retained the Bowery RAP Right pursuant to an amended assistance agreement with the FDIC. Home did not make a Code section 338 election to treat the stock acquisition as an asset acquisition. Therefore, New Bowery's assets retained their historical tax basis when Home acquired the stock of New Bowery. New Bowery became a member of Ahmanson's affiliated group.

87. Until 1992, New Bowery's books were separate from Home's books. In 1992, Home and New Bowery merged in a tax-free reorganization. Home received carryover basis in New Bowery's assets and counted the remaining New Bowery goodwill toward its regulatory capital requirements.

<u>General Claims</u>

88. Under Code section 167, Home is entitled to amortization deductions with respect to the Missouri-Florida RAP Right, Illinois-Texas RAP Right, Century RAP Right, and Ohio RAP Right (collectively, the "Non-Bowery RAP Rights").

89. Congress enacted the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA") in 1989. FIRREA phased out the use of supervisory goodwill to satisfy regulatory capital requirements over the five-year period 1990 through 1994. At the end of

1994, supervisory goodwill could no longer be counted towards regulatory capital for purposes of meeting a federal thrift's regulatory capital requirements.

90. Over the period 1990-1994, as required by FIRREA, Home phased out its use of supervisory goodwill to meet its regulatory capital requirements.

91. Although Home's Non-Bowery RAP Rights were previously amortizable on a straight-line basis for 40 years, the enactment of FIRREA shortened the useful life of the Non-Bowery RAP Rights so that Home is entitled to amortize its remaining adjusted basis in the Non-Bowery RAP Rights on a straight-line method from 1989 through 1994.

92. Alternatively, because Home acquired the right to amortize the Non-Bowery RAP Rights over 40 years, Home is entitled to (1) an amortization deduction for 1991 equal to one-fortieth of Home's basis in the Missouri-Florida RAP Right and (2) an amortization deduction for 1994 equal to one-fortieth of Home's basis in the Non-Bowery RAP Rights.

93. Alternatively, because FIRREA disallowed the use of supervisory goodwill after 1994, Home is entitled to a deduction in 1994 to the extent of any remaining unamortized basis in the Non-Bowery RAP Rights under section 165.

94. Alternatively, if the Non-Bowery RAP Rights were not subject to amortization, Home is entitled to a loss deduction in 1994 in the amount of Home's original basis in the Non-Bowery RAP Rights under section 165.

95. Under Code section 167, Home is entitled to amortization deductions with respect to the Bowery RAP Right.

96. Although the Bowery RAP Right was previously amortizable in accordance with GAAP, the enactment of FIRREA and the 1992 Home-Bowery merger shortened the useful life of the Bowery RAP Right so that Home is entitled to amortize its remaining adjusted basis in the Bowery RAP Right on a straight-line method from 1992 through 1994.

97. Alternatively, because Home acquired the right to amortize the Bowery RAP Right in accordance with GAAP, Home is entitled to amortization deductions for 1994 equal to the original GAAP amortization (before any adjustments for FIRREA) for that year.

98. Alternatively, if the Bowery RAP Right was not subject to amortization, Home is entitled to a loss deduction in 1994 in the amount of the original cost basis in the Bowery RAP Right under section 165.

99. Alternatively, because FIRREA disallowed the use of supervisory goodwill after 1994, Home is entitled to a deduction in 1994 to the extent of any remaining unamortized basis in the Bowery RAP Right under section 165.

100. Home is entitled to an amortization deduction for 1994 with respect to the Century Favorable Financing Right under section 167 equal to one-tenth of Home's basis in the Century Favorable Financing Right.

101. Home is entitled to an amortization deduction for 1994 with respect to the Ohio Favorable Financing Right under Code section 167 equal to one-tenth of Home's basis in the Ohio Favorable Financing Right.

102. Home is entitled to an amortization deduction for 1994 with respect to the Bowery Favorable Financing Right under Code section 167.

103. Home is entitled to an abandonment loss in 1994 under Code section 165 with respect to its Illinois Branching Rights because Home suffered a loss for which Home was not covered by insurance or otherwise compensated.

104. Plaintiff timely filed with the IRS claims for refund (attached) with respect to each of the tax years at issue. In those claims Plaintiff claimed the abandonment loss and amortization deductions summarized above and set forth in the detailed counts below.

105. Plaintiff is the sole owner of the claims for refund and has made no assignment or transfer of any part of these claims. There is no other suit or process by Plaintiff pending in any

other court on these claims. No action on the claims has been taken by the Congress of the United States or by any departments of the United States government, other than the actions by the IRS on September 21, 2005 and January 17, 2006, denying the claims in full.

**COUNT ONE**
**(1991 TAX YEAR)**

106. Plaintiff incorporates herein by reference and realleges all allegations in paragraphs 1-105 of this Complaint.

107. On or before September 15, 1992, Ahmanson timely filed a Form 1120 federal income tax return for its 1991 tax year with the IRS at Fresno, California, reporting total tax in the amount of $202,074,655. The name, address, and identification number appearing on that return were as follows:

H.F. Ahmanson & Co. and Subsidiaries
4900 Rivergrade Road
Irwindale, California, 91706
EIN 95-0479700

108. Plaintiff paid in full to the Fresno, California Service Center (for the payments made before 1998) or the Ogden, Utah Service Center (for the payments made after 1998) the tax reported to be due on its 1991 return as follows:

a) $36,000,000 of estimated tax paid on April 15, 1991;

b) $36,000,000 of estimated tax paid on June 17, 1991;

c) $48,000,000 of estimated tax paid on September 16, 1991;

d) $3,685,722.66 of overpayment credit elect from prior year credited on April 15, 1991;

e) $50.34 of overpayment credit elect from prior year credited on April 15, 1991;

f) $66,000,000 of estimated tax paid on December 16, 1991;

g) $25,000,000 of estimated tax paid on March 16, 1992;

h) $1,004,192.58 of overpayment offset from 1988 credited on June 29, 1994;

i) $1,959,042 and $1,446,457 of cash bond payments on May 4, 1999;

j) $367,726.97 of subsequent payment on account on December 8, 1999;

k) $1,880.74 of subsequent payment on account on February 1, 2000; and

l) $1,034,188.15 of subsequent payment on account on September 15, 2006.

The IRS subsequently audited Ahmanson, and pursuant to that audit, Plaintiff paid an additional $327,454.

109. For the reasons described in paragraph 91, Home is entitled to additional amortization deductions under section 167 for its 1991 tax year in the amount of $9,283,683 or $10,175,000 with respect to the RAP Rights it acquired pursuant to the Missouri-Florida Transaction.

110. Alternatively, for the reasons described in paragraph 92, Home is entitled to amortization deductions under section 167 for its 1991 tax year in the amount of $1,687,975 or $1,850,000 with respect to the RAP Rights it acquired pursuant to the Missouri-Florida Transaction.

111. Ahmanson is entitled to an additional net operating loss carryback deduction of $207,842,178 arising from its 1994 tax year. The additional carryback results from abandonment loss deductions, additional amortization deductions, or, alternatively, certain adjustments in the amount of gain or loss on the sale of branches in the 1994 tax year. These additional deductions and adjustments are described in paragraphs 119 through 138 of Count Two of this Complaint.

112. On June 28, 2005, Washington Mutual timely filed an amended return on Form 1120X with the IRS in Seattle, Washington, seeking a refund of tax for Ahmanson's 1991 tax year on the basis that: (1) Home is entitled to the deductions for amortization of the Missouri-Florida RAP Right as described in paragraph 91; or, in the alternative, that (2) Home is entitled to a deduction for amortization of the Missouri-Florida RAP Right as described in paragraph 92.

113. The IRS disallowed that claim in full on January 17, 2006. This complaint is timely because the IRS and Washington Mutual executed Form 907 agreements to extend the statute of limitations for filing suit until March 31, 2008.

114. On June 30, 2006, Washington Mutual timely filed an amended return on Form 1120X, seeking a refund of tax for Ahmanson's 1991 tax year on the basis of net operating loss carrybacks from 1994 described in paragraph 111.

115. As a result of the claims described in paragraphs 109 and 111, Ahmanson overpaid its federal income tax for the 1991 tax year and is entitled to a refund of at least $73,915,692, plus statutory interest as the law provides.

**COUNT TWO**
**(1994 TAX YEAR)**

116. Plaintiff incorporates by reference and realleges all allegations in paragraphs 1-105 of this Complaint.

117. On or before September 15, 2005, Ahmanson timely filed a Form 1120 federal income tax return for its 1994 tax year with the IRS at Fresno, California, reporting total tax in the amount of $450,942. The name, address, and identification number appearing on that return were as follows:

H.F. Ahmanson & Co. and Subsidiaries
4900 Rivergrade Road
Irwindale, California, 91706
EIN 95-0479700

118. Plaintiff paid in full to the Fresno, California Service Center (for the payments made before 1998) or the Ogden, Utah Service Center (for the payments made after 1998) the tax reported to be due on its 1994 return as follows:

a) $140,825.13 in overpayment credit from prior year on April 15, 1994;

b) $600,000 of overpayment offset from 1992 on October 27, 1994;

c) $662,845 of advance payment of deficiency on April 14, 2005;

d) $783,938 of designated interest payment on April 14, 2005;

e) $9,942.39 of subsequent payment of tax on July 7, 2005;

f) $23,099.64 of subsequent payment of tax on February 7, 2006; and

g) $616.05 of subsequent payment of tax on May 3, 2006.

The IRS subsequently audited Ahmanson, and pursuant to that audit, Ahmanson paid an additional $105,719.

119. For the reasons described in paragraph 91, Home is entitled to additional amortization deductions under section 167 for its 1994 tax year in the amount of $9,283,683 or $10,175,000 with respect to the Missouri-Florida RAP Right.

120. Alternatively, for the reasons described in paragraph 92, Home is entitled to amortization deductions under section 167 for its 1994 tax year in the amount of $1,687,975 or $1,850,000 with respect to the Missouri-Florida RAP Right.

121. Alternatively, for the reasons described in paragraph 93 or 94, Home is entitled to a deduction under section 165 for its 1994 tax year in the amount of Home's remaining unamortized basis in the Missouri-Florida RAP Right.

122. For the reasons described in paragraph 91, Home is entitled to additional amortization deductions under section 167 for its 1994 tax year in the amount of $30,481,131 with respect to the Illinois-Texas RAP Right.

123. Alternatively, for the reasons described in paragraph 92, Home is entitled to amortization deductions under section 167 for its 1994 tax year in the amount of $5,542,024 with respect to the Illinois-Texas RAP Right.

124. Alternatively, for the reasons described in paragraph 93 or 94, Home is entitled to a deduction under section 165 for its 1994 tax year in the amount of Home's remaining unamortized basis in the Illinois-Texas RAP Right.

125. For the reasons described in paragraph 91, Home is entitled to additional amortization deductions under section 167 for its 1994 tax year in the amount of $3,944,185 with respect to the Century RAP Right.

126. Alternatively, for the reasons described in paragraph 92, Home is entitled to amortization deductions under section 167 for its 1994 tax year in the amount of $676,146 with respect to the Century RAP Right.

127. Alternatively, for the reasons described in paragraph 93 or 94, Home is entitled to a deduction under section 165 for its 1994 tax year in the amount of Home's remaining unamortized basis in the Century RAP Right.

128. For the reasons described in paragraph 91, Home is entitled to additional amortization deductions under section 167 for its 1994 tax year in the amount of $534,738 with respect to the Ohio RAP Right.

129. Alternatively, for the reasons described in paragraph 92, Home is entitled to amortization deductions under section 167 for its 1994 tax year in the amount of $89,125 with respect to the Ohio RAP Right.

130. Alternatively, for the reasons described in paragraph 93 or 94, Home is entitled to a deduction under section 165 for its 1994 tax year in the amount of Home's remaining unamortized basis in the Ohio RAP Right.

131. For the reasons described in paragraph 96, Home is entitled to additional amortization deductions under section 167 for its 1994 tax year in the amount of $99,805,230 with respect to the Bowery RAP Right.

132. Alternatively, for the reasons described in paragraph 97, Home is entitled to amortization deductions under section 167 for its 1994 tax year in the amount of $47,964,330 with respect to the Bowery RAP Right.

133. Alternatively, for the reasons described in paragraph 98 or 99, Home is entitled to a deduction under section 165 for its 1994 tax year in the amount of Home's remaining unamortized basis in the Bowery RAP Right.

134. For the reasons described in paragraph 100, Home is entitled to an amortization deduction under section 167 for its 1994 tax year in the amount of $9,970,000 with respect to the Century Favorable Financing Right.

135. For the reasons described in paragraph 101, Home is entitled to an amortization deduction under section 167 for its 1994 tax year in the amount of $3,425,000 with respect to the Ohio Favorable Financing Right.

136. For the reasons described in paragraph 102, Home is entitled to an amortization deduction under section 167 for its 1994 tax year with respect to the Bowery Favorable Financing Right.

137. Because Home made the affirmative decision to leave the Illinois market and it sold or otherwise divested itself of all of its remaining Illinois branches in 1994, Home suffered a loss of its Illinois Branching Rights for which Home was not covered by insurance or otherwise compensated. Home is entitled to an abandonment loss deduction of $75,806,934 for its 1994 tax year under Code section 165 with respect to the Illinois Branching Rights.

138. Alternatively, to the extent Home is not entitled to recover the basis of the Illinois Branching Rights and the Illinois RAP Right branches as loss deductions under Code section 165

in 1994, or through amortization deductions under Code section 167, such basis amounts are includible in the adjusted basis of the Illinois branches sold or otherwise disposed of by Home, and Home is entitled -- for its 1994 tax year – to a corresponding adjustment to the gain or loss recognized under Code section 1001 on the 1994 Illinois branch sales.

139. On December 19, 2002, Ahmanson timely filed an amended return on Form 1120X with the IRS in Seattle, Washington, seeking a refund of tax for its 1994 tax year, on the basis that Home was entitled to abandonment and amortization deductions relating to the RAP Right acquired in connection with the acquisition of the Texas thrifts in January 1982.

140. On June 28, 2005, Ahmanson timely filed an amended return on Form 1120X with the IRS in Seattle, Washington, seeking a refund of tax for its 1994 tax year, on the basis that (1) Home is entitled to the additional amortization deductions for RAP Rights as described in paragraphs 119, 122, 125, 128, and 131; (2) Home is entitled to an abandonment loss deduction for Illinois Branching Rights as described in paragraph 137; and (3) Home is entitled to amortization deductions for the Century Favorable Financing Right as described in paragraph 134, the Ohio Favorable Financing Right as described in paragraph 135, and the Bowery Favorable Financing Right as described in paragraph 136. On the amended return, Ahmanson also sought a refund of tax for its 1994 tax year on the alternative bases that: (1) Home is entitled to additional amortization deductions for the RAP Rights on the basis described in paragraphs 120, 123, 126, 129, and 132; (2) Home is entitled to additional loss deductions for the RAP Rights on the basis described in paragraphs 121, 124, 127, 130, and 133; and (3) Home is entitled to an adjustment to the gain or loss recognized on the sale or other disposition of the Illinois branches under Code section 1001 as described in paragraph 138.

141. The IRS denied the December 19, 2002 claim for the 1994 tax year in full on September 21, 2005.

142. Washington Mutual filed an amended return with the IRS in Seattle, Washington for the 1994 tax year on June 30, 2006.

143. The IRS disallowed June 28, 2005 claim for the 1994 tax year in full on January 17, 2006. This complaint is timely because the IRS and Washington Mutual executed Form 907 agreements to extend the statute of limitations for filing suit on the June 28, 2005 claim for the 1994 tax year until March 31, 2008. The IRS has also extended the statute of limitations for filing suit on the December 19, 2002 claim for the 1994 tax year until April 30, 2008.

144. As a result of the claims described in paragraph 140, Ahmanson overpaid its federal income tax for the 1994 tax year and is entitled to a refund of at least $556,661, plus statutory interest as the law provides, and a carryback deduction of at least $207,842,178.

**RELIEF REQUESTED**

WHEREFORE, Plaintiff Washington Mutual prays for judgment against the United States of at least the sum of $74,477,453 representing overpayments in tax by its predecessor in interest H.F. Ahmanson & Co. and Subsidiaries, plus statutory interest as the law provides, and such costs and attorneys' fees as are available, and such other and further relief that this Court deems equitable and proper.

DATED: March 31, 2008.

Signed: Thomas D. Johnston

Date: March 31, 2008

Thomas D. Johnston
Counsel of Record
c/o Shearman & Sterling LLP
801 Pennsylvania Avenue N.W.
Washington, DC 20004
Telephone: (202) 508-8022
Facsimile: (202) 508-8100

**OF COUNSEL**
**SHEARMAN & STERLING** LLP
Steven R. Dixon
801 Pennsylvania Ave., NW
Washington, D.C. 20004-2634
Telephone: (202) 508-8000
Fax: (202) 508-8100

**MILLER & CHEVALIER** Chartered
Maria O'Toole Jones
Trever K. Asam
655 15th St., NW, Suite 900
Washington, D.C. 20005
Telephone: (202) 626-5800
Fax: (202) 626-0858

# Appendix

June 2005 Claim for Tax Year 1991 .......... 1

June 2005 Claim for Tax Year 1994 .......... 9

June 2006 Claim for Tax Year 1991 .......... 27

June 2006 Claim for Tax Year 1994 .......... 31

December 2002 Claim for Tax Year 1994 .......... 49

# June 2005 Claim for Tax Year 1991

June 2005 Claim for Tax Year 1991

Form **1120X** (Rev. December 2004) Department of the Treasury Internal Revenue Service

# Amended U.S. Corporation Income Tax Return

OMB No. 1545-0132

For tax year ending ▶ DECEMBER 1991 (Enter month and year.)

| | |
|---|---|
| Please Type or Print — Name: H.F. AHMANSON & CO. & CONSOLIDATED SUBSIDIARIES | Employer identification number: 95-0479700 |
| Number, street, and room or suite no. (If a P.O. box, see instructions.): C/O WASHINGTON MUTUAL, 999 THIRD AVENUE, SUITE 1500 | Telephone number (optional): (206) 377-4564 |
| City or town, state, and ZIP code: SEATTLE, WA 98104 | |

Enter name and address used on original return (If same as above, write "Same.")

H.F. AHMANSON & CO. & CONS SUBS., 4900 RIVERGRADE ROAD, IRWINDALE, CA 91706

Internal Revenue Service Center where original return was filed ▶ FRESNO, CALIFORNIA

**Fill in applicable items and use Part II on the back to explain any changes**

| **Part I** Income and Deductions (see instructions) | | (a) As originally reported or as previously adjusted | (b) Net change—increase or (decrease)—explain in Part II | (c) Correct amount |
|---|---|---|---|---|
| 1 Total income (Form 1120 or 1120-A, line 11) | 1 | 0 | 0 | 0 |
| 2 Total deductions (total of lines 27 and 29c, Form 1120, or lines 23 and 25c, Form 1120-A) | 2 | 0 | 0 | 0 |
| 3 Taxable income. Subtract line 2 from line 1 | 3 | 600,037,129 | -268,948,125 | 331,089,004 |
| 4 Tax (Form 1120, line 31, or Form 1120-A, line 27) | 4 | 204,858,041 | -91,442,362 | 113,415,679 |
| **Payments and Credits** (see instructions) | | | | |
| 5 a Overpayment in prior year allowed as a credit | 5a | 0 | 0 | 0 |
| b Estimated tax payments | 5b | 0 | 0 | 0 |
| c Refund applied for on Form 4466 | 5c | 0 | 0 | 0 |
| d Subtract line 5c from the sum of lines 5a and 5b | 5d | 0 | 0 | 0 |
| e Tax deposited with Form 7004 | 5e | 0 | 0 | 0 |
| f Credit from Form 2439 | 5f | 0 | 0 | 0 |
| g Credit for Federal tax on fuels | 5g | 0 | 0 | 0 |
| 6 Tax deposited or paid with (or after) the filing of the original return | 6 | | | 204,858,041 |
| 7 Add lines 5d through 6, column (c) | 7 | | | 204,858,041 |
| 8 Overpayment, if any, as shown on original return or as later adjusted | 8 | | | 0 |
| 9 Subtract line 8 from line 7 | 9 | | | 204,858,041 |
| **Tax Due or Overpayment** (see instructions) | | | | |
| 10 **Tax due.** Subtract line 9 from line 4, column (c). If paying by check, make it payable to the "**United States Treasury**" ▶ | 10 | | | 0 |
| 11 **Overpayment.** Subtract line 4, column (c), from line 9 ▶ | 11 | | | 91,442,302 |
| 12 Enter the amount of line 11 you want: **Credited to 20 ___ estimated tax** ▶ **Refunded** ▶ | 12 | | | 91,442,362 |

**Sign Here**

Under penalties of perjury, I declare that I have filed an original return and that I have examined this amended return, including accompanying schedules and statements, and to the best of my knowledge and belief, this amended return is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

▶ [signature] Signature of officer — Date 6/27/05 — ▶ SENIOR VICE PRES - SUCCESSOR IN INTEREST Title

**Paid Preparer's Use Only**

Preparer's signature ▶ — Date — Check if self-employed ☐ — Preparer's SSN or PTIN

Firm's name (or yours if self-employed), address, and ZIP code ▶ — EIN — Phone no.

**For Privacy Act and Paperwork Reduction Act Notice, see page 4.** (HTA) Form **1120X** (Rev. 12-2004)

**Part II** **Explanation of Changes to Items in Part I** (Enter the line number from page 1 for the items you are changing, and give the reason for each change. Show any computation in detail. Also, **see What To Attach** on page 3 of the instructions.)

If the change is due to a net operating loss carryback, a capital loss carryback, or a general business credit carryback, see **Carryback Claims** on page 3, and check here ▶ [X]

THIS RETURN IS AMENDED TO CLAIM THE NET OPERATING LOSS FROM 1994 AS A RESULT OF AN AMENDED RETURN FILED FOR THAT YEAR. SEE ALSO ADDITIONAL CLAIMS FOR AMORTIZATION OF RAP RIGHTS UNDER IRC SECTION 167. THE TOTAL AMOUNT CLAIMED IS $268,948,125.

1. NET OPERATING LOSS CARRYBACK FROM 1994 DUE TO AMENDMENT MADE TO 1994 RETURN FOR LOSS ON THE ABANDONMENT OF BRANCHING RIGHTS $268,948,125

Amended U.S. Corporation Income Tax Return
Form 1120X
For the Tax Year Ending December 31, 1991
Net Operating Loss ("NOL") Carryback

During 1991, Home Savings of America ("Home"), a federally chartered savings and loan association, was a wholly owned subsidiary of H.F. Ahmanson & Company ("Ahmanson") and a member of the affiliated group for which Ahmanson was the common parent corporation. Ahmanson is entitled to a refund for overpayment of 1991 taxes as a result of an NOL carryback from 1994. The NOL arises from amortization and abandonment loss deductions the Internal Revenue Service ("IRS") failed to allow Home for the 1994 tax year, including the loss from the abandonment of Illinois Branching Rights. Details of the deductions are set forth in the refund claims for the year ended December 31, 1994, which are attached as Exhibit 1. This claim is an additional claim to the Form 1120X for 1991 filed with the IRS on June 28, 2005.

In addition, Ahmanson requests a refund of assessed interest plus statutory interest as provided by law.

Amended U.S. Corporation Income Tax Return
Form 1120X
For the Tax Year Ending December 31, 1991
Amortization Deductions and Abandonment Loss
Relating to Missouri and Florida Thrift Institutions

During 1991, Home Savings of America ("Home"), a federally chartered savings and loan association, was a wholly owned subsidiary of H.F. Ahmanson & Company ("Ahmanson") and a member of the affiliated group for which Ahmanson was the common parent corporation. Home is entitled to a refund for overpayment of 1991 taxes because the Internal Revenue Service ("IRS") erred by failing to allow Home an abandonment loss and amortization deductions for contractual rights acquired pursuant to the acquisition of Missouri and Florida thrift institutions. Details of the loss and deductions in issue are set forth below.

Background

1. The Acquisition. On December 17, 1981, Home acquired Security Federal Savings and Loan Association and Hamiltonian Federal Savings and Loan Association, both Missouri thrift institutions, and Southern Federal Savings and Loan Association, a Florida thrift institution. Home's acquisition of the Missouri and Florida thrifts was accomplished through a two-step merger transaction. The Missouri thrifts were first merged into the Florida thrift. The Florida thrift was then merged into Home. Both mergers qualified as tax-free reorganizations under section 368(a)(1)(G) of the Code. The acquisition of the Missouri and Florida thrift institutions was a supervisory merger arranged by the Federal Savings and Loan Insurance Corporation ("FSLIC") and its parent, the Federal Home Loan Bank Board ("FHLBB"). At the time of the acquisition, there was a financial crisis in the savings and loan industry. FSLIC and the FHLBB had determined that FSLIC lacked the funds necessary to liquidate all of the failing thrifts, and therefore provided assistance ("FSLIC Assistance") to induce healthy thrifts to take over failing thrifts. FSLIC Assistance of one or more types was provided, including, but not limited to, cash, state branching rights, guarantees against losses, and the right to count the excess of the liabilities assumed over the fair market value of the identifiable assets acquired ("Supervisory Goodwill") toward regulatory capital requirements.

At the time Home acquired the Missouri and Florida thrift institutions, each of the three was insolvent. FSLIC determined that the Missouri and Florida thrift institutions had no going concern value, and that FSLIC Assistance was required to attract a buyer for the thrifts.

Under its Assistance Agreement with FSLIC, Home received the contractual right to establish and expand into additional branches in Missouri and Florida, a small amount of cash, the right to be compensated for certain future losses of the thrifts, and certain forbearances with respect to regulatory net worth requirements. Home also received the contractual rights to count the Supervisory Goodwill resulting from the acquisition to satisfy its regulatory capital requirements for 40 years. These contractual rights are referred to herein as the Regulatory

Accounting Principles Rights, or "RAP Rights." In 1989, Congress enacted the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), which provided for an accelerated phase-out of the RAP Rights over the five-year period from 1990 to 1994.

As noted above, one form of FSLIC Assistance that Home sought and received in connection with the acquisition of the Missouri and Florida thrifts was the right to establish branches in Missouri ("Missouri Branching Rights") and Florida ("Florida Branching Rights"). At the time of the acquisition, FHLBB regulations generally prohibited a thrift from owning or establishing out-of-state branches, *i.e.*, branches outside of its home state. In March 1981, FHLBB created an exception to this general rule to permit thrifts to acquire out-of-state branches via supervisory mergers. In September 1981, FHLBB further amended its regulations to permit thrifts who acquired out-of-state branches via supervisory mergers to establish (subject to FHLBB's approval) new branches in that other state.

2. Basis. Internal Revenue Code ("Code") section 1012 provides that the basis of property is equal to the cost of that property. Treas. Reg. § 1.1012-1(a) defines cost to equal the amount paid for the property, and the amount paid includes liabilities assumed by the buyer. *See e.g. Crane v. Commissioner*, 331 U.S. 1 (1947). Home purchased the Branching Rights and RAP Rights from FSLIC for an amount equal to the negative value of the thrifts it acquired, *i.e.*, the difference between the liabilities of the thrifts and the fair market value of the identifiable assets, net of other consideration received from FSLIC, was the purchase price for the Branching Rights and RAP Rights, ("Purchase Price"), giving Home a cost basis in the Branching Rights and RAP Rights of $268,948,125, under Code section 1012.

Alternatively, if the Branching Rights and RAP Rights are deemed, contrary to fact, to have been transferred to the Missouri and Florida thrifts prior to the merger of the thrifts into Home, Home received basis in these rights under Code section 362(b). The Branching Rights and RAP Rights constituted property received by the Missouri and Florida thrifts from FSLIC pursuant to section 406(f) of the National Housing Act, 12 U.S.C. § 1729(f). The receipt of the Branching Rights and RAP Rights was excludable from the income of the thrifts under Code section 597(a), in effect as of the date of the merger, but gave rise to basis under Code section 362. The Missouri and Florida thrifts received basis in the Branching Rights and RAP Rights equal to the fair market value of these rights on the date received, $268,948,125. Home's adjusted basis in the Branching Rights and RAP Rights received from the Missouri and Florida thrifts was the same as the basis of those assets in the hands of the thrifts immediately before the transfer. I.R.C. § 362(b).

3. Abandonment. In 1991, Home's management made the decision to terminate its branch banking operations in Missouri. In 1992 and 1993, Home engaged in a series of transactions in which it either exchanged or sold each of its branches in Missouri. At that time, Home left the Missouri branch banking market with no intention of reestablishing any other branches in Missouri. Home has not reentered the Missouri branch banking market since that time.

Claims

1. Amortization Deduction for the Missouri and Florida RAP Rights. Following the acquisition of the Missouri and Florida thrifts in 1981, Home was entitled to amortization deductions under section 167 with respect to the RAP Rights. As a result of the accelerated phase-out of the RAP Rights under FIRREA, Home is entitled to a section 167 amortization deduction of $35,859,750 in 1991. Alternatively, because the RAP Rights initially had a 40-year life, Home is entitled to a section 167 amortization deduction of $6,723,703 in 1991 for amortization of the RAP Rights.

2. Loss on Abandonment of Branching Rights. Home is entitled to a refund of tax resulting from a section 165 loss sustained upon the abandonment of a portion of its Branching Rights in 1991. Because Home made the affirmative decision to leave the Missouri market in 1991, it is entitled to an abandonment loss deduction under section 165 in that year.

3. Loss Deduction for the RAP Rights. (Alternative Claim) To the extent of any remaining unamortized basis in the RAP Rights, Home is entitled to a deduction for such amount in 1991, under section 165. In the alternative, if the RAP Rights were not subject to amortization, Home is entitled to a loss deduction under section 165 in the amount of Home's original basis in the RAP Rights.

4. Loss Deductions or Amortization Deductions for Other Rights Acquired. Under the Assistance Agreement, in addition to the Branching Rights and the RAP Rights, Home acquired other rights ("Other Rights"). To the extent that the amount paid by Home was attributable to Other Rights, Home acquired a cost basis in those assets under section 1012. In the alternative, if the Other Rights are deemed to have been transferred by FSLIC to the Missouri and Florida branches before the supervisory merger, Home received a basis in the Other Rights under section 362(b) in the merger.

If the Other Rights had a determinable useful life such that amortization deductions under section 167 are allowed for those Other Rights, Home is entitled to such amortization deductions under section 167 in 1991. If the Other Rights did not have a determinable useful life, so that amortization deductions were not permitted with respect to those rights, Home is entitled to a loss deduction under section 165 in 1991 if such Other Rights were abandoned or became worthless in that year.

5. Reduction in the Gain on the Sale of the Missouri Branches. (Alternative Claim) To the extent Home did not recover the basis of the assets relating to the Missouri branches as loss deductions under section 165, or through amortization deductions under section 167, such basis amounts are includible in the adjusted basis of the Missouri branches sold by Home, and Home is entitled to a corresponding adjustment to the gain or loss recognized under section 1001 on the sale of such branches.

6. Correlative and Computational Adjustments. In addition to the adjustments set forth above, Home is entitled to all correlative and computational adjustments and consequential

changes to any items (including, but not limited to, all types of credits (including but not limited to alternative minimum tax credits), net operating losses and charitable contributions, the carryback and carryover of the credits, losses, and deductions) required in the year in issue resulting from the adjustments in the year in issue.

7. Interest. Home requests a refund of assessed interest plus statutory interest as provided by law.

# June 2005 Claim for Tax Year 1994

June 2005 Claim for Tax Year 1994

Form **1120X** (Rev. December 2004) Department of the Treasury Internal Revenue Service

# Amended U.S. Corporation Income Tax Return

OMB No 1545-0132

For tax year ending ▶ DECEMBER 1994 (Enter month and year.)

Please Type or Print

Name: H.F. AHMANSON & CO. & CONSOLIDATED SUBSIDIARIES

Employer identification number: 95-0479700

Number, street, and room or suite no. (If a P.O. box, see instructions.): C/O WASHINGTON MUTUAL, 999 THIRD AVENUE, SUITE 1500

City or town, state, and ZIP code: SEATTLE, WA 98104

Telephone number (optional): (206) 377-4564

Enter name and address used on original return (If same as above, write "Same."): H.F. AHMANSON & CO & CONS SUBS., 4900 RIVERGRADE ROAD, IRWINDALE, CA 91706

Internal Revenue Service Center where original return was filed ▶ FRESNO, CALIFORNIA

**Fill in applicable items and use Part II on the back to explain any changes**

| **Part I** Income and Deductions (see instructions) | | (a) As originally reported or as previously adjusted | (b) Net change—increase or (decrease)—explain in Part II | (c) Correct amount |
|---|---|---|---|---|
| 1 Total income (Form 1120 or 1120-A, line 11) | 1 | 0 | 0 | 0 |
| 2 Total deductions (total of lines 27 and 29c, Form 1120, or lines 23 and 25c, Form 1120-A) | 2 | 0 | 0 | 0 |
| 3 Taxable income. Subtract line 2 from line 1 | 3 | -4,604,463 | -878,882,050 | -883,486,513 |
| 4 Tax (Form 1120, line 31, or Form 1120-A, line 27) | 4 | 1,113,787 | -1,113,787 | 0 |
| **Payments and Credits (see instructions)** | | | | |
| 5 a Overpayment in prior year allowed as a credit | 5a | 0 | 0 | 0 |
| b Estimated tax payments | 5b | 0 | 0 | 0 |
| c Refund applied for on Form 4466 | 5c | 0 | 0 | 0 |
| d Subtract line 5c from the sum of lines 5a and 5b | 5d | 0 | 0 | 0 |
| e Tax deposited with Form 7004 | 5e | 0 | 0 | 0 |
| f Credit from Form 2439 | 5f | 0 | 0 | 0 |
| g Credit for Federal tax on fuels | 5g | 0 | 0 | 0 |
| 6 Tax deposited or paid with (or after) the filing of the original return | 6 | | | 1,113,787 |
| 7 Add lines 5d through 6, column (c) | 7 | | | 1,113,787 |
| 8 Overpayment, if any, as shown on original return or as later adjusted | 8 | | | 0 |
| 9 Subtract line 8 from line 7 | 9 | | | 1,113,787 |
| **Tax Due or Overpayment (see instructions)** | | | | |
| 10 **Tax due.** Subtract line 9 from line 4, column (c). If paying by check, make it payable to the "United States Treasury" ▶ | 10 | | | 0 |
| 11 **Overpayment.** Subtract line 4, column (c), from line 9 ▶ | 11 | | | 1,113,787 |
| 12 Enter the amount of line 11 you want: **Credited to 20 __ estimated tax** ▶ **Refunded** ▶ | 12 | | | 1,113,787 |

**Sign Here** — Under penalties of perjury, I declare that I have filed an original return and that I have examined this amended return, including accompanying schedules and statements, and to the best of my knowledge and belief, this amended return is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

▶ [signature] Signature of officer — Date 6/27/05 — ▶ Senior Vice Pres. as Successor in Interest — Title

**Paid Preparer's Use Only** — Preparer's signature ▶ | Date | Check if self-employed ☐ | Preparer's SSN or PTIN

Firm's name (or yours if self-employed), address, and ZIP code ▶ | EIN | Phone no.

**For Privacy Act and Paperwork Reduction Act Notice, see page 4.** (HTA) — Form **1120X** (Rev. 12-2004)

**Part II** **Explanation of Changes to Items in Part I** (Enter the line number from page 1 for the items you are changing, and give the reason for each change. Show any computation in detail. Also, see **What To Attach** on page 3 of the instructions.)

If the change is due to a net operating loss carryback, a capital loss carryback, or a general business credit carryback, see **Carryback Claims** on page 3, and check here . . . . . ▶ ☐

THIS RETURN IS AMENDED TO CLAIM THE LOSS ON THE ABANDONMENT OF BRANCHING RIGHTS AS AN ORDINARY LOSS UNDER IRC SECTION 165.; THE AMORTIZATION FOR RAP RIGHTS UNDER IRC SECTION 167; AND TO DELETE THE 1994 ENVIRONMENTAL TAX AND NOL DEDUCTED. THE TOTAL AMOUNT OF IRC SECTION 165 LOSS IS $878,882,000, AND AMORTIZATION IS SHOWN ON THE ATTACHED STATEMENTS. THE ADJUSTMENTS ARE AS FOLLOWS:

BREAKDOWN OF CHANGE:

1. ORDINARY LOSS ON ABANDONMENT OF BRANCHING RIGHTS:

| | |
|---|---|
| Bowery Savings Bank | $(165,737,925) |
| Century Savings & Loan | $(182,200,000) |
| Texas and Illinois Savings & Loan Associations | $(227,181,000) |
| Missouri and Florida Savings & Loan Associations | $(268,948,125) |
| Ohio Savings & Loan Associations | $( 34,815,000) |
| TOTAL ORDINARY LOSS | $(878,882,000) |

Amended U.S. Corporation Income Tax Return
Form 1120X
For the Tax Year Ending December 31, 1994
Amortization and Loss Deductions
Relating to Bowery, a New York Thrift Institution

During 1994, Home Savings of America ("Home"), a federally chartered savings and loan association, was a wholly owned subsidiary of H.F. Ahmanson & Company ("Ahmanson") and a member of the affiliated group for which Ahmanson was the common parent corporation. Home is entitled to a refund for overpayment of 1994 taxes because the Internal Revenue Service ("IRS") erred by failing to allow Home amortization and loss deductions relating to contractual rights acquired pursuant to Home's acquisition of The Bowery Savings Bank ("Bowery"), an FDIC-insured, New York-chartered, mutual savings bank and Bowery's conversion to a federally chartered savings bank. Details of the loss and deductions in issue are set forth below.

Background

1. The Acquisition. On October 5, 1987, Home signed an acquisition agreement to acquire all of the stock of The Bowery Savings Bank ("Bowery"), an FDIC-insured, state chartered (New York), mutual savings bank with a negative net worth. Just prior to that agreement, private investors had purchased Bowery in a supervisory transaction. Pursuant to that supervisory transaction, Bowery and the FDIC entered into an assistance agreement. Because of that assistance agreement, Home's stock purchase was not final until the FDIC and Home agreed to amendments to the assistance agreement. The assistance agreement was amended (the "Amended Assistance Agreement") -- and Home's stock purchase became final -- on January 29, 1988.

Upon consummation of the stock purchase, Bowery became a wholly owned indirect subsidiary of Home. Home's stock purchase resulted in $165,737,925 in goodwill. Until 1992, Bowery's books were separate from Home's and Home accounted for that goodwill on Bowery's books.

In April 1992, Bowery's name was changed to Home Savings of America, The Bowery Division, SSB. On September 1, 1992, Bowery converted to a federally chartered savings bank, and changed its name to Home Savings of America, The Bowery Division, FSB. In connection with this conversion, the Office of Thrift Supervision ("OTS") agreed to permit Home to count -- under Regulatory Accounting Principles -- the remaining goodwill from the Bowery stock purchase toward Home's regulatory capital requirements. This right is referred to herein as the Regulatory Accounting Principles Right, or "RAP Right."

2. Basis. Internal Revenue Code ("Code") section 1012 provides that the basis of property is equal to the cost of that property. Treas. Reg. § 1.1012-1(a) defines cost to equal the amount paid for the property, and the amount paid includes liabilities assumed by the buyer. *See*

*e.g. Crane v. Commissioner*, 331 U.S. 1 (1947). Home purchased the RAP Right for an amount equal to the negative value of Bowery, *i.e.*, the difference between the liabilities of the thrift and the fair market value of the identifiable assets, net of other consideration received from FSLIC, was the purchase price for the RAP Right, ("Purchase Price"), giving Home a cost basis in the RAP Right of $165,737,925 under Code section 1012.

Claims

1. Amortization Deduction for the RAP Right. Following the acquisition and conversion of Bowery, Home was entitled to amortization deductions under section 167 with respect to the RAP Right. Home is entitled to a section 167 amortization deduction of $165,737,925 in 1994. Alternatively, because the RAP Right initially had a fixed life, Home is entitled to a section 167 amortization deduction in 1994 in an amount equal to the amortized portion of the cost basis for 1994 for amortization of the RAP Right.

2. Loss Deduction for the RAP Right. (Alternative Claim) To the extent of any remaining unamortized basis in the RAP Right, Home is entitled to a deduction for such amount in 1994, under section 165. In the alternative, if the RAP Right was not subject to amortization, Home is entitled to a loss deduction under section 165 in the amount of Home's original basis in the RAP Right.

3. Amortization Deduction for Other Rights Acquired. Under the Amended Assistance Agreement, in addition to the RAP Right, Home acquired other rights ("Other Rights"). To the extent that the amount paid by Home was attributable to Other Rights, Home acquired a cost basis in those Other Rights under section 1012.

The Other Rights had determinable useful lives such that amortization deductions under section 167 are allowed for the amortization of those Other Rights. Home is entitled to such amortization deductions under section 167 in 1994.

4. Correlative and Computational Adjustments. In addition to the adjustments set forth above, Home is entitled to all correlative and computational adjustments and consequential changes to any items (including, but not limited to, all types of credits (including but not limited to alternative minimum tax credits), net operating losses and charitable contributions, the carryback and carryover of the credits, losses, and deductions) required in the year in issue resulting from the adjustments in the year in issue.

5. Interest. Home requests a refund of assessed interest plus statutory interest as provided by law.

Amended U.S. Corporation Income Tax Return
Form 1120X
For the Tax Year Ending December 31, 1994
Amortization and Loss Deductions
Relating to Century, a New York Thrift Institution

During 1994, Home Savings of America ("Home"), a federally chartered savings and loan association, was a wholly owned subsidiary of H.F. Ahmanson & Company ("Ahmanson") and a member of the affiliated group for which Ahmanson was the common parent corporation. Home is entitled to a refund for overpayment of 1994 taxes because the Internal Revenue Service ("IRS") erred by failing to allow Home amortization and loss deductions relating to contractual rights acquired pursuant to the acquisition of Century, a New York thrift institution. Details of the loss and deductions in issue are set forth below.

## Background

1. The Acquisition. On August 10, 1984, Home acquired Century Federal Savings and Loan Association ("Century"), a New York thrift institution. Home's acquisition of the New York thrift qualified as a tax-free reorganization under section 368(a)(1)(G) of the Code. The acquisition of Century was a supervisory merger arranged by the Federal Savings and Loan Insurance Corporation ("FSLIC") and its parent, the Federal Home Loan Bank Board ("FHLBB"). At the time of the acquisition, there was a financial crisis in the savings and loan industry. FSLIC and the FHLBB had determined that FSLIC lacked the funds necessary to liquidate all of the failing thrifts, and therefore provided assistance ("FSLIC Assistance") to induce healthy thrifts to take over failing thrifts. FSLIC Assistance of one or more types was provided, including, but not limited to, cash, state branching rights, guarantees against losses, and the right to count the excess of the liabilities assumed over the fair market value of the identifiable assets acquired ("Supervisory Goodwill") toward regulatory capital requirements.

At the time Home acquired Century, the New York thrift was insolvent. FSLIC determined that Century had no going concern value, and that FSLIC Assistance was required to attract a buyer for the thrift.

Under its Assistance Agreement with FSLIC, Home received the contractual right to establish and expand into additional branches in New York ("Branching Rights"), cash, the right to be compensated for certain future losses of the thrifts, a loan evidenced by a term note, and certain forbearances with respect to regulatory net worth requirements. Home also received the contractual right to count the Supervisory Goodwill resulting from the acquisition to satisfy its regulatory capital requirements for 40 years. This right is referred to herein as the Regulatory Accounting Principles Right, or "RAP Right." In 1989, Congress enacted the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), which provided for an accelerated phase-out of the RAP Right over the five-year period from 1990 to 1994.

2. Basis. Internal Revenue Code ("Code") section 1012 provides that the basis of property is equal to the cost of that property. Treas. Reg. § 1.1012-1(a) defines cost to equal the amount paid for the property, and the amount paid includes liabilities assumed by the buyer. *See e.g. Crane v. Commissioner*, 331 U.S. 1 (1947). Home purchased the RAP Right from FSLIC for an amount equal to the negative value of the thrift acquired, *i.e.*, the difference between the liabilities of the thrift and the fair market value of the identifiable assets, net of other consideration received from FSLIC, was the purchase price for the RAP Right, ("Purchase Price"), giving Home a cost basis in the RAP Right of $182,200,000, under Code section 1012.

Alternatively, if the RAP Right is deemed, contrary to fact, to have been transferred to Century prior to the merger of the thrift into Home, Home received basis in the RAP Right under Code section 362(b). The RAP Right constituted property received by Century from FSLIC pursuant to section 406(f) of the National Housing Act, 12 U.S.C. § 1729(f). The receipt of the RAP Right was excludable from the income of the thrift under Code section 597(a), in effect as of the date of the merger, but gave rise to basis under Code section 362. Century received basis in the RAP Right equal to the fair market value of the RAP Right on the date received. Home's adjusted basis in the RAP Right received from Century was the same as the basis of that asset in the hands of the thrift immediately before the transfer. I.R.C. § 362(b).

## Claims

1. Amortization Deduction for the RAP Right. Following the acquisition of Century, Home was entitled to amortization deductions under section 167 with respect to the RAP Right. As a result of the accelerated phase-out of the RAP Right under FIRREA, Home is entitled to a section 167 amortization deduction of $25,811,667 in 1994. Alternatively, because the RAP Right initially had a 40-year life, Home is entitled to a section 167 amortization deduction of $4,555,000 in 1994 for amortization of the RAP Right.

2. Loss Deduction for the RAP Right. (Alternative Claim) To the extent of any remaining unamortized basis in the RAP Right, Home is entitled to a deduction for such amount in 1994, under section 165. In the alternative, if the RAP Right was not subject to amortization, Home is entitled to a loss deduction under section 165 in the amount of Home's original basis in the RAP Right.

3. Amortization Deduction for Other Rights Acquired. Under the Assistance Agreement, in addition to Branching Rights and the RAP Right, Home acquired other rights ("Other Rights"). To the extent that the amount paid by Home for Century, was attributable to Other Rights, Home acquired a cost basis in those Other Rights under section 1012. In the alternative, if the Other Rights are deemed to have been transferred by FSLIC to Century before the supervisory merger, Home received a basis in the Other Rights under section 362(b) in the merger.

The Other Rights had determinable useful lives such that amortization deductions under section 167 are allowed for the amortization of those Other Rights. Home is entitled to such amortization deductions under section 167 in 1994.

4. Correlative and Computational Adjustments. In addition to the adjustments set forth above, Home is entitled to all correlative and computational adjustments and consequential changes to any items (including, but not limited to, all types of credits (including but not limited to alternative minimum tax credits), net operating losses and charitable contributions, the carryback and carryover of the credits, losses, and deductions) required in the year in issue resulting from the adjustments in the year in issue.

5. Interest. Home requests a refund of assessed interest plus statutory interest as provided by law.

Amended U.S. Corporation Income Tax Return
Form 1120X
For the Tax Year Ending December 31, 1994
Abandonment Loss and Amortization Deductions
Relating to Texas and Illinois Thrift Institutions

During 1994, Home Savings of America ("Home"), a federally chartered savings and loan association, was a wholly owned subsidiary of H.F. Ahmanson & Company ("Ahmanson") and a member of the affiliated group for which Ahmanson was the common parent corporation. Home is entitled to a refund for overpayment of 1994 taxes because the Internal Revenue Service ("IRS") erred by failing to allow Home an abandonment loss and amortization deductions for contractual rights acquired pursuant to the acquisition of Texas and Illinois thrift institutions. Details of the loss and deductions in issue are set forth below. This claim is a substitute claim to the Form 1120X for 1994 filed on December 19, 2002, which claim the IRS disallowed in full on March 1, 2005.

Background

1. The Acquisition. On January 15, 1982, Home acquired Royal Federal Savings and Loan Association and El Centro Federal Savings and Loan Association, both Texas thrift institutions, and Hyde Park Federal Savings and Loan Association, an Illinois thrift institution. Home's acquisition of the Texas and Illinois thrifts qualified as tax-free reorganizations under section 368(a)(1)(G) of the Code. The acquisition of the Texas and Illinois thrift institutions was a supervisory merger arranged by the Federal Savings and Loan Insurance Corporation ("FSLIC") and its parent, the Federal Home Loan Bank Board ("FHLBB"). At the time of the acquisition, there was a financial crisis in the savings and loan industry. FSLIC and the FHLBB had determined that FSLIC lacked the funds necessary to liquidate all of the failing thrifts, and therefore provided assistance ("FSLIC Assistance") to induce healthy thrifts to take over failing thrifts. FSLIC Assistance of one or more types was provided, including, but not limited to, cash, state branching rights, guarantees against losses, and the right to count the excess of the liabilities assumed over the fair market value of the identifiable assets acquired ("Supervisory Goodwill") toward regulatory capital requirements.

At the time Home acquired the Texas and Illinois thrift institutions, each of the three was insolvent. FSLIC determined that the Texas and Illinois thrift institutions had no going concern value, and that FSLIC Assistance was required to attract a buyer for the thrifts.

Under its Assistance Agreement with FSLIC, Home received the contractual right to establish and expand into additional branches in Texas and Illinois, cash, the right to be compensated for certain future losses of the thrifts, and certain forbearances with respect to regulatory net worth requirements. Home also received the contractual rights to count the Supervisory Goodwill resulting from the acquisition to satisfy its regulatory capital requirements for 40 years. These rights are referred to herein as the Regulatory Accounting Principles Rights,

or "RAP Rights." In 1989, Congress enacted the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), which provided for an accelerated phase-out of the RAP Rights over the five-year period from 1990 to 1994.

The principal form of FSLIC Assistance that Home sought and received in connection with the acquisition of the Texas and Illinois thrifts was the right to establish branches in Texas ("Texas Branching Rights") and Illinois ("Illinois Branching Rights"). At the time of the acquisition, FHLBB regulations generally prohibited a thrift from owning or establishing out-of-state branches, *i.e.*, branches outside of its home state. In March 1981, FHLBB created an exception to this general rule to permit thrifts to acquire out-of-state branches via supervisory mergers. In September 1981, FHLBB further amended its regulations to permit thrifts who acquired out-of-state branches via supervisory mergers to establish (subject to FHLBB's approval) new branches in that other state. Therefore, at the time of the acquisition, interstate branching rights were valuable assets that thrifts could obtain only in the context of a supervisory merger.

2. Basis. Internal Revenue Code ("Code") section 1012 provides that the basis of property is equal to the cost of that property. Treas. Reg. § 1.1012-1(a) defines cost to equal the amount paid for the property, and the amount paid includes liabilities assumed by the buyer. *See e.g. Crane v. Commissioner*, 331 U.S. 1 (1947). Home purchased the Branching Rights and RAP Rights from FSLIC for an amount equal to the negative value of the thrifts it acquired, *i.e.*, the difference between the liabilities of the thrifts and the fair market value of the identifiable assets, net of other consideration received from FSLIC, was the purchase price for the Branching Rights and RAP Rights, ("Purchase Price"), giving Home a cost basis in the Branching Rights and RAP Rights of $227,181,000, under Code section 1012.

Alternatively, if the Branching Rights and RAP Rights are deemed, contrary to fact, to have been transferred to the Texas and Illinois thrifts prior to the merger of the thrifts into Home, Home received basis in these rights under Code section 362(b). The Branching Rights and RAP Rights constituted property received by the Texas and Illinois thrifts from FSLIC pursuant to section 406(f) of the National Housing Act, 12 U.S.C. § 1729(f). The receipt of the Branching Rights and RAP Rights was excludable from the income of the thrifts under Code section 597(a), in effect as of the date of the merger, but gave rise to basis under Code section 362. The Texas and Illinois thrifts received basis in the Branching Rights and RAP Rights equal to the fair market value of these rights on the date received, $227,181,000. Home's adjusted basis in the Branching Rights and RAP Rights received from the Texas and Illinois thrifts was the same as the basis of those assets in the hands of the thrifts immediately before the transfer. I.R.C. § 362(b).

3. Abandonment. In 1994, Home abandoned its Illinois Branching Rights. At that time, Home left the Illinois branch banking market with no intention of reestablishing any other branches in Illinois. Home has not reentered the Illinois branch banking market since that time.

Claims

1. Loss on Abandonment of Branching Rights. Home is entitled to a refund of tax resulting from a section 165 loss in the amount of $74,871,163 sustained upon the abandonment of its Illinois Branching Rights in 1994. Because Home made the affirmative decision to leave the Illinois market, sold or otherwise divested itself of all of the Illinois branches, and actually left that market in 1994, it thereby abandoned its Illinois Branching Rights in 1994. Home is therefore entitled to a deduction under section 165 in that year.

2. Amortization Deduction for the Texas and Illinois RAP Rights. Following the acquisition of the Texas and Illinois thrifts, Home was entitled to amortization deductions under section 167 with respect to the RAP Rights. As a result of the accelerated phase-out of the RAP Rights under FIRREA, Home is entitled to a section 167 amortization deduction of $30,290,800 in 1994. Alternatively, because the RAP Rights initially had a 40-year life, Home is entitled to a section 167 amortization deduction of $5,679,525 in 1994 for amortization of the RAP Rights.

3. Loss Deduction for the RAP Rights. (Alternative Claim) To the extent of any remaining unamortized basis in the RAP Rights, Home is entitled to a deduction for such amount in 1994, under section 165. In the alternative, if the RAP Rights were not subject to amortization, Home is entitled to a loss deduction under section 165 in the amount of Home's basis in the RAP Rights.

4. Loss Deductions or Amortization Deductions for Other Rights Acquired. Under the Assistance Agreement, in addition to the Branching Rights, and the RAP Rights, Home acquired other rights ("Other Rights"). To the extent that the amount paid by Home was attributable to Other Rights, Home acquired a cost basis in those assets under section 1012. In the alternative, if the Other Rights are deemed to have been transferred by FSLIC to the Texas and Illinois branches before the supervisory merger, Home received a basis in the Other Rights under section 362(b) in the merger.

If the Other Rights had a determinable useful life such that amortization deductions under section 167 are allowed for those Other Rights, Home is entitled to such amortization deductions under section 167 in 1994. If the Other Rights did not have a determinable useful life, so that amortization deductions were not permitted with respect to those rights, Home is entitled to a loss deduction under section 165 in 1994 if such Other Rights were abandoned or became worthless in that year.

5. Reduction in the Gain on the Sale of the Illinois Branches. (Alternative Claim) To the extent Home did not recover the basis of the assets relating to the Illinois branches as loss deductions under section 165, or through amortization deductions under section 167, such basis amounts are includible in the adjusted basis of the Illinois branches sold by Home, and Home is entitled to a corresponding adjustment to the gain or loss recognized under section 1001 on the sale of such branches in 1994.

6. Correlative and Computational Adjustments. In addition to the adjustments set forth above, Home is entitled to all correlative and computational adjustments and consequential changes to any items (including, but not limited to, all types of credits (including but not limited to alternative minimum tax credits), net operating losses and charitable contributions, the carryback and carryover of the credits, losses, and deductions) required in the year in issue resulting from the adjustments in the year in issue.

7. Interest. Home requests a refund of assessed interest plus statutory interest as provided by law.

Amended U.S. Corporation Income Tax Return
Form 1120X
For the Tax Year Ending December 31, 1994
Amortization and Loss Deductions
Relating to Missouri and Florida Thrift Institutions

During 1994, Home Savings of America ("Home"), a federally chartered savings and loan association, was a wholly owned subsidiary of H.F. Ahmanson & Company ("Ahmanson") and a member of the affiliated group for which Ahmanson was the common parent corporation. Home is entitled to a refund for overpayment of 1994 taxes because the Internal Revenue Service ("IRS") erred by failing to allow Home amortization and loss deductions relating to contractual rights acquired pursuant to the acquisition of Missouri and Florida thrift institutions. Details of the loss and deductions in issue are set forth below.

<u>Background</u>

1. <u>The Acquisition.</u> On December 17, 1981, Home acquired Security Federal Savings and Loan Association and Hamiltonian Federal Savings and Loan Association, both Missouri thrift institutions, and Southern Federal Savings and Loan Association, a Florida thrift institution. Home's acquisition of the Missouri and Florida thrifts was accomplished through a two-step merger transaction. The Missouri thrifts were first merged into the Florida thrift. The Florida thrift was then merged into Home. Both mergers qualified as tax-free reorganizations under section 368(a)(1)(G) of the Code. The acquisition of the Missouri and Florida thrift institutions was a supervisory merger arranged by the Federal Savings and Loan Insurance Corporation ("FSLIC") and its parent, the Federal Home Loan Bank Board ("FHLBB"). At the time of the acquisition, there was a financial crisis in the savings and loan industry. FSLIC and the FHLBB had determined that FSLIC lacked the funds necessary to liquidate all of the failing thrifts, and therefore provided assistance ("FSLIC Assistance") to induce healthy thrifts to take over failing thrifts. FSLIC Assistance of one or more types was provided, including, but not limited to, cash, state branching rights, guarantees against losses, and the right to count the excess of the liabilities assumed over the fair market value of the identifiable assets acquired ("Supervisory Goodwill") toward regulatory capital requirements.

At the time Home acquired the Missouri and Florida thrift institutions, each of the three was insolvent. FSLIC determined that the Missouri and Florida thrift institutions had no going concern value, and that FSLIC Assistance was required to attract a buyer for the thrifts.

Under its Assistance Agreement with FSLIC, Home received the contractual right to establish and expand into additional branches in Missouri and Florida ("Branching Rights"), a small amount of cash, the right to be compensated for certain future losses of the thrifts, and certain forbearances with respect to regulatory net worth requirements. Home also received the contractual rights to count the Supervisory Goodwill resulting from the acquisition to satisfy its regulatory capital requirements for 40 years. These rights are referred to herein as the

Regulatory Accounting Principles Rights, or "RAP Rights." In 1989, Congress enacted the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), which provided for an accelerated phase-out of the RAP Rights over the five-year period from 1990 to 1994.

2. Basis. Internal Revenue Code ("Code") section 1012 provides that the basis of property is equal to the cost of that property. Treas. Reg. § 1.1012-1(a) defines cost to equal the amount paid for the property, and the amount paid includes liabilities assumed by the buyer. *See e.g. Crane v. Commissioner*, 331 U.S. 1 (1947). Home purchased the RAP Rights from FSLIC for an amount equal to the negative value of the thrifts it acquired, *i.e.*, the difference between the liabilities of the thrifts and the fair market value of the identifiable assets, net of other consideration received from FSLIC, was the purchase price for the RAP Rights, ("Purchase Price"), giving Home a cost basis in the RAP Rights of $268,948,125, under Code section 1012.

Alternatively, if the RAP Rights are deemed, contrary to fact, to have been transferred to the Missouri and Florida thrifts prior to the merger of the thrifts into Home, Home received basis in the RAP Rights under Code section 362(b). The RAP Rights constituted property received by the Missouri and Florida thrifts from FSLIC pursuant to section 406(f) of the National Housing Act, 12 U.S.C. § 1729(f). The receipt of the RAP Rights was excludable from the income of the thrifts under Code section 597(a), in effect as of the date of the merger, but gave rise to basis under Code section 362. The Missouri and Florida thrifts received basis in the RAP Rights equal to the fair market value of the RAP Rights on the date received, $268,948,125. Home's adjusted basis in the RAP Rights received from the Missouri and Florida thrifts was the same as the basis of that asset in the hands of the thrifts immediately before the transfer. I.R.C. § 362(b).

Claims

1. Amortization Deduction for the RAP Rights. Following the acquisition of the Missouri and Florida thrifts, Home was entitled to amortization deductions under section 167 with respect to the RAP Rights. As a result of the accelerated phase-out of the RAP Rights under FIRREA, Home is entitled to a section 167 amortization deduction of $35,859,750 in 1994. Alternatively, because the RAP Rights initially had a 40-year life, Home is entitled to a section 167 amortization deduction of $6,723,703 in 1994 for amortization of the RAP Rights.

2. Loss Deduction for the RAP Rights. (Alternative Claim) To the extent of any remaining unamortized basis in the RAP Rights, Home is entitled to a deduction for such amount in 1994, under section 165. In the alternative, if the RAP Rights were not subject to amortization, Home is entitled to a loss deduction under section 165 in the amount of Home's original basis in the RAP Rights.

3. Amortization Deduction for Other Rights Acquired. Under the Assistance Agreement, in addition to Branching Rights and RAP Rights, Home acquired other rights ("Other Rights"). To the extent that the amount paid by Home was attributable to Other Rights, Home acquired a cost basis in those Other Rights under section 1012. In the alternative, if the Other Rights are deemed to have been transferred by FSLIC to the Missouri and Florida thrifts before the

supervisory merger, Home received a basis in the Other Rights under section 362(b) in the merger.

The Other Rights had determinable useful lives such that amortization deductions under section 167 are allowed for the amortization of those Other Rights. Home is entitled to such amortization deductions under section 167 in 1994.

4. Correlative and Computational Adjustments. In addition to the adjustments set forth above, Home is entitled to all correlative and computational adjustments and consequential changes to any items (including, but not limited to, all types of credits (including but not limited to alternative minimum tax credits), net operating losses and charitable contributions, the carryback and carryover of the credits, losses, and deductions) required in the year in issue resulting from the adjustments in the year in issue.

5. Interest. Home requests a refund of assessed interest plus statutory interest as provided by law.

Amended U.S. Corporation Income Tax Return
Form 1120X
For the Tax Year Ending December 31, 1994
Amortization and Loss Deductions
Relating to Ohio Thrift Institutions

During 1994, Home Savings of America ("Home"), a federally chartered savings and loan association, was a wholly owned subsidiary of H.F. Ahmanson & Company ("Ahmanson") and a member of the affiliated group for which Ahmanson was the common parent corporation. Home is entitled to a refund for overpayment of 1994 taxes because the Internal Revenue Service ("IRS") erred by failing to allow Home an abandonment loss and amortization deductions for contractual rights acquired pursuant to the acquisition of Ohio thrift institutions. Details of the loss and deductions in issue are set forth below.

Background

1. The Acquisition. On May 22, 1985, Home acquired Permanent Savings and Loan, Oxford Savings Association, Home Federal Savings and Loan, and American Savings Bank, all Ohio thrift institutions. On June 20, 1985, Home acquired Savings One Association, also an Ohio thrift institution. Home's acquisitions of the Ohio thrifts qualified as tax-free reorganizations under section 368(a)(1)(G) of the Code. The acquisitions of the Ohio thrifts were supervisory mergers arranged by the Federal Savings and Loan Insurance Corporation ("FSLIC") and its parent, the Federal Home Loan Bank Board ("FHLBB"). At the time of the acquisitions, there was a financial crisis in the savings and loan industry. FSLIC and the FHLBB had determined that FSLIC lacked the funds necessary to liquidate all of the failing thrifts, and therefore provided assistance ("FSLIC Assistance") to induce healthy thrifts to take over failing thrifts. FSLIC Assistance of one or more types was provided, including, but not limited to, cash, state branching rights, guarantees against losses, and the right to count the excess of the liabilities assumed over the fair market value of the identifiable assets acquired ("Supervisory Goodwill") toward regulatory capital requirements.

At the time Home acquired the Ohio thrifts, the thrifts were insolvent. FSLIC determined that the Ohio thrifts had no going concern value, and that FSLIC Assistance was required to attract a buyer for the thrifts.

Under its Assistance Agreement with FSLIC, Home received the contractual right to establish and expand into additional branches in Ohio ("Branching Rights"), cash, the right to be compensated for certain future losses of the thrifts, a loan evidenced by a term note, and certain forbearances with respect to regulatory net worth requirements. Home also received the contractual right to count the Supervisory Goodwill resulting from the acquisition to satisfy its regulatory capital requirements for 40 years. This right is referred to herein as the Regulatory Accounting Principles Right, or "RAP Right." In 1989, Congress enacted the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), which provided for an accelerated phase-out of the RAP Right over the five-year period from 1990 to 1994.

As noted above, one form of FSLIC Assistance that Home sought and received in connection with the acquisition of the Ohio thrifts was Branching Rights. At the time of the acquisition, FHLBB regulations generally prohibited a thrift from owning or establishing out-of-state branches, *i.e.*, branches outside of its home state. In March 1981, FHLBB created an exception to this general rule to permit thrifts to acquire out-of-state branches via supervisory mergers. In September 1981, FHLBB further amended its regulations to permit thrifts who acquired out-of-state branches via supervisory mergers to establish (subject to FHLBB's approval) new branches in that other state.

2. Basis. Internal Revenue Code ("Code") section 1012 provides that the basis of property is equal to the cost of that property. Treas. Reg. § 1.1012-1(a) defines cost to equal the amount paid for the property, and the amount paid includes liabilities assumed by the buyer. *See e.g. Crane v. Commissioner*, 331 U.S. 1 (1947). Home purchased the Ohio Branching Right and RAP Right from FSLIC for an amount equal to the negative value of the thrifts it acquired, *i.e.*, the difference between the liabilities of the thrifts and the fair market value of the identifiable assets, net of other consideration received from FSLIC, was the purchase price for the Ohio Branching Right and RAP Right, ("Purchase Price"), giving Home a cost basis in the Ohio Branching Right and RAP Right of $34,815,000 under Code section 1012.

Alternatively, if the Ohio Branching Right and RAP Right are deemed, contrary to fact, to have been transferred to the Ohio thrifts prior to the merger of the thrifts into Home, Home received basis in the Ohio Branching Right and RAP Right under Code section 362(b). The Ohio Branching Right and RAP Right constituted property received by the Ohio thrifts from FSLIC pursuant to section 406(f) of the National Housing Act, 12 U.S.C. § 1729(f). The receipt of the Ohio Branching Right and RAP Right was excludable from the income of the thrifts under Code section 597(a), in effect as of the date of the merger, but gave rise to basis under Code section 362. The Ohio thrifts received basis in the Ohio Branching Right and RAP Right equal to the fair market value of the Ohio Branching Right and RAP Right on the date received. Home's adjusted basis in the Ohio Branching Right and RAP Right was the same as the basis of those assets in the hands of the thrifts immediately before the transfer. I.R.C. § 362(b).

3. Abandonment. In 1994, Home's management made the decision to terminate its branch banking operations in Ohio. In 1994 and 1995, Home engaged in a series of transactions in which it either exchanged or sold each of its branches in Ohio. At that time, Home left the Ohio branch banking market with no intention of reestablishing any other branches in Ohio. Home has not reentered the Ohio branch banking market since that time.

Claims

1. Amortization Deduction for the Ohio RAP Right. Following the acquisition of the Ohio thrifts, Home was entitled to amortization deductions under section 167 with respect to the RAP Right. As a result of the accelerated phase-out of the RAP Right under FIRREA, Home is entitled to a section 167 amortization deduction of $5,077,188 in 1994. Alternatively, because the RAP Right initially had a 40-year life, Home is entitled to a section 167 amortization deduction of $870,375 in 1994 for amortization of the RAP Right.

2. Loss Deduction for the RAP Right. (Alternative Claim) To the extent of any remaining unamortized basis in the RAP Right, Home is entitled to a deduction for such amount in 1994, under section 165. In the alternative, if the RAP Right was not subject to amortization, Home is entitled to a loss deduction under section 165 in the amount of Home's original basis in the RAP Right.

3. Loss on Abandonment of Branching Rights. Home is entitled to a refund of tax resulting from a section 165 loss sustained upon the abandonment of its Ohio Branching Rights in 1994. Because Home made the affirmative decision to leave the Ohio market and it sold or otherwise divested itself of certain branches in 1994, Home is entitled to an abandonment loss deduction under section 165 in that year with respect to the divested branches.

4. Loss Deductions or Amortization Deductions for Other Rights Acquired. Under the Assistance Agreement, in addition to the Branching Rights, and the RAP Right, Home acquired other rights ("Other Rights"). To the extent that the amount paid by Home was attributable to Other Rights, Home acquired a cost basis in those assets under section 1012. In the alternative, if the Other Rights are deemed to have been transferred by FSLIC to the Ohio branches before the supervisory merger, Home received a basis in the Other Rights under section 362(b) in the merger.

If the Other Rights had a determinable useful life such that amortization deductions under section 167 are allowed for those Other Rights, Home is entitled to such amortization deductions under section 167 in 1994. If the Other Rights did not have a determinable useful life, so that amortization deductions were not permitted with respect to those rights, Home is entitled to a loss deduction under section 165 in 1994 if such Other Rights were abandoned or became worthless in that year.

5. Reduction in the Gain on the Sale of the Ohio Branches. (Alternative Claim) To the extent Home did not recover the basis of the assets relating to the Ohio branches as loss deductions under section 165, or through amortization deductions under section 167, such basis amounts are includible in the adjusted basis of the Ohio branches sold by Home, and Home is entitled to a corresponding adjustment to the gain or loss recognized under section 1001 on the sale of such branches in 1994.

6. Correlative and Computational Adjustments. In addition to the adjustments set forth above, Home is entitled to all correlative and computational adjustments and consequential changes to any items (including, but not limited to, all types of credits (including but not limited to alternative minimum tax credits), net operating losses and charitable contributions, the carryback and carryover of the credits, losses, and deductions) required in the year in issue resulting from the adjustments in the year in issue.

7. Interest. Home requests a refund of assessed interest plus statutory interest as provided by law.

June 2006 Claim for Tax Year 1991

June 2006 Claim for Tax Year 1991

Form **1120X** (Rev. December 2004) Department of the Treasury Internal Revenue Service

# Amended U.S. Corporation Income Tax Return

OMB No. 1545-0132

For tax year ending ▶ 12/1991 (Enter month and year.)

Please Type or Print

Name: H.F. Ahmanson & Co. & Cons. Subs. by Washington Mutual Bank F.A. as successor*

Employer identification number: 95-0479700

Number, street, and room or suite no. (If a P.O. box, see instructions.): c/o Washington Mutual, Inc.; PO Box 834, FIS 1520

City or town, state, and ZIP code: Seattle, WA 98111

Telephone number (optional):

Enter name and address used on original return (If same as above, write "Same.")

H.F. Ahmanson & Co. & Cons. Subs.; 4900 Rivergrade Road; Irwindale, CA 91706

Internal Revenue Service Center where original return was filed ▶ Ogden, UT

**Fill in applicable items and use Part II on the back to explain any changes**

| **Part I** Income and Deductions (see instructions) | | (a) As originally reported or as previously adjusted | (b) Net change—increase or (decrease)—explain in Part II | (c) Correct amount |
|---|---|---|---|---|
| 1 Total income (Form 1120 or 1120-A, line 11) | 1 | | 0 | |
| 2 Total deductions (total of lines 27 and 29c, Form 1120, or lines 23 and 25c, Form 1120-A) | 2 | | 0 | |
| 3 Taxable income. Subtract line 2 from line 1 | 3 | 601,053,338 | -601,053,338 | 0 |
| 4 Tax (Form 1120, line 31, or Form 1120-A, line 27) | 4 | 205,206,791 | -192,202,976 | 13,003,815 |
| **Payments and Credits (see instructions)** | | | | |
| 5a Overpayment in prior year allowed as a credit | 5a | 3,685,773 | 0 | 3,685,773 |
| b Estimated tax payments | 5b | 186,000,000 | 0 | 186,000,000 |
| c Refund applied for on Form 4466 | 5c | 0 | 0 | 0 |
| d Subtract line 5c from the sum of lines 5a and 5b | 5d | 189,685,773 | 0 | 189,685,773 |
| e Tax deposited with Form 7004 | 5e | 25,000,000 | 0 | 25,000,000 |
| f Credit from Form 2439 | 5f | 0 | 0 | 0 |
| g Credit for Federal tax on fuels | 5g | 0 | 0 | 0 |

INTERNAL REVENUE SERVICE RECEIVED JUN 30 2006 SEATTLE, WA

| | | |
|---|---|---|
| 6 Tax deposited or paid with (or after) the filing of the original return | 6 | 0 |
| 7 Add lines 5d through 6, column (c) | 7 | 214,685,773 |
| 8 Overpayment, if any, as shown on original return or as later adjusted | 8 | 12,283,664 |
| 9 Subtract line 8 from line 7 | 9 | 202,402,109 |
| **Tax Due or Overpayment (see instructions)** | | |
| 10 Tax due. Subtract line 9 from line 4, column (c). If paying by check, make it payable to the "United States Treasury" ▶ | 10 | 0 |
| 11 Overpayment. Subtract line 4, column (c), from line 9 ▶ | 11 | 189,398,294 |
| 12 Enter the amount of line 11 you want: Credited to 20 ___ estimated tax ▶ Refunded ▶ | 12 | 189,398,294 |

**Sign Here** Under penalties of perjury, I declare that I have filed an original return and that I have examined this amended return, including accompanying schedules and statements, and to the best of my knowledge and belief, this amended return is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

▶ [signature] Signature of officer — Date 6/30/06 — ▶ Sr. V.P. Title

**Paid Preparer's Use Only** Preparer's signature ▶ Date — Check if self-employed ☐ — Preparer's SSN or PTIN

Firm's name (or yours if self-employed), address, and ZIP code ▶ — EIN — Phone no.

For Privacy Act and Paperwork Reduction Act Notice, see page 4. (HTA) Form **1120X** (Rev.

Form 1120X (Rev. 12-2004) H.F. Ahmanson & Co. & Cons. Subs., by Washington M 95-0479700 Page 2

**Part II** **Explanation of Changes to Items in Part I** (Enter the line number from page 1 for the items you are changing, and give the reason for each change. Show any computation in detail. Also, see **What To Attach** on page 3 of the instructions.)

If the change is due to a net operating loss carryback, a capital loss carryback, or a general business credit carryback, see **Carryback Claims** on page 3, and check here ► [X]

THIS RETURN IS AMENDED TO CLAIM THE NET OPERATING LOSS FROM 1994 AS A RESULT OF AN AMENDED RETURN FILED FOR THAT YEAR. THE TOTAL AMOUNT CLAIMED IS $601,053,338.

1. NET OPERATING LOSS CARRYBACK FROM 1994 DUE TO AMENDMENT MADE TO 1994 RETURN FOR LOSS ON THE ABANDONMENT OF BRANCHING RIGHTS $601,053,338

*On October 1, 1998, Home Savings of America was merged with and into Washington Mutual Bank F.A. Washington Mutual Bank F.A. is the successor in interest to Home Savings of America.

Form **1120X** (Rev. 12-2004)

Amended U.S. Corporation Income Tax Return
Form 1120X
For the Tax Year Ending December 31, 1991
Net Operating Loss ("NOL") Carryback

During 1991, Home Savings of America ("Home"), a federally chartered savings and loan association, was a wholly owned subsidiary of H.F. Ahmanson & Company ("Ahmanson") and a member of the affiliated group for which Ahmanson was the common parent corporation. Ahmanson is entitled to a refund for overpayment of 1991 taxes as a result of an NOL carryback from 1994. The NOL arises from amortization and abandonment loss deductions the Internal Revenue Service ("IRS") failed to allow Home for the 1994 tax year, including the loss from the abandonment of Illinois Branching Rights. Details of the deductions are set forth in the refund claims for the year ended December 31, 1994, which are attached as Exhibit 1. This claim is an additional claim to the Form 1120X for 1991 filed with the IRS on June 28, 2005.

In addition, Ahmanson requests a refund of assessed interest plus statutory interest as provided by law.

June 2006 Claim for Tax Year 1994

June 2006 Claim for Tax Year 1994

Form **1120X** (Rev. December 2004) Department of the Treasury Internal Revenue Service

# Amended U.S. Corporation Income Tax Return

OMB No. 1545-0132

For tax year ending ▶ 12/1994 (Enter month and year.)

Please Type or Print

Name: H.F. Ahmanson & Co. & Cons. Subs., by Washington Mutual, Inc. as successor*

Employer identification number: 95-0479700

Number, street, and room or suite no. (If a P.O. box, see instructions.): c/o Washington Mutual, Inc.; PO Box 834, FIS 1520

City or town, state, and ZIP code: Seattle, WA 98111

Telephone number (optional):

Enter name and address used on original return (If same as above, write "Same.")

H.F. Ahmanson & Co. & Cons. Subs.; 4900 Rivergrade Road; Irwindale, CA 91706

Internal Revenue Service Center where original return was filed ▶ Ogden, UT

**Fill in applicable items and use Part II on the back to explain any changes**

**Part I** Income and Deductions (see instructions)

| | | | (a) As originally reported or as previously adjusted | (b) Net change—increase or (decrease)—explain in Part II | (c) Correct amount |
|---|---|---|---|---|---|
| 1 | Total income (Form 1120 or 1120-A, line 11) | 1 | 3,510,549,140 | 0 | 3,510,549,140 |
| 2 | Total deductions (total of lines 27 and 29c, Form 1120, or lines 23 and 25c, Form 1120-A) | 2 | 3,510,549,140 | 896,450,125 | 4,406,999,265 |
| 3 | Taxable income. Subtract line 2 from line 1 | 3 | 0 | -896,450,125 | -896,450,125 |
| 4 | Tax (Form 1120, line 31, or Form 1120-A, line 27) | 4 | 558,661 | -558,661 | 0 |

**Payments and Credits (see instructions)**

| | | | | | |
|---|---|---|---|---|---|
| 5 a | Overpayment in prior year allowed as a credit | 5a | 740,825 | 0 | 740,825 |
| b | Estimated tax payments | 5b | 0 | 0 | 0 |
| c | Refund applied for on Form 4466 | 5c | 0 | 0 | 0 |
| d | Subtract line 5c from the sum of lines 5a and 5b | 5d | 740,825 | 0 | 740,825 |
| e | Tax deposited with Form 7004 | 5e | 0 | 0 | 0 |
| f | Credit from Form 2439 | 5f | 0 | 0 | 0 |
| g | Credit for Federal tax on fuels | 5g | 0 | 0 | 0 |

| | | | |
|---|---|---|---|
| 6 | Tax deposited or paid with (or after) the filing of the original return | 6 | 0 |
| 7 | Add lines 5d through 6, column (c) | 7 | 740,825 |
| 8 | Overpayment, if any, as shown on original return or as later adjusted | 8 | 289,883 |
| 9 | Subtract line 8 from line 7 | 9 | 450,942 |

INTERNAL REVENUE SERVICE-EA RECEIVED JUN 30 2006 SEATTLE, WA

**Tax Due or Overpayment (see instructions)**

| | | | |
|---|---|---|---|
| 10 | Tax due. Subtract line 9 from line 4, column (c). If paying by check, make it payable to the "United States Treasury" ▶ | 10 | 0 |
| 11 | Overpayment. Subtract line 4, column (c), from line 9 ▶ | 11 | 450,942 |
| 12 | Enter the amount of line 11 you want: Credited to 20__ estimated tax ▶ Refunded ▶ | 12 | 450,942 |

**Sign Here**

Under penalties of perjury, I declare that I have filed an original return and that I have examined this amended return, including accompanying schedules and statements, and to the best of my knowledge and belief, this amended return is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

▶ [signature] Signature of officer — Date 6/30/06 — ▶ Sr. V. P. Title

**Paid Preparer's Use Only**

Preparer's signature ▶ — Date — Check if self-employed ☐ — Preparer's SSN or PTIN

Firm's name (or yours if self-employed), address, and ZIP code ▶ — EIN — Phone no.

For Privacy Act and Paperwork Reduction Act Notice, see page 4. (HTA) Form **1120X** (Rev. 12-2004)

**Part II** **Explanation of Changes to Items in Part I** (Enter the line number from page 1 for the items you are changing, and give the reason for each change. Show any computation in detail. Also, see **What To Attach** on page 3 of the instructions.)

If the change is due to a net operating loss carryback, a capital loss carryback, or a general business credit carryback, see **Carryback Claims** on page 3, and check here . . . . . . . . ▶ ☐

BRANCHING RIGHTS ABANDONMENT LOSS - STATEMENT 1

*On October 1, 1998, H.F. Ahmanson was merged with and into Washington Mutual, Inc.

Washington Mutual, Inc. is the successor in interest to H.F. Ahmanson.

Amended U.S. Corporation Income Tax Return
Form 1120X
For the Tax Year Ending December 31, 1994
Amortization and Loss Deductions
Relating to Bowery, a New York Federally Chartered Savings Bank

During 1994, Home Savings of America ("Home"), a federally chartered savings and loan association, was a wholly owned subsidiary of H.F. Ahmanson & Company ("Ahmanson") and a member of the affiliated group for which Ahmanson was the common parent corporation. Home is entitled to a refund for overpayment of 1994 taxes because the Internal Revenue Service ("IRS") erred by failing to allow Home amortization and loss deductions relating to contractual rights acquired pursuant to Home's acquisition of The Bowery Savings Bank ("Bowery") and Bowery's conversion to a federally chartered savings bank. Details of the deductions in issue are set forth below.

<u>Background</u>

1. <u>The Acquisition.</u> On October 5, 1987, Home signed an acquisition agreement to acquire all of the stock of The Bowery Savings Bank ("Bowery"), an FDIC-insured, New York-chartered, mutual savings bank. Before that agreement, private investors had purchased Bowery in a supervisory transaction. In that supervisory transaction, Bowery and the FDIC entered into an assistance agreement. Because of that assistance agreement, Home's stock purchase was not final until the FDIC and Home agreed to amendments to the assistance agreement. The assistance agreement was amended (the "Amended Assistance Agreement") -- and Home's stock purchase became final -- on January 29, 1988.

Upon consummation of the stock purchase, Bowery became a wholly owned indirect subsidiary of Home. Home's stock purchase resulted in $183,306,000 in goodwill, which Bowery could use for capital compliance purposes under the Amended Assistance Agreement. Until 1992, Bowery's books were separate from Home's books and Home accounted for that goodwill on Bowery's books.

In April 1992, Bowery's name was changed to Home Savings of America, The Bowery Division, SSB. On September 1, 1992, Bowery converted to a federally chartered savings bank, and changed its name to Home Savings of America, The Bowery Division, FSB. In connection with this conversion, Home counted -- under Regulatory Accounting Principles -- the remaining goodwill from the Bowery stock purchase toward Home's regulatory capital requirements. This right is referred to herein as the Regulatory Accounting Principles Right, or "RAP Right." Under the Amended Assistance Agreement, in addition to the RAP Right, Home acquired other rights ("Other Rights").

2. <u>Basis.</u> Internal Revenue Code ("Code") section 1012 provides that the basis of property is equal to the cost of that property. Treas. Reg. § 1.1012-1(a) defines cost to equal the

353302.1

amount paid for the property. Home purchased the RAP Right and Other Rights, giving Home a cost basis in the RAP Right and Other Rights of $183,306,000 under Code section 1012.

Claims

1. Amortization Deduction for the RAP Right. Following the acquisition and conversion of Bowery, Home was entitled to amortization deductions under section 167 with respect to the RAP Right. Home is entitled to a section 167 amortization deduction of $183,306,000 in 1994. Alternatively, because the RAP Right initially had a fixed life, Home is entitled to a section 167 amortization deduction in 1994 in an amount equal to the amortized portion of the cost basis for 1994 for amortization of the RAP Right.

2. Loss Deduction for the RAP Right. (Alternative Claim) To the extent of any remaining unamortized basis in the RAP Right, Home is entitled to a deduction for such amount in 1994, under section 165. In the alternative, if the RAP Right was not subject to amortization, Home is entitled to a loss deduction under section 165 in the amount of Home's original basis in the RAP Right.

3. Amortization Deduction for Other Rights Acquired. Under the Amended Assistance Agreement, in addition to the RAP Right, Home acquired Other Rights. To the extent that the amount paid by Home was attributable to Other Rights, Home acquired a cost basis in those Other Rights under section 1012.

The Other Rights had determinable useful lives such that amortization deductions under section 167 are allowed for the amortization of those Other Rights. Home is entitled to such amortization deductions under section 167 in 1994.

4. Correlative and Computational Adjustments. In addition to the adjustments set forth above, Home is entitled to all correlative and computational adjustments and consequential changes to any items (including, but not limited to, all types of credits (including but not limited to alternative minimum tax credits), net operating losses and charitable contributions, the carryback and carryover of the credits, losses, and deductions) required in the year in issue resulting from the adjustments in the year in issue.

5. Interest. Home requests a refund of assessed interest plus statutory interest as provided by law.

Amended U.S. Corporation Income Tax Return
Form 1120X
For the Tax Year Ending December 31, 1994
Amortization and Loss Deductions
Relating to Century, a New York Thrift Institution

During 1994, Home Savings of America ("Home"), a federally chartered savings and loan association, was a wholly owned subsidiary of H.F. Ahmanson & Company ("Ahmanson") and a member of the affiliated group for which Ahmanson was the common parent corporation. Home is entitled to a refund for overpayment of 1994 taxes because the Internal Revenue Service ("IRS") erred by failing to allow Home amortization and loss deductions relating to contractual rights acquired pursuant to the acquisition of Century, a New York thrift institution. Details of the loss and deductions in issue are set forth below.

Background

1. The Acquisition. On August 10, 1984, Home acquired Century Federal Savings and Loan Association ("Century"), a New York thrift institution. Home's acquisition of the New York thrift qualified as a tax-free reorganization under section 368(a)(1)(G) of the Code. The acquisition of Century was a supervisory merger arranged by the Federal Savings and Loan Insurance Corporation ("FSLIC") and its parent, the Federal Home Loan Bank Board ("FHLBB"). At the time of the acquisition, there was a financial crisis in the savings and loan industry. FSLIC and the FHLBB had determined that FSLIC lacked the funds necessary to liquidate all of the failing thrifts, and therefore provided assistance ("FSLIC Assistance") to induce healthy thrifts to take over failing thrifts. FSLIC Assistance of one or more types was provided, including, but not limited to, cash, state branching rights, guarantees against losses, and the right to count the excess of the liabilities assumed over the fair market value of the identifiable assets acquired ("Supervisory Goodwill") toward regulatory capital requirements.

At the time Home acquired Century, the New York thrift was insolvent. FSLIC determined that Century had no going concern value, and that FSLIC Assistance was required to attract a buyer for the thrift.

Under its Assistance Agreement with FSLIC, Home received the contractual right to establish and expand into additional branches in New York ("Branching Rights"), cash, the right to be compensated for certain future losses of the thrifts, a loan evidenced by a term note, and certain forbearances with respect to regulatory net worth requirements. Home also received the contractual right to count the Supervisory Goodwill resulting from the acquisition to satisfy its regulatory capital requirements for 40 years. This right is referred to herein as the Regulatory Accounting Principles Right, or "RAP Right." In 1989, Congress enacted the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), which provided for an accelerated phase-out of the RAP Right over the five-year period from 1990 to 1994.

2. Basis. Internal Revenue Code ("Code") section 1012 provides that the basis of property is equal to the cost of that property. Treas. Reg. § 1.1012-1(a) defines cost to equal the amount paid for the property, and the amount paid includes liabilities assumed by the buyer. *See e.g. Crane v. Commissioner*, 331 U.S. 1 (1947). Home purchased the RAP Right from FSLIC for an amount equal to the negative value of the thrift acquired, *i.e.*, the difference between the liabilities of the thrift and the fair market value of the identifiable assets, net of other consideration received from FSLIC, was the purchase price for the RAP Right, ("Purchase Price"), giving Home a cost basis in the RAP Right of $182,200,000, under Code section 1012.

Alternatively, if the RAP Right is deemed, contrary to fact, to have been transferred to Century prior to the merger of the thrift into Home, Home received basis in the RAP Right under Code section 362(b). The RAP Right constituted property received by Century from FSLIC pursuant to section 406(f) of the National Housing Act, 12 U.S.C. § 1729(f). The receipt of the RAP Right was excludable from the income of the thrift under Code section 597(a), in effect as of the date of the merger, but gave rise to basis under Code section 362. Century received basis in the RAP Right equal to the fair market value of the RAP Right on the date received. Home's adjusted basis in the RAP Right received from Century was the same as the basis of that asset in the hands of the thrift immediately before the transfer. I.R.C. § 362(b).

Claims

1. Amortization Deduction for the RAP Right. Following the acquisition of Century, Home was entitled to amortization deductions under section 167 with respect to the RAP Right. As a result of the accelerated phase-out of the RAP Right under FIRREA, Home is entitled to a section 167 amortization deduction of $25,811,667 in 1994. Alternatively, because the RAP Right initially had a 40-year life, Home is entitled to a section 167 amortization deduction of $4,555,000 in 1994 for amortization of the RAP Right.

2. Loss Deduction for the RAP Right. (Alternative Claim) To the extent of any remaining unamortized basis in the RAP Right, Home is entitled to a deduction for such amount in 1994, under section 165. In the alternative, if the RAP Right was not subject to amortization, Home is entitled to a loss deduction under section 165 in the amount of Home's original basis in the RAP Right.

3. Amortization Deduction for Other Rights Acquired. Under the Assistance Agreement, in addition to Branching Rights and the RAP Right, Home acquired other rights ("Other Rights"). To the extent that the amount paid by Home for Century, was attributable to Other Rights, Home acquired a cost basis in those Other Rights under section 1012. In the alternative, if the Other Rights are deemed to have been transferred by FSLIC to Century before the supervisory merger, Home received a basis in the Other Rights under section 362(b) in the merger.

The Other Rights had determinable useful lives such that amortization deductions under section 167 are allowed for the amortization of those Other Rights. Home is entitled to such amortization deductions under section 167 in 1994.

4. Correlative and Computational Adjustments. In addition to the adjustments set forth above, Home is entitled to all correlative and computational adjustments and consequential changes to any items (including, but not limited to, all types of credits (including but not limited to alternative minimum tax credits), net operating losses and charitable contributions, the carryback and carryover of the credits, losses, and deductions) required in the year in issue resulting from the adjustments in the year in issue.

5. Interest. Home requests a refund of assessed interest plus statutory interest as provided by law.

Amended U.S. Corporation Income Tax Return
Form 1120X
For the Tax Year Ending December 31, 1994
Abandonment Loss and Amortization Deductions
Relating to Texas and Illinois Thrift Institutions

During 1994, Home Savings of America ("Home"), a federally chartered savings and loan association, was a wholly owned subsidiary of H.F. Ahmanson & Company ("Ahmanson") and a member of the affiliated group for which Ahmanson was the common parent corporation. Home is entitled to a refund for overpayment of 1994 taxes because the Internal Revenue Service ("IRS") erred by failing to allow Home an abandonment loss and amortization deductions for contractual rights acquired pursuant to the acquisition of Texas and Illinois thrift institutions. Details of the loss and deductions in issue are set forth below. This claim is a substitute claim to the Form 1120X for 1994 filed on December 19, 2002, which claim the IRS disallowed in full on March 1, 2005.

## Background

1. The Acquisition. On January 15, 1982, Home acquired Royal Federal Savings and Loan Association and El Centro Federal Savings and Loan Association, both Texas thrift institutions, and Hyde Park Federal Savings and Loan Association, an Illinois thrift institution. Home's acquisition of the Texas and Illinois thrifts qualified as tax-free reorganizations under section 368(a)(1)(G) of the Code. The acquisition of the Texas and Illinois thrift institutions was a supervisory merger arranged by the Federal Savings and Loan Insurance Corporation ("FSLIC") and its parent, the Federal Home Loan Bank Board ("FHLBB"). At the time of the acquisition, there was a financial crisis in the savings and loan industry. FSLIC and the FHLBB had determined that FSLIC lacked the funds necessary to liquidate all of the failing thrifts, and therefore provided assistance ("FSLIC Assistance") to induce healthy thrifts to take over failing thrifts. FSLIC Assistance of one or more types was provided, including, but not limited to, cash, state branching rights, guarantees against losses, and the right to count the excess of the liabilities assumed over the fair market value of the identifiable assets acquired ("Supervisory Goodwill") toward regulatory capital requirements.

At the time Home acquired the Texas and Illinois thrift institutions, each of the three was insolvent. FSLIC determined that the Texas and Illinois thrift institutions had no going concern value, and that FSLIC Assistance was required to attract a buyer for the thrifts.

Under its Assistance Agreement with FSLIC, Home received the contractual right to establish and expand into additional branches in Texas and Illinois, cash, the right to be compensated for certain future losses of the thrifts, and certain forbearances with respect to regulatory net worth requirements. Home also received the contractual rights to count the Supervisory Goodwill resulting from the acquisition to satisfy its regulatory capital requirements for 40 years. These rights are referred to herein as the Regulatory Accounting Principles Rights,

or "RAP Rights." In 1989, Congress enacted the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), which provided for an accelerated phase-out of the RAP Rights over the five-year period from 1990 to 1994.

The principal form of FSLIC Assistance that Home sought and received in connection with the acquisition of the Texas and Illinois thrifts was the right to establish branches in Texas ("Texas Branching Rights") and Illinois ("Illinois Branching Rights"). At the time of the acquisition, FHLBB regulations generally prohibited a thrift from owning or establishing out-of-state branches, *i.e.*, branches outside of its home state. In March 1981, FHLBB created an exception to this general rule to permit thrifts to acquire out-of-state branches via supervisory mergers. In September 1981, FHLBB further amended its regulations to permit thrifts who acquired out-of-state branches via supervisory mergers to establish (subject to FHLBB's approval) new branches in that other state. Therefore, at the time of the acquisition, interstate branching rights were valuable assets that thrifts could obtain only in the context of a supervisory merger.

2. Basis. Internal Revenue Code ("Code") section 1012 provides that the basis of property is equal to the cost of that property. Treas. Reg. § 1.1012-1(a) defines cost to equal the amount paid for the property, and the amount paid includes liabilities assumed by the buyer. *See e.g. Crane v. Commissioner*, 331 U.S. 1 (1947). Home purchased the Branching Rights and RAP Rights from FSLIC for an amount equal to the negative value of the thrifts it acquired, *i.e.*, the difference between the liabilities of the thrifts and the fair market value of the identifiable assets, net of other consideration received from FSLIC, was the purchase price for the Branching Rights and RAP Rights, ("Purchase Price"), giving Home a cost basis in the Branching Rights and RAP Rights of $227,181,000, under Code section 1012.

Alternatively, if the Branching Rights and RAP Rights are deemed, contrary to fact, to have been transferred to the Texas and Illinois thrifts prior to the merger of the thrifts into Home, Home received basis in these rights under Code section 362(b). The Branching Rights and RAP Rights constituted property received by the Texas and Illinois thrifts from FSLIC pursuant to section 406(f) of the National Housing Act, 12 U.S.C. § 1729(f). The receipt of the Branching Rights and RAP Rights was excludable from the income of the thrifts under Code section 597(a), in effect as of the date of the merger, but gave rise to basis under Code section 362. The Texas and Illinois thrifts received basis in the Branching Rights and RAP Rights equal to the fair market value of these rights on the date received, $227,181,000. Home's adjusted basis in the Branching Rights and RAP Rights received from the Texas and Illinois thrifts was the same as the basis of those assets in the hands of the thrifts immediately before the transfer. I.R.C. § 362(b).

3. Abandonment. In 1994, Home abandoned its Illinois Branching Rights. At that time, Home left the Illinois branch banking market with no intention of reestablishing any other branches in Illinois. Home has not reentered the Illinois branch banking market since that time.

<u>Claims</u>

1. <u>Loss on Abandonment of Branching Rights</u>. Home is entitled to a refund of tax resulting from a section 165 loss in the amount of $74,871,163 sustained upon the abandonment of its Illinois Branching Rights in 1994. Because Home made the affirmative decision to leave the Illinois market, sold or otherwise divested itself of all of the Illinois branches, and actually left that market in 1994, it thereby abandoned its Illinois Branching Rights in 1994. Home is therefore entitled to a deduction under section 165 in that year.

2. <u>Amortization Deduction for the Texas and Illinois RAP Rights</u>. Following the acquisition of the Texas and Illinois thrifts, Home was entitled to amortization deductions under section 167 with respect to the RAP Rights. As a result of the accelerated phase-out of the RAP Rights under FIRREA, Home is entitled to a section 167 amortization deduction of $30,290,800 in 1994. Alternatively, because the RAP Rights initially had a 40-year life, Home is entitled to a section 167 amortization deduction of $5,679,525 in 1994 for amortization of the RAP Rights.

3. <u>Loss Deduction for the RAP Rights</u>. (Alternative Claim) To the extent of any remaining unamortized basis in the RAP Rights, Home is entitled to a deduction for such amount in 1994, under section 165. In the alternative, if the RAP Rights were not subject to amortization, Home is entitled to a loss deduction under section 165 in the amount of Home's basis in the RAP Rights.

4. <u>Loss Deductions or Amortization Deductions for Other Rights Acquired</u>. Under the Assistance Agreement, in addition to the Branching Rights, and the RAP Rights, Home acquired other rights ("Other Rights"). To the extent that the amount paid by Home was attributable to Other Rights, Home acquired a cost basis in those assets under section 1012. In the alternative, if the Other Rights are deemed to have been transferred by FSLIC to the Texas and Illinois branches before the supervisory merger, Home received a basis in the Other Rights under section 362(b) in the merger.

If the Other Rights had a determinable useful life such that amortization deductions under section 167 are allowed for those Other Rights, Home is entitled to such amortization deductions under section 167 in 1994. If the Other Rights did not have a determinable useful life, so that amortization deductions were not permitted with respect to those rights, Home is entitled to a loss deduction under section 165 in 1994 if such Other Rights were abandoned or became worthless in that year.

5. <u>Reduction in the Gain on the Sale of the Illinois Branches</u>. (Alternative Claim) To the extent Home did not recover the basis of the assets relating to the Illinois branches as loss deductions under section 165, or through amortization deductions under section 167, such basis amounts are includible in the adjusted basis of the Illinois branches sold by Home, and Home is entitled to a corresponding adjustment to the gain or loss recognized under section 1001 on the sale of such branches in 1994.

6. Correlative and Computational Adjustments. In addition to the adjustments set forth above, Home is entitled to all correlative and computational adjustments and consequential changes to any items (including, but not limited to, all types of credits (including but not limited to alternative minimum tax credits), net operating losses and charitable contributions, the carryback and carryover of the credits, losses, and deductions) required in the year in issue resulting from the adjustments in the year in issue.

7. Interest. Home requests a refund of assessed interest plus statutory interest as provided by law.

Amended U.S. Corporation Income Tax Return
Form 1120X
For the Tax Year Ending December 31, 1994
Amortization and Loss Deductions
Relating to Missouri and Florida Thrift Institutions

During 1994, Home Savings of America ("Home"), a federally chartered savings and loan association, was a wholly owned subsidiary of H.F. Ahmanson & Company ("Ahmanson") and a member of the affiliated group for which Ahmanson was the common parent corporation. Home is entitled to a refund for overpayment of 1994 taxes because the Internal Revenue Service ("IRS") erred by failing to allow Home amortization and loss deductions relating to contractual rights acquired pursuant to the acquisition of Missouri and Florida thrift institutions. Details of the loss and deductions in issue are set forth below.

<u>Background</u>

1. <u>The Acquisition.</u> On December 17, 1981, Home acquired Security Federal Savings and Loan Association and Hamiltonian Federal Savings and Loan Association, both Missouri thrift institutions, and Southern Federal Savings and Loan Association, a Florida thrift institution. Home's acquisition of the Missouri and Florida thrifts was accomplished through a two-step merger transaction. The Missouri thrifts were first merged into the Florida thrift. The Florida thrift was then merged into Home. Both mergers qualified as tax-free reorganizations under section 368(a)(1)(G) of the Code. The acquisition of the Missouri and Florida thrift institutions was a supervisory merger arranged by the Federal Savings and Loan Insurance Corporation ("FSLIC") and its parent, the Federal Home Loan Bank Board ("FHLBB"). At the time of the acquisition, there was a financial crisis in the savings and loan industry. FSLIC and the FHLBB had determined that FSLIC lacked the funds necessary to liquidate all of the failing thrifts, and therefore provided assistance ("FSLIC Assistance") to induce healthy thrifts to take over failing thrifts. FSLIC Assistance of one or more types was provided, including, but not limited to, cash, state branching rights, guarantees against losses, and the right to count the excess of the liabilities assumed over the fair market value of the identifiable assets acquired ("Supervisory Goodwill") toward regulatory capital requirements.

At the time Home acquired the Missouri and Florida thrift institutions, each of the three was insolvent. FSLIC determined that the Missouri and Florida thrift institutions had no going concern value, and that FSLIC Assistance was required to attract a buyer for the thrifts.

Under its Assistance Agreement with FSLIC, Home received the contractual right to establish and expand into additional branches in Missouri and Florida ("Branching Rights"), a small amount of cash, the right to be compensated for certain future losses of the thrifts, and certain forbearances with respect to regulatory net worth requirements. Home also received the contractual rights to count the Supervisory Goodwill resulting from the acquisition to satisfy its regulatory capital requirements for 40 years. These rights are referred to herein as the

Regulatory Accounting Principles Rights, or "RAP Rights." In 1989, Congress enacted the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), which provided for an accelerated phase-out of the RAP Rights over the five-year period from 1990 to 1994.

2. Basis. Internal Revenue Code ("Code") section 1012 provides that the basis of property is equal to the cost of that property. Treas. Reg. § 1.1012-1(a) defines cost to equal the amount paid for the property, and the amount paid includes liabilities assumed by the buyer. *See e.g. Crane v. Commissioner*, 331 U.S. 1 (1947). Home purchased the RAP Rights from FSLIC for an amount equal to the negative value of the thrifts it acquired, i.e., the difference between the liabilities of the thrifts and the fair market value of the identifiable assets, net of other consideration received from FSLIC, was the purchase price for the RAP Rights, ("Purchase Price"), giving Home a cost basis in the RAP Rights of $268,948,125, under Code section 1012.

Alternatively, if the RAP Rights are deemed, contrary to fact, to have been transferred to the Missouri and Florida thrifts prior to the merger of the thrifts into Home, Home received basis in the RAP Rights under Code section 362(b). The RAP Rights constituted property received by the Missouri and Florida thrifts from FSLIC pursuant to section 406(f) of the National Housing Act, 12 U.S.C. § 1729(f). The receipt of the RAP Rights was excludable from the income of the thrifts under Code section 597(a), in effect as of the date of the merger, but gave rise to basis under Code section 362. The Missouri and Florida thrifts received basis in the RAP Rights equal to the fair market value of the RAP Rights on the date received, $268,948,125. Home's adjusted basis in the RAP Rights received from the Missouri and Florida thrifts was the same as the basis of that asset in the hands of the thrifts immediately before the transfer. I.R.C. § 362(b).

Claims

1. Amortization Deduction for the RAP Rights. Following the acquisition of the Missouri and Florida thrifts, Home was entitled to amortization deductions under section 167 with respect to the RAP Rights. As a result of the accelerated phase-out of the RAP Rights under FIRREA, Home is entitled to a section 167 amortization deduction of $35,859,750 in 1994. Alternatively, because the RAP Rights initially had a 40-year life, Home is entitled to a section 167 amortization deduction of $6,723,703 in 1994 for amortization of the RAP Rights.

2. Loss Deduction for the RAP Rights. (Alternative Claim) To the extent of any remaining unamortized basis in the RAP Rights, Home is entitled to a deduction for such amount in 1994, under section 165. In the alternative, if the RAP Rights were not subject to amortization, Home is entitled to a loss deduction under section 165 in the amount of Home's original basis in the RAP Rights.

3. Amortization Deduction for Other Rights Acquired. Under the Assistance Agreement, in addition to Branching Rights and RAP Rights, Home acquired other rights ("Other Rights"). To the extent that the amount paid by Home was attributable to Other Rights, Home acquired a cost basis in those Other Rights under section 1012. In the alternative, if the Other Rights are deemed to have been transferred by FSLIC to the Missouri and Florida thrifts before the

supervisory merger, Home received a basis in the Other Rights under section 362(b) in the merger.

The Other Rights had determinable useful lives such that amortization deductions under section 167 are allowed for the amortization of those Other Rights. Home is entitled to such amortization deductions under section 167 in 1994.

4. Correlative and Computational Adjustments. In addition to the adjustments set forth above, Home is entitled to all correlative and computational adjustments and consequential changes to any items (including, but not limited to, all types of credits (including but not limited to alternative minimum tax credits), net operating losses and charitable contributions, the carryback and carryover of the credits, losses, and deductions) required in the year in issue resulting from the adjustments in the year in issue.

5. Interest. Home requests a refund of assessed interest plus statutory interest as provided by law.

Amended U.S. Corporation Income Tax Return
Form 1120X
For the Tax Year Ending December 31, 1994
Amortization and Loss Deductions
Relating to Ohio Thrift Institutions

During 1994, Home Savings of America ("Home"), a federally chartered savings and loan association, was a wholly owned subsidiary of H.F. Ahmanson & Company ("Ahmanson") and a member of the affiliated group for which Ahmanson was the common parent corporation. Home is entitled to a refund for overpayment of 1994 taxes because the Internal Revenue Service ("IRS") erred by failing to allow Home an abandonment loss and amortization deductions for contractual rights acquired pursuant to the acquisition of Ohio thrift institutions. Details of the loss and deductions in issue are set forth below.

<u>Background</u>

1. <u>The Acquisition.</u> On May 22, 1985, Home acquired Permanent Savings and Loan, Oxford Savings Association, Home Federal Savings and Loan, and American Savings Bank, all Ohio thrift institutions. On June 20, 1985, Home acquired Savings One Association, also an Ohio thrift institution. Home's acquisitions of the Ohio thrifts qualified as tax-free reorganizations under section 368(a)(1)(G) of the Code. The acquisitions of the Ohio thrifts were supervisory mergers arranged by the Federal Savings and Loan Insurance Corporation ("FSLIC") and its parent, the Federal Home Loan Bank Board ("FHLBB"). At the time of the acquisitions, there was a financial crisis in the savings and loan industry. FSLIC and the FHLBB had determined that FSLIC lacked the funds necessary to liquidate all of the failing thrifts, and therefore provided assistance ("FSLIC Assistance") to induce healthy thrifts to take over failing thrifts. FSLIC Assistance of one or more types was provided, including, but not limited to, cash, state branching rights, guarantees against losses, and the right to count the excess of the liabilities assumed over the fair market value of the identifiable assets acquired ("Supervisory Goodwill") toward regulatory capital requirements.

At the time Home acquired the Ohio thrifts, the thrifts were insolvent. FSLIC determined that the Ohio thrifts had no going concern value, and that FSLIC Assistance was required to attract a buyer for the thrifts.

Under its Assistance Agreement with FSLIC, Home received the contractual right to establish and expand into additional branches in Ohio ("Branching Rights"), cash, the right to be compensated for certain future losses of the thrifts, a loan evidenced by a term note, and certain forbearances with respect to regulatory net worth requirements. Home also received the contractual right to count the Supervisory Goodwill resulting from the acquisition to satisfy its regulatory capital requirements for 40 years. This right is referred to herein as the Regulatory Accounting Principles Right, or "RAP Right." In 1989, Congress enacted the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), which provided for an accelerated phase-out of the RAP Right over the five-year period from 1990 to 1994.

As noted above, one form of FSLIC Assistance that Home sought and received in connection with the acquisition of the Ohio thrifts was Branching Rights. At the time of the acquisition, FHLBB regulations generally prohibited a thrift from owning or establishing out-of-state branches, *i.e.*, branches outside of its home state. In March 1981, FHLBB created an exception to this general rule to permit thrifts to acquire out-of-state branches via supervisory mergers. In September 1981, FHLBB further amended its regulations to permit thrifts who acquired out-of-state branches via supervisory mergers to establish (subject to FHLBB's approval) new branches in that other state.

2. Basis. Internal Revenue Code ("Code") section 1012 provides that the basis of property is equal to the cost of that property. Treas. Reg. § 1.1012-1(a) defines cost to equal the amount paid for the property, and the amount paid includes liabilities assumed by the buyer. *See e.g. Crane v. Commissioner*, 331 U.S. 1 (1947). Home purchased the Ohio Branching Right and RAP Right from FSLIC for an amount equal to the negative value of the thrifts it acquired, *i.e.*, the difference between the liabilities of the thrifts and the fair market value of the identifiable assets, net of other consideration received from FSLIC, was the purchase price for the Ohio Branching Right and RAP Right, ("Purchase Price"), giving Home a cost basis in the Ohio Branching Right and RAP Right of $34,815,000 under Code section 1012.

Alternatively, if the Ohio Branching Right and RAP Right are deemed, contrary to fact, to have been transferred to the Ohio thrifts prior to the merger of the thrifts into Home, Home received basis in the Ohio Branching Right and RAP Right under Code section 362(b). The Ohio Branching Right and RAP Right constituted property received by the Ohio thrifts from FSLIC pursuant to section 406(f) of the National Housing Act, 12 U.S.C. § 1729(f). The receipt of the Ohio Branching Right and RAP Right was excludable from the income of the thrifts under Code section 597(a), in effect as of the date of the merger, but gave rise to basis under Code section 362. The Ohio thrifts received basis in the Ohio Branching Right and RAP Right equal to the fair market value of the Ohio Branching Right and RAP Right on the date received. Home's adjusted basis in the Ohio Branching Right and RAP Right was the same as the basis of those assets in the hands of the thrifts immediately before the transfer. I.R.C. § 362(b).

3. Abandonment. In 1994, Home's management made the decision to terminate its branch banking operations in Ohio. In 1994 and 1995, Home engaged in a series of transactions in which it either exchanged or sold each of its branches in Ohio. At that time, Home left the Ohio branch banking market with no intention of reestablishing any other branches in Ohio. Home has not reentered the Ohio branch banking market since that time.

## Claims

1. Amortization Deduction for the Ohio RAP Right. Following the acquisition of the Ohio thrifts, Home was entitled to amortization deductions under section 167 with respect to the RAP Right. As a result of the accelerated phase-out of the RAP Right under FIRREA, Home is entitled to a section 167 amortization deduction of $5,077,188 in 1994. Alternatively, because the RAP Right initially had a 40-year life, Home is entitled to a section 167 amortization deduction of $870,375 in 1994 for amortization of the RAP Right.

2. Loss Deduction for the RAP Right. (Alternative Claim) To the extent of any remaining unamortized basis in the RAP Right, Home is entitled to a deduction for such amount in 1994, under section 165. In the alternative, if the RAP Right was not subject to amortization, Home is entitled to a loss deduction under section 165 in the amount of Home's original basis in the RAP Right.

3. Loss on Abandonment of Branching Rights. Home is entitled to a refund of tax resulting from a section 165 loss sustained upon the abandonment of its Ohio Branching Rights in 1994. Because Home made the affirmative decision to leave the Ohio market and it sold or otherwise divested itself of certain branches in 1994, Home is entitled to an abandonment loss deduction under section 165 in that year with respect to the divested branches.

4. Loss Deductions or Amortization Deductions for Other Rights Acquired. Under the Assistance Agreement, in addition to the Branching Rights, and the RAP Right, Home acquired other rights ("Other Rights"). To the extent that the amount paid by Home was attributable to Other Rights, Home acquired a cost basis in those assets under section 1012. In the alternative, if the Other Rights are deemed to have been transferred by FSLIC to the Ohio branches before the supervisory merger, Home received a basis in the Other Rights under section 362(b) in the merger.

If the Other Rights had a determinable useful life such that amortization deductions under section 167 are allowed for those Other Rights, Home is entitled to such amortization deductions under section 167 in 1994. If the Other Rights did not have a determinable useful life, so that amortization deductions were not permitted with respect to those rights, Home is entitled to a loss deduction under section 165 in 1994 if such Other Rights were abandoned or became worthless in that year.

5. Reduction in the Gain on the Sale of the Ohio Branches. (Alternative Claim) To the extent Home did not recover the basis of the assets relating to the Ohio branches as loss deductions under section 165, or through amortization deductions under section 167, such basis amounts are includible in the adjusted basis of the Ohio branches sold by Home, and Home is entitled to a corresponding adjustment to the gain or loss recognized under section 1001 on the sale of such branches in 1994.

6. Correlative and Computational Adjustments. In addition to the adjustments set forth above, Home is entitled to all correlative and computational adjustments and consequential changes to any items (including, but not limited to, all types of credits (including but not limited to alternative minimum tax credits), net operating losses and charitable contributions, the carryback and carryover of the credits, losses, and deductions) required in the year in issue resulting from the adjustments in the year in issue.

7. Interest. Home requests a refund of assessed interest plus statutory interest as provided by law.

December 2002 Claim for Tax Year 1994

December 2002 Claim for
Tax Year 1994

Form **1120X**
(Rev. December 2001)
Department of the Treasury
Internal Revenue Service

# Amended U.S. Corporation Income Tax Return

OMB No. 1545-0132
For tax year ending
DECEMBER, 1994
(Enter month and year.)

Please Type or Print

Name
H.F. Ahmanson & Co. & Consolidated Subs

Employer identification number
95-0479700

Number, street, and room or suite no. (If a P.O. box, see instructions.)
999 Third Avenue, C/O Corporate TaX, FIS1520

City or town, state, and ZIP code
Seattle, WA 98111

Telephone number (optional)

Enter name and address used on original return (If same as above, write "Same.")
SAME

Internal Revenue Service Center where original return was filed Fresno, CA

## Fill in Applicable Items and Use Part II To Explain Any Changes

| Part I Income and Deductions (see instructions) | | (a) As originally reported or as previously adjusted | (b) Net change - increase or (decrease) - explain in Part II | (c) Correct amount |
|---|---|---|---|---|
| 1 Total income (Form 1120 or 1120-A, line 11) | 1 | 3,487,322,279 | 0 | 3,487,322,279 |
| 2 Total deductions (total of lines 27 and 29c, Form 1120, or lines 23 and 25c, Form 1120-A) | 2 | 3,487,322,279 | 145,874,021 | 3,633,196,300 |
| 3 Taxable income. Subtract line 2 from line 1 | 3 | 0 | -145,874,021 | -145,874,021 |
| 4 Tax (Form 1120, line 31, or Form 1120-A, line 27) | 4 | 419,963 | -419,963 | |
| **Payments and Credits** (see instructions) | | | | |
| 5a Overpayment in prior year allowed as a credit | 5a | 740,825 | 0 | 740,825 |
| b Estimated tax payments | b | 0 | 0 | |
| c Refund applied for on Form 4466 | c | 0 | 0 | |
| d Subtract line 5c from the sum of lines 5a and 5b | d | 740,825 | 0 | 740,825 |
| e Tax deposited with Form 7004 | e | 0 | 0 | |
| f Credit from Form 2439 | f | 0 | 0 | |
| g Credit for Federal tax on fuels | g | 0 | 0 | |
| 6 Tax deposited or paid with (or after) the filing of the original return | 6 | | | 0 |
| 7 Add lines 5d through 6, column (c) | 7 | | | 740,825 |
| 8 Overpayment, if any, as shown on original return or as later adjusted | 8 | | | 320,862 |
| 9 Subtract line 8 from line 7 | 9 | | | 419,963 |
| **Tax Due or Overpayment** (see instructions) | | | | |
| 10 Tax due. Subtract line 9 from line 4, column (c). If paying by check, make it payable to the "United States Treasury." | 10 | | | 0 |
| 11 Overpayment. Subtract line 4, column (c), from line 9 | 11 | | | 419,963 |
| 12 Enter the amount of line 11 you want: Credited to 20 ____ estimated tax Refunded | 12 | | | 419,963 |

RECEIVED DEC 1 9 2002 INTERNAL REVENUE SERVICE LMSB SEATTLE, WA

RECEIVED DEC 1 9 2002 INTERNAL REVENUE SERVICE LMSB SEATTLE, WA

**Please Sign Here**

Under penalties of perjury, I declare that I have filed an original return and that I have examined this amended return, including accompanying schedules and statements, and to the best of my knowledge and belief, this amended return is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

Randy T. Campbell (signature) Signature of officer | 12/19/2002 Date | FIRST VICE PRESIDENT Title

**Paid Preparer's Use Only**

Preparer's signature | Date | Check if self-employed ☐ | Preparer's SSN or PTIN

Firm's name (or yours if self-employed), address, and ZIP code | EIN | Phone no. ( )

For Paperwork Reduction Act Notice, see page 4. (HTA) Form 1120X (Rev. 12-2001)

**H.F. Ahmanson & Company & Subsidiaries**

**Form 1120X**
**Tax Year End: 12/31/94**

**Taxpayer Identification Number: 95-0479700**

Attachment to Form 1120X: Line 2, Description of Reasons for Amendment

In 1982, H.F. Ahmanson & Company ("HFA") expanded its savings and loan operations into Texas by having its wholly owned subsidiary, Home Savings of America, FSB ("Home"), acquire the branch network of several failed Texas thrifts. Specifically, on January 15, 1982, Home acquired the assets and assumed the liabilities of the following thrift associations:

- Royal Federal Savings and Loan Association of Dallas, Texas ("Royal"),
- El Centro Federal Savings and Loan Association of Dallas, Texas ("El Centro"),
- Civic Savings and Loan Association of Irving, Texas ("Civic"),
- Republic of Texas Savings Association of Houston, Texas ("Republic"), and,
- Buffalo Savings and Loan Association of Houston, Texas ("Buffalo").

Home acquired Royal by purchasing nearly all of Royal's assets and assuming nearly all of Royal's liabilities. Home acquired the remaining four thrifts in a transaction pursuant to which El Centro acquired substantially all of the assets and assumed substantially all of the liabilities of Civic, Republic and Buffalo, and then El Centro merged into Home.

Home acquired the Texas institutions in the midst of the severe financial crisis that faced the thrift industry during the late 1970s and early 1980s. At that time, many thrifts held long-term, fixed-rate loans that were created when interest rates were low. The sharp increase in interest rates during this period made it increasingly expensive to attract short-term deposits. When the costs of meeting deposit obligations exceeded the revenue from long-term, low interest rate loans, an unprecedented number of thrifts failed.

The federal regulatory regime in place at this time consisted of two Congressionally-created entities: the Federal Home Loan Bank Board ("FHLBB") and the Federal Savings and Loan Insurance Corporation ("FSLIC"). The FHLBB was authorized to charter and regulate thrifts. The FSLIC, which was created as a permanent instrumentality of the FHLBB, was responsible for insuring thrift deposits and for regulating all federally insured thrifts. The FSLIC and the FHLBB determined that the FSLIC lacked the funds necessary to liquidate all of the failing thrifts and pay off the federally insured depositors. Therefore, in an effort to avoid liquidation costs, and to mitigate the FSLIC's liabilities as insurer of the thrifts' deposits, the FHLBB and FSLIC encouraged healthier institutions to take over failing thrifts. However, because most failing thrifts had liabilities in excess of the fair market value of their assets, it would have been irrational for prospective acquirers to agree to assume the insolvent thrifts'

liabilities without receiving money or other valuable assistance from the federal government.

Consequently, in order to induce healthier institutions to take over failing thrifts, the FSLIC, pursuant to its authority under section 406(f) of the National Housing Act (12 U.S.C. § 1729(f)), provided financial assistance ("FSLIC Assistance") to those institutions. Although FSLIC Assistance often included cash, the FSLIC did not have sufficient cash to facilitate such transactions with cash payments alone. Accordingly, the government used "cash substitutes" in order to facilitate the transactions. Starting as of March 30, 1981, a principal form of such assistance was interstate branching rights and an intangible asset known as "supervisory goodwill".

Home's acquisitions of the five Texas thrifts in 1982 were induced and arranged by the FSLIC, with the approval and direction of the FHLBB. Because the liabilities of the Texas thrifts exceeded the fair market value of their assets, FSLIC Assistance was necessary to make the transactions work. The FSLIC Assistance provided to Home in each transaction included both interstate branching rights and supervisory goodwill. Home was permitted to count the supervisory goodwill assets received in the transactions as regulatory capital for purposes of meeting federal capital reserve requirements for a period of 15 years.

In accounting for the Texas acquisitions, as expressly permitted under the terms of the acquisition agreements, Home used the purchase method of accounting in conformity with generally accepted accounting principles ("GAAP"). Application of the purchase method of accounting resulted in the five Texas thrifts having an aggregate negative net worth, absent assistance provided by the FSLIC, of $145,874,021. The amount of negative net worth represented the excess of the Texas thrifts' aggregate liabilities over the fair market value of their assets. Based on this deficit, the supervisory goodwill assets Home received in the transactions had an aggregate fair market value of at least $145,874,021.

The supervisory goodwill assets described above were received by Home pursuant to § 406(f) of the National Housing Act (12 U.S.C. § 1729(f)). The supervisory goodwill assets were excluded from Home's gross income pursuant to Internal Revenue Code § 597(a), as such section applied at the time of the acquisitions. Further, pursuant to Internal Revenue Code § 597(b), Home took a fair market value tax basis in the supervisory goodwill assets (totaling at least $145,874,021) and did not incur a basis reduction in any of the other assets it obtained in the acquisitions.

After the acquisitions, Home began counting the supervisory goodwill assets as regulatory capital in calculating its regulatory capital ratios. Approximately eight years later, on August 10, 1989, Congress enacted the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA").[1] Regulations issued pursuant to FIRREA imposed stringent capital standards on thrifts and terminated, as of December 31, 1994, Home's contractual right to count the supervisory goodwill assets in calculating its

[1] Pub. L. 101-73, 103 Stat. 183 (1989) (codified in relevant part at 12 U.S.C. § 1464).

regulatory capital ratios. Given the swift and harsh impact of FIRREA's new capital standards on thrifts that had been using supervisory goodwill to meet their capital reserve requirements, at least 100 of the thrifts filed suit against the United States Government seeking more than $20 billion in damages on the basis of theories that included breach of contract. Home and Ahmanson have such a lawsuit pending against the United States with respect to Home's acquisitions of the five Texas thrifts.

In preparing its consolidated federal income tax return for the year ended December 31, 1994, Ahmanson did not take into account the $145,874,021 tax basis that Home had in its supervisory goodwill. As a result, Ahmanson failed to report on its 1994 return the $145,874,021 loss from the worthlessness and abandonment of the supervisory goodwill assets. Therefore, pursuant to Internal Revenue Code § 165, Taxpayer is claiming on Form 1120X, Line 2, an additional tax deduction of $145,874,021, or such greater amount as is legally refundable, together with interest, for the loss from the worthlessness and abandonment of the supervisory goodwill assets.[2]

Alternatively, Ahmanson is entitled to additional amortization under Internal Revenue Code § 167.

[2] On October 3, 1998, Ahmanson merged into Washington Mutual, Inc. ("WAMU"). Thereafter, Home Savings was merged into WAMU's wholly-owned subsidiary, Washington Mutual Bank, F.A.

After Carryback

Form **1120** Department of the Treasury Internal Revenue Service

# U.S. Corporation Income Tax Return

For calendar year 1994 or tax year beginning ........, 1994, ending ........, 19..

► Instructions are separate. See page 1 for Paperwork Reduction Act Notice.

OMB No 1545-0123

**1994**

A Check if: 1 Consolidated return (attach Form 851) [X] 2 Personal holding co. (attach Sch. PH) [ ] 3 Personal service corp. (as defined in Temporary Regs. sec. 1.441-4T — see instructions) [ ]

Use IRS label. Otherwise, please print or type.

H. F. AHMANSON & CO & CONSOLIDATED SUBS
C/O HOME SAVINGS OF AMERICA, FSB
4900 RIVERGRADE RD, CORP TAX 3100
IRWINDALE CA 91706

B Employer identification number: 95-0479700
C Date incorporated: 07/16/34
D Total assets (see Specific Instructions): 59,167,657,413

E Check applicable boxes: (1) Initial return (2) Final return (3) Change of address

| Line | Description | Sub | Amount | Line | Amount |
|---|---|---|---|---|---|
| 1a | Gross receipts or sales 102,486,750 b Less returns and allowances 0 c Bal ► | | | 1c | 102,486,750 |
| 2 | Cost of goods sold (Schedule A, line 8) | | | 2 | 143,999,840 |
| 3 | Gross profit. Subtract line 2 from line 1c | | | 3 | -41,513,090 |
| 4 | Dividends (Schedule C, line 19) | | | 4 | 250,071,609 |
| 5 | Interest | | | 5 | 2,921,988,653 |
| 6 | Gross rents | | | 6 | 37,841,244 |
| 7 | Gross royalties | | | 7 | 0 |
| 8 | Capital gain net income (attach Schedule D (Form 1120)) | | | 8 | 121,503,190 |
| 9 | Net gain or (loss) from Form 4797, Part II, line 20 (attach Form 4797) | | | 9 | -18,759,207 |
| 10 | Other income (see instructions — attach schedule) | | | 10 | 216,189,881 |
| 11 | Total income. Add lines 3 through 10 ► | | | 11 | 3,487,322,279 |
| 12 | Compensation of officers (Schedule E, line 4) | | | 12 | 4,496,940 |
| 13 | Salaries and wages (less employment credits) | | | 13 | 320,093,902 |
| 14 | Repairs and maintenance | | | 14 | 55,086,433 |
| 15 | Bad debts | | | 15 | 413,565,175 |
| 16 | Rents | | | 16 | 75,869,947 |
| 17 | Taxes and licenses | | | 17 | 56,084,677 |
| 18 | Interest | | | 18 | 1,745,272,788 |
| 19 | Charitable contributions (see instructions for 10% limitation) | | | 19 | 2,441,097 |
| 20 | Depreciation (attach Form 4562) | 20 | 63,507,359 | | |
| 21 | Less depreciation claimed on Schedule A and elsewhere on return | 21a | 0 | 21b | 63,507,359 |
| 22 | Depletion | | | 22 | 0 |
| 23 | Advertising | | | 23 | 29,930,853 |
| 24 | Pension, profit-sharing, etc., plans | | | 24 | 7,413,234 |
| 25 | Employee benefit programs | | | 25 | 35,672,869 |
| 26 | Other deductions (attach schedule) | | | 26 | 409,482,402 |
| 27 | Total deductions. Add lines 12 through 26 ► | | | 27 | 3,229,912,445 |
| 28 | Taxable income before net operating loss deduction and special deductions. Subtract line 27 from line 11 | | | 28 | 257,409,834 |
| 29 | Less: a Net operating loss deduction (see instructions) | 29a | 7,421,968 | | |
| | b Special deductions (Schedule C, line 20) | 29b | 249,987,866 | 29c | 257,409,834 |
| 30 | Taxable income. Subtract line 29c from line 28 | | | 30 | 0 |
| 31 | Total tax (Schedule J, line 10) | | | 31 | 419,963 |
| 32 | Payments: a 1993 overpayment credited to 1994 | 32a | 740,825 | | |
| | b 1994 estimated tax payments | 32b | 0 | | |
| | c Less 1994 refund applied for on Form 4466 | 32c | 0 | | |
| | d Bal ► | 32d | 0 | | |
| | e Tax deposited with Form 7004 | 32e | 0 | | |
| | f Credit from regulated investment companies (attach Form 2439) | 32f | 0 | | |
| | g Credit for Federal tax on fuels (attach Form 4136). See instructions | 32g | 0 | 32h | 0 |
| 33 | Estimated tax penalty (see instructions). Check if Form 2220 is attached ► [ ] | | | 33 | 0 |
| 34 | Tax due. If line 32h is smaller than the total of lines 31 and 33, enter amount owed | | | 34 | 320,862 |
| 35 | Overpayment. If line 32h is larger than the total of lines 31 and 33, enter amount overpaid | | | 35 | 0 |
| 36 | Enter amount of line 35 you want: Credited to 1995 estimated tax ► 0 Refunded ► | | | 36 | 0 |

Please Sign Here — Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

► Signature of officer | Date | ► Title

Paid — Preparer's signature ► | Date | Check if self-employed [ ] | Preparer's social security no.

After Carryback

Form 1120 (1994) H. F. AHMANSON & CO & CONSOLIDATED SUBS 95-0479700 Page

**Schedule A** Cost of Goods Sold (See instructions.)

| | | | |
|---|---|---|---|
| 1 | Inventory at beginning of year | 1 | 0 |
| 2 | Purchases | 2 | 0 |
| 3 | Cost of labor | 3 | 0 |
| 4 | Additional section 263A costs (attach schedule) | 4 | 0 |
| 5 | Other costs (attach schedule) | 5 | 143,999,840 |
| 6 | Total. Add lines 1 through 5 | 6 | 143,999,840 |
| 7 | Inventory at end of year | 7 | 0 |
| 8 | Cost of goods sold. Subtract line 7 from line 6. Enter here and on page 1, line 2 | 8 | 143,999,840 |

9 a Check all methods used for valuing closing inventory:
- ☐ Cost ☐ Lower of cost or market as described in Regulations section 1.471-4
- ☐ Writedown of subnormal goods as described in Regulations section 1.471-2(c)
- ☐ Other (Specify method used and attach explanation.) ▶

b Check if the LIFO inventory method was adopted this tax year for any goods (if checked, attach Form 970) ▶ ☐

c If the LIFO inventory method was used for this tax year, enter percentage (or amounts) of closing inventory computed under LIFO 9c

d Do the rules of section 263A (for property produced or acquired for resale) apply to the corporation? ☐ Yes ☒ No

e Was there any change in determining quantities, cost, or valuations between opening and closing inventory? If "Yes," attach explanation ☐ Yes ☒ No

**Schedule C** Dividends and Special Deductions (See instructions.)

| | | (a) Dividends received | (b) % | (c) Special deductions (a) x (b) |
|---|---|---|---|---|
| 1 | Dividends from less-than-20%-owned domestic corporations that are subject to the 70% deduction (other than debt-financed stock) | 54,094 | 70 | 37,866 |
| 2 | Dividends from 20%-or-more-owned domestic corporations that are subject to the 80% deduction (other than debt-financed stock) | 0 | 80 | 0 |
| 3 | Dividends on debt-financed stock of domestic and foreign corporations (section 246A) | 0 | see instructions | 0 |
| 4 | Dividends on certain preferred stock of less-than-20%-owned public utilities | 0 | 42 | 0 |
| 5 | Dividends on certain preferred stock of 20%-or-more-owned public utilities | 0 | 48 | 0 |
| 6 | Dividends from less-than-20%-owned foreign corporations and certain FSCs that are subject to the 70% deduction | 0 | 70 | 0 |
| 7 | Dividends from 20%-or-more-owned foreign corporations and certain FSCs that are subject to the 80% deduction | 0 | 80 | 0 |
| 8 | Dividends from wholly owned foreign subsidiaries subject to the 100% deduction (section 245(b)) | 0 | 100 | 0 |
| 9 | Total. Add lines 1 through 8. See instructions for limitation | | | 37,866 |
| 10 | Dividends from domestic corporations received by a small business investment company operating under the Small Business Investment Act of 1958 | 0 | 100 | 0 |
| 11 | Dividends from certain FSCs that are subject to the 100% deduction (section 245(c)(1)) | 0 | 100 | 0 |
| 12 | Dividends from affiliated group members subject to the 100% deduction (section 243(a)(3)) | 249,950,000 | 100 | 249,950,000 |
| 13 | Other dividends from foreign corporations not included on lines 3, 5, 7, 8, or 11 | 0 | | |
| 14 | Income from controlled foreign corporations under subpart F (attach Form(s) 5471) | 0 | | |
| 15 | Foreign dividend gross-up (section 78) | 0 | | |
| 16 | IC-DISC and former DISC dividends not included on lines 1, 2, or 3 (section 246(d)) | 0 | | |
| 17 | Other dividends | 67,515 | | |
| 18 | Deduction for dividends paid on certain preferred stock of public utilities | | | 0 |
| 19 | Total dividends. Add lines 1 through 17. Enter here and on line 4, page 1 ▶ | 250,071,609 | | |
| 20 | Total special deductions. Add lines 9, 10, 11, 12, and 18. Enter here and on line 29b, page 1 ▶ | | | 249,987,866 |

**Schedule E** Compensation of Officers (See instructions for line 12, page 1.)

Complete Schedule E only if total receipts (line 1a plus lines 4 through 10 on page 1, Form 1120) are $500,000 or more.

| | (a) Name of officer | (b) Social security number | (c) Percent of time devoted to business | Percent of corporation stock owned (d) Common | (e) Preferred | (f) Amount of compensation |
|---|---|---|---|---|---|---|
| 1 | | | % | % | % | 0 |
| | | | % | % | % | 0 |
| | | | % | % | % | 0 |
| | | | % | % | % | 0 |
| | | | % | % | % | 0 |
| 2 | Total compensation of officers | | | | | 0 |
| 3 | Compensation of officers claimed on Schedule A and elsewhere on return | | | | | 0 |

A[illegible] Carryback

Tax for Non-Life Group 212,332
Tax for HSA Life 207,631
419,963

Form 1120 (1994) H. F. AHMANSON & CO & CONSOLIDATED SUBS 95-0479700 Pag

**Schedule J Tax Computation** (See instructions.)

| | | | |
|---|---|---|---|
| 1 Check if the corporation is a member of a controlled group (see sections 1561 and 1563) . . . . ▶ ☐ | | | |
| 2a If the box on line 1 is checked, enter the corporation's share of the $50,000, $25,000 and $9,925,000 taxable income brackets (in that order): (1) 0 (2) 0 (3) 0 | | | |
| b Enter the corporation's share of (1) Additional 5% tax (not more than $11,750) 0 | | | |
| (2) Additional 3% tax (not more than $100,000) 0 | | | |
| 3 Income tax. Check this box if the corporation is a qualified personal service corporation as defined in section 448(d)(2) (see instructions) . . . . . . 0. ▶ ☐ | | 3 | |
| 4a Foreign tax credit (attach Form 1118) | 4a | 0 | |
| b Possessions tax credit (attach Form 5735) | 4b | 0 | |
| c Orphan drug credit (attach Form 6765) | 4c | 0 | |
| d Check: ☐ Nonconventional source fuel credit ☐ QEV credit (attach Form 8834) | 4d | 0 | |
| e General business credit. Enter here and check which forms are attached: ☒ 3800 ☐ 3468 ☐ 5884 ☐ 6478 ☐ 6765 ☒ 8586 ☐ 8830 ☐ 8826 ☐ 8835 ☐ 8844 ☐ 8845 ☐ 8846 ☐ 8847 | 4e | 0 | |
| f Credit for prior year minimum tax (attach Form 8827) | 4f | 0 | |
| 5 Total credits. Add lines 4a through 4f | | 5 | 0 |
| 6 Subtract line 5 from line 3 | | 6 | 0 |
| 7 Personal holding company tax (attach Schedule PH (Form 1120)) | | 7 | 0 |
| 8 Recapture taxes. Check if from: ☐ Form 4255 ☐ Form 8611 | | 8 | 0 |
| 9a Alternative minimum tax (attach Form 4626) . . . 0. | | 9a | 202,56[illegible] |
| b Environmental tax (attach Form 4626) | | 9b | 9,766 |
| 10 Total tax. Add lines 6 through 9b. Enter here and on line 31, page 1 . . . 0. | | 10 | 419,963 |

**Schedule K Other Information** (See instructions.)

| | Yes | No |
|---|---|---|
| 1 Check method of accounting: a ☐ Cash b ☒ Accrual c ☐ Other (specify) ▶ | | |
| 2 Refer to the instructions and state the principal: a Business activity code no. ▶ 6749 b Business activity ▶ HOLDING COMPANY c Product or service ▶ FINANCIAL SERVICES | | |
| 3 Did the corporation at the end of the tax year own, directly or indirectly, 50% or more of the voting stock of a domestic corporation? (For rules of attribution, see section 267(c).) | X | |
| If "Yes," attach a schedule showing: (a) name and identifying number, (b) percentage owned, and (c) taxable income or (loss) before NOL and special deductions of such corporation for the tax year ending with or within your tax year. | | |
| 4 Is the corporation a subsidiary in an affiliated group or a parent-subsidiary controlled group? | | X |
| If "Yes," enter employer identification number and name of the parent corporation ▶ | | |
| 5 Did any individual, partnership, corporation, estate or trust at the end of the tax year, own, directly or indirectly, 50% or more of the corporation's voting stock? (For rules of attribution, see section 267(c).) | | X |
| If "Yes," attach a schedule showing name and identifying number. (Do not include any information already entered in 4 above.) Enter percentage owned ▶ | | |
| 6 During this tax year, did the corporation pay dividends (other than stock dividends and distributions in exchange for stock) in excess of the corporation's current and accumulated earnings and profits? (See secs. 301 and 316.) | | X |
| If "Yes," file Form 5452. If this is a consolidated return, | | |

| | Yes | No |
|---|---|---|
| 7 Was the corporation a U.S. shareholder of any controlled foreign corporation? (See sections 951 and 957.) | | X |
| If "Yes," attach Form 5471 for each such corporation. Enter number of Forms 5471 attached ▶ | | |
| 8 At any time during the 1994 calendar year, did the corporation have an interest in or a signature or other authority over a financial account in a foreign country (such as a bank account, securities account, or other financial account)? | | X |
| If "Yes," the corporation may have to file Form TD F 90-22.1. If "Yes," enter name of foreign country ▶ | | |
| 9 Was the corporation the grantor of, or transferor to, a foreign trust that existed during the current tax year, whether or not the corporation has any beneficial interest in it? If "Yes," the corporation may have to file Forms 926, 3520, or 3520-A | | X |
| 10 Did one foreign person at any time during the tax year own, directly or indirectly, at least 25% of: (a) the total voting power of all classes of stock of the corporation entitled to vote, or (b) the total value of all classes of stock of the corporation? If "Yes," | | X |
| a Enter percentage owned ▶ | | |
| b Enter owner's country ▶ | | |
| c The corporation may have to file Form 5472. Enter number of Forms 5472 attached ▶ | | |
| 11 Check this box if the corporation issued publicly offered debt instruments with original issue discount . . . ▶ ☐ | | |
| If so, the corporation may have to file Form 8281. | | |
| 12 Enter the amount of tax-exempt interest received or accrued during the tax year ▶ 0 | | |
| 13 If there were 35 or fewer shareholders at the end of the tax year, enter the number ▶ | | |
| 14 If the corporation has an NOL for the tax year and is electing to forego the carryback period, check here ▶ ☐ | | |

After Carryback

SCHEDULE D (Form 1120)

Department of the Treasury Internal Revenue Service

# Capital Gains and Losses

To be filed with Forms 1120, 1120-A, 1120-IC-DISC, 1120-F, 1120-FSC, 1120-H, 1120-L, 1120-ND, 1120-PC, 1120-POL, 1120-REIT, 1120-RIC, 1120 SF, 990-C, and certain Forms 990-T

OMB No. 1545-0123

1994

Name: H. F. AHMANSON & CO & CONSOLIDATED SUBS

Employer identification number: 95-0479700

## Part I Short-Term Capital Gains and Losses – Assets Held 1 Year or Less

| (a) Kind of property and description (Example, 100 shares of "Z" Co.) | (b) Date acquired (mo., day, yr.) | (c) Date sold (mo., day, yr.) | (d) Gross sales price | (e) Cost or other basis, plus expense of sale | (f) Gain or (loss) ((d) less (e)) |
|---|---|---|---|---|---|
| 1 | | | 0 | 0 | 0 |
| | | | 0 | 0 | 0 |
| | | | 0 | 0 | 0 |
| | | | 0 | 0 | 0 |
| | | | 0 | 0 | 0 |
| | | | 0 | 0 | 0 |
| | | | 0 | 0 | 0 |
| | | | 0 | 0 | 6,541 |

| | | |
|---|---|---|
| 2 Short-term capital gain from installment sales from Form 6252, line 26 or 37 | 2 | 0 |
| 3 Short-term gain or (loss) from like-kind exchanges from Form 8824 | 3 | 0 |
| 4 Unused capital loss carryover (attach computation) | 4 | -1,462,949 |
| 5 Net short-term capital gain or (loss). (Combine lines 1 through 4) | 5 | -1,456,408 |

## Part II Long-Term Capital Gains and Losses – Assets Held More Than 1 Year

| (a) | (b) | (c) | (d) | (e) | (f) |
|---|---|---|---|---|---|
| 6 | | | 0 | 0 | 0 |
| | | | 0 | 0 | 0 |
| | | | 0 | 0 | 0 |
| | | | 0 | 0 | 0 |
| | | | 0 | 0 | 0 |
| | | | 0 | 0 | 0 |
| | | | 0 | 0 | 121,891,377 |

| | | |
|---|---|---|
| 7 Enter gain from Form 4797, line 8 or 10 | 7 | 1,068,221 |
| 8 Long-term capital gain from installment sales from Form 6252, line 26 or 37 | 8 | 0 |
| 9 Long-term gain or (loss) from like-kind exchanges from Form 8824 | 9 | 0 |
| 10 Net long-term capital gain or (loss). (Combine lines 6 through 9) | 10 | 122,959,598 |

## Part III Summary of Parts I and II

| | | |
|---|---|---|
| 11 Enter excess of net short-term capital gain (line 5) over net long-term capital loss (line 10) | 11 | 0 |
| 12 Net capital gain. Enter excess of net long-term capital gain (line 10) over net short-term capital loss (line 5) | 12 | 121,503,190 |
| 13 Add lines 11 and 12. Enter here and on Form 1120, page 1, line 8, or the proper line on other returns | 13 | 121,503,190 |

Note: If losses exceed gains, see instructions on capital losses for explanation of capital loss carrybacks.

After Carryback

# 3800 General Business Credit

► Attach to your tax return.
► See separate instructions.

OMB No. 1545-0895
1994
22

Department of the Treasury Internal Revenue Service

Name(s) shown on return: [illegible] CONSOL. 04752 3083
Identifying number: 95-3479750

## Part I Tentative Credit

| | | |
|---|---|---|
| 1a Current year investment credit (Form 3468, Part II) | 1a | 0 |
| b Current year jobs credit (Form 5884, Part II) | 1b | 0 |
| c Current year credit for alcohol used as fuel (Form 6478) | 1c | 0 |
| d Current year credit for increasing research activities (Form 6765, Part III) | 1d | 0 |
| e Current year low-income housing credit (Form 8586, Part II) | 1e | 607,326 |
| f Current year enhanced oil recovery credit (Form 8830, Part I) | 1f | 0 |
| g Current year disabled access credit (Form 8826, Part I) | 1g | 0 |
| h Current year renewable electricity production credit (Form 8835, Part II) | 1h | 0 |
| i Current year Indian employment credit (Form 8845, Part I) | 1i | 0 |
| j Current year credit for employer social security and Medicare taxes paid on certain employee tips (Form 8846, Part II) | 1j | 0 |
| k Current year credit for contributions to selected community development corporations (Form 8847, Part I) | 1k | 0 |
| l Current year general business credit. Add lines 1a through 1k | 1l | 607,326 |
| 2 Passive activity credits included on lines 1a through 1k (see instructions) | 2 | 0 |
| 3 Subtract line 2 from line 1l | 3 | 607,326 |
| 4 Passive activity credits allowed for 1994 (see instructions) | 4 | 0 |
| 5 Carryforward of general business, WIN, or ESOP credit to 1994 (see instructions for the schedule to attach) | 5 | 0 |
| 6 Carryback of general business credit to 1994 (see instructions) | 6 | 0 |
| 7 Tentative general business credit. Add lines 3 through 6 | 7 | 607,326 |

## Part II General Business Credit Limitation Based on Amount of Tax

| | | | | |
|---|---|---|---|---|
| 8a Individuals. Enter amount from Form 1040, line 40 / b Corporations. Enter amount from Form 1120, Schedule J, line 3 (or Form 1120-A, Part I, line 1) / c Other filers. Enter regular tax before credits from your return (see instructions) | | | 8 | 0 |
| 9 Credits that reduce regular tax before the general business credit: | | | | |
| a Credit for child and dependent care expenses (Form 2441, line 10) | 9a | | | |
| b Credit for the elderly or the disabled (Schedule R (Form 1040), line 21) | 9b | | | |
| c Mortgage interest credit (Form 8396, line 11) | 9c | | | |
| d Foreign tax credit (Form 1118, line 32 or Form 1116, Sch. B, line 12) | 9d | 0 | | |
| e Possessions tax credit (Form 5735) | 9e | 0 | | |
| f Orphan drug credit (Form 6765, line 10) | 9f | 0 | | |
| g Credit for fuel from a nonconventional source | 9g | 0 | | |
| h Qualified electric vehicle credit (Form 8834, line 19) | 9h | 0 | | |
| i Add lines 9a through 9h | | | 9i | 0 |
| 10 Net regular tax. Subtract line 9i from line 8 | | | 10 | 0 |
| 11 Tentative minimum tax (see instructions): a Individuals. Enter amount from Form 6251, line 26 / b Corporations. Enter amount from Form 4626, line 13 / c Estates and trusts. Enter amount from Form 1041, Schedule H, line 37 | | | 11 | 202,556 |
| 12 Net income tax: a Individuals. Add line 10 above and line 28 of Form 6251 / b Corporations. Add line 10 above and line 15 of Form 4626 / c Estates and trusts. Add line 10 above and line 39 of Form 1041, Schedule H | | | 12 | 202,556 |
| 13 If line 10 is more than $25,000, enter 25% (.25) of the excess (see instructions) | | | 13 | 0 |
| 14 Subtract line 11 or line 13, whichever is greater, from line 12. If less than zero, enter -0- | | | 14 | 0 |
| 15 General business credit allowed for current year. Enter the smaller of line 7 or line 14. Enter here and on Form 1040, line 44; Form 1120, Schedule J, line 4e; Form 1120-A, Part I, line 2a; or on the appropriate line of your tax return. (Individuals, estates, and trusts, see instructions if the credit for increasing research activities is claimed. C corporations, see instructions for Schedule A if any regular investment credit carryforward is claimed and the corporation has undergone a post-1986 "ownership change.") | | | 15 | 0 |

H. F. AHMANSON & CO & CONSOLIDATED — After Carryback — 95-0479700

Form 3800 (1994) — Page 2

## Schedule A – Additional General Business Credit Allowed By Section 38(c)(2) (Before Repeal by the Revenue Reconciliation Act of 1990) – Only Applicable to C Corporations

| | | | | |
|---|---|---|---|---|
| 16 | Enter the portion of the credit shown on line 5, page 1, that is attributable to the regular investment credit under section 46 (before amendment by the Revenue Reconciliation Act of 1990) | | 16 | 0 |
| 17 | Tentative minimum tax (from line 11, page 1) | 17 — 0 | | |
| 18 | Multiply line 17 by 25% (.25) | | 18 | 0 |
| 19 | Enter the amount from line 14, page 1 | 19 — 0 | | |
| 20 | Enter the portion of the credit shown on line 7, page 1 that is NOT attributable to the regular investment credit under section 46 (before amendment by the Revenue Reconciliation Act of 1990) | 20 — 0 | | |
| 21 | Subtract line 20 from line 19 (if less than zero, enter -0-) | | 21 | 0 |
| 22 | Subtract line 21 from line 16 (if less than zero, enter -0-) | | 22 | 0 |
| 23 | For purposes of this line only, recompute the amount on line 11, Form 4626, by using zero on line 6, Form 4626, and enter the result here | 23 — 0 | | |
| 24 | Multiply line 23 by 10% (.10) | | 24 | 0 |
| 25 | Net income tax (from line 12, page 1) | | 25 | 0 |
| 26 | General business credit (from line 15, page 1) | | 26 | 0 |
| 27 | Subtract line 26 from line 25 | | 27 | 0 |
| 28 | Subtract line 24 from line 27 | | 28 | 0 |
| 29 | Enter the smallest of line 18, line 22, or line 28 | | 29 | 0 |
| 30 | Subtract line 29 from line 17 | | 30 | 0 |
| 31 | Enter the greater of line 30 or line 13, page 1 | | 31 | 0 |
| 32 | Subtract line 31 from line 25 | | 32 | 0 |
| 33 | Enter the smaller of line 32 or line 10, page 1. Enter this amount also on line 15, page 1, instead of the amount previously figured on that line. Write "Sec. 38(c)(2)" in the margin next to your entry on line 15, page 1 | | 33 | 0 |
| 34 | If line 32 is greater than line 33, enter the excess here (see instructions) | | 34 | 0 |

After Carryback

Form **4626**

Department of the Treasury
Internal Revenue Service

# Alternative Minimum Tax – Corporations

(including environmental tax)

► See separate instructions.

► Attach to the corporation's tax return.

OMB No. 1545-0175

**1994**

Name: H. F. AHMANSON & CO & CONSOLIDATED SUBS

Employer identification number: 95-0479700

| | | | | |
|---|---|---|---|---|
| 1 | Taxable income or (loss) before net operating loss deduction. (Important: See instructions if the corporation is subject to the environmental tax.) | | | 7,421,5 |
| 2 | Adjustments and preferences: | | | |
| a | Depreciation of post-1986 property | 2a | 6,305,546 | |
| b | Amortization of certified pollution control facilities | 2b | 0 | |
| c | Amortization of mining exploration and development costs | 2c | 0 | |
| d | Amortization of circulation expenditures (personal holding companies only) | 2d | 0 | |
| e | Adjusted gain or loss | 2e | -2,449,593 | |
| f | Long-term contracts | 2f | 0 | |
| g | Installment sales | 2g | 0 | |
| h | Merchant marine capital construction funds | 2h | 0 | |
| i | Section 833(b) deduction (Blue Cross, Blue Shield, and similar type organizations only) | 2i | 0 | |
| j | Tax shelter farm activities (personal service corporations only) | 2j | 0 | |
| k | Passive activities (closely held corporations and personal service corporations only) | 2k | 0 | |
| l | Loss limitations | 2l | 0 | |
| m | Depletion | 2m | 0 | |
| n | Tax-exempt interest from specified private activity bonds | 2n | 0 | |
| o | Charitable contributions | 2o | 0 | |
| p | Intangible drilling costs | 2p | 0 | |
| q | Reserves for losses on bad debts of financial institutions | 2q | 0 | |
| r | Accelerated depreciation of real property (pre-1987) | 2r | 0 | |
| s | Accelerated depreciation of leased personal property (pre-1987) (personal holding companies only) | 2s | 0 | |
| t | Other adjustments | 2t | 349,087 | |
| u | Combine lines 2a through 2t | | | 2u 4,205,04 |
| 3 | Preadjustment alternative minimum taxable income (AMTI). Combine lines 1 and 2u | | | 3 11,627,005 |
| 4 | Adjusted current earnings (ACE) adjustment: | | | |
| a | Enter the corporation's ACE from line 10 of the worksheet in the instructions | 4a | 9,625,705 | |
| b | Subtract line 3 from line 4a. If line 3 exceeds line 4a, enter the difference as a negative amount (see instructions for examples) | 4b | -1,998,303 | |
| c | Multiply line 4b by 75% (.75). Enter the result as a positive amount | 4c | 1,498,727 | |
| d | Enter the excess, if any, of the corporation's total increases in AMTI from prior year ACE adjustments over its total reductions in AMTI from prior year ACE adjustments (see instructions). Note: You must enter an amount on line 4d (even if line 4b is positive) | 4d | 11,367,952 | |
| e | ACE adjustment: • If you entered a positive number or zero on line 4b, enter the amount from line 4c here as a positive amount. • If you entered a negative number on line 4b, enter the smaller of line 4c or line 4d here as a negative amount. | | | 4e -1,498,727 |
| 5 | Combine lines 3 and 4e. If zero or less, stop here; the corporation does not owe alternative minimum tax | | | 5 10,128,25 |
| 6 | Alternative tax net operating loss deduction (see instructions) | | | 6 9,115,45 |
| 7 | Alternative minimum taxable income. Subtract line 6 from line 5 | | | 7 1,012,824 |

After Carryback

H. F. AHMANSON & CO & CONSOLIDATED SUBS 95-0479700

Form 4626 (1994) Page

| | | |
|---|---|---|
| 8 Enter the amount from line 7 (alternative minimum taxable income) | 8 | 1,012,82 |
| 9 Exemption phase-out computation (If line 8 is $310,000 or more, skip lines 9a and 9b and enter -0- on line 9c): | | |
| a Subtract $150,000 from line 8 (if you are completing this line for a member of a controlled group, see instructions). If zero or less, enter -0- . . . 9a 0 | | |
| b Multiply line 9a by 25% (.25) . . . 9b 0 | | |
| c Exemption. Subtract line 9b from $40,000 (if you are completing this line for a member of a controlled group, see instructions). If zero or less, enter -0- | 9c | 0 |
| 10 Subtract line 9c from line 8. If zero or less, enter -0- | 10 | 1,012,825 |
| 11 Multiply line 10 by 20% (.20) | 11 | 202,565 |
| 12 Alternative minimum tax foreign tax credit. See instructions for limitations. | 12 | 0 |
| 13 Tentative minimum tax. Subtract line 12 from line 11 | 13 | 202,565 |
| 14 Regular tax liability before all credits except the foreign tax credit and possessions tax credit | 14 | 0 |
| 15 Alternative minimum tax. Subtract line 14 from line 13. Enter the result on the appropriate line of the corporation's income tax return (e.g., Form 1120, Schedule J, line 9a). If zero or less, enter -0- | 15 | 202,565 |
| 16 Environmental tax. Subtract $2 million from line 5 (figured without the corporation's environmental tax deduction). Multiply the excess, if any, by 0.12% (.0012). Enter the result here and on the appropriate line of the corporation's income tax return (e.g., Form 1120, Schedule J, line 9b). If you are completing this line for a member of a controlled group, see the instructions | 16 | 9,755 |

After Carryback

H. F. AHMANSON & CO & CONSOLIDATED SUBS 95-0479700

## Adjusted Current Earnings Worksheet

► See ACE Worksheet Instructions.

| | | | | | |
|---|---|---|---|---|---|
| 1 | Pre-adjustment AMTI. Enter the amount from line 3 of Form 4626 | | | 1 | 11,627,00 |
| 2 | ACE depreciation adjustment: | | | | |
| a | AMT depreciation | 2a | 57,277,155 | | |
| b | ACE depreciation: | | | | |
| | (1) Post-1993 property | 2b(1) 51,415,040 | | | |
| | (2) Post-1989, pre-1994 property | 2b(2) 2,640,865 | | | |
| | (3) Pre-1990 MACRS property | 2b(3) 17,419 | | | |
| | (4) Pre-1990 original ACRS property | 2b(4) 0 | | | |
| | (5) Property described in sections 168(f)(1) through (4) | 2b(5) 0 | | | |
| | (6) Other property | 2b(6) 248,030 | | | |
| | (7) Total ACE depreciation. Add lines 2b(1) through 2b(6) | 2b(7) | 54,321,354 | | |
| c | ACE depreciation adjustment. Subtract line 2b(7) from line 2a | | | 2c | 2,955,801 |
| 3 | Inclusion in ACE of items included in earnings and profits (E&P): | | | | |
| a | Tax-exempt interest income | 3a | 0 | | |
| b | Death benefits from life insurance contracts | 3b | 0 | | |
| c | All other distributions from life insurance contracts (including surrenders) | 3c | 0 | | |
| d | Inside buildup of undistributed income in life insurance contracts | 3d | 0 | | |
| e | Other items (see Regulations sections 1.56(g)-1(c)(6)(iii) through (ix) for a partial list) | 3e | 0 | | |
| f | Total increase to ACE from inclusion in ACE of items included in E&P. Add lines 3a through 3e | | | 3f | 0 |
| 4 | Disallowance of items not deductible from E&P: | | | | |
| a | Certain dividends received | 4a | 0 | | |
| b | Dividends paid on certain preferred stock of public utilities that are deductible under section 247 | 4b | 0 | | |
| c | Dividends paid to an ESOP that are deductible under section 404(k) | 4c | 0 | | |
| d | Nonpatronage dividends that are paid and deductible under section 1382(c) | 4d | 0 | | |
| e | Other items (see Regulations sections 1.56(g)-1(d)(3)(i) and (ii) for a partial list) | 4e | 0 | | |
| f | Total increase to ACE because of disallowance of items not deductible from E&P. Add lines 4a through 4e | | | 4f | 0 |
| 5 | Other adjustments based on rules for figuring E&P: | | | | |
| a | Intangible drilling costs | 5a | 0 | | |
| b | Circulation expenditures | 5b | 0 | | |
| c | Organizational expenditures | 5c | 0 | | |
| d | LIFO inventory adjustments | 5d | 0 | | |
| e | Installment sales | 5e | 0 | | |
| f | Total other E&P adjustments. Combine lines 5a through 5e | | | 5f | 0 |
| 6 | Disallowance of loss on exchange of debt pools | | | 6 | 0 |
| 7 | Acquisition expenses of life insurance companies for qualified foreign contracts | | | 7 | 0 |
| 8 | Depletion | | | 8 | 0 |
| 9 | Basis adjustments in determining gain or loss from sale or exchange of pre-1994 property | | | 9 | -4,954,104 |
| 10 | Adjusted current earnings. Combine lines 1, 2c, 3f, 4f, and 5f through 9. Enter the result here and on line 4a of Form 4626 | | | 10 | 9,628,705 |