**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| **WASHINGTON MUTUAL, INC., AS SUCCESSOR IN INTEREST TO H.F. AHMANSON & CO. AND SUBSIDIARIES; WASHINGTON MUTUAL BANK, A FEDERAL ASSOCIATION, AS SUCCESSOR IN INTEREST TO HOME SAVINGS OF AMERICA; AND SAVINGS OF AMERICA, INC., AS SUBSTITUTE AGENT FOR H.F. AHMANSON & CO. AND SUBSIDIARIES,** **Plaintiffs,** | **No. 08-211** |
| **v.** | **Judge Lynn J. Bush** |
| **THE UNITED STATES of AMERICA,** **Defendant.** | |

**FIRST AMENDED COMPLAINT**

Plaintiffs Washington Mutual, Inc. ("Washington Mutual"), Washington Mutual Bank, a Federal Association, and Savings of America, Inc., (collectively, “Plaintiffs”) allege as follows:

**THE PARTIES**

1. Washington Mutual is a domestic corporation incorporated in the State of Washington, with its corporate headquarters at 1301 Second Avenue, Seattle, Washington, 98101. Washington Mutual's employer identification number ("EIN") is 91-1653725.

2. H.F. Ahmanson & Co. ("Ahmanson") was a domestic corporation incorporated in Delaware. Until October 1, 1998, its corporate headquarters were at 4900 Rivergrade Road, Irwindale, California, 91706. Ahmanson's EIN is 95-0479700.

3. Washington Mutual acquired Ahmanson on October 1, 1998. Ahmanson merged into Washington Mutual and went out of existence on that date. Washington Mutual is the successor in interest to the claims presented herein.

4. For the tax years ending December 31, 1991, and December 31, 1994, Home Savings of America ("Home") was a federally chartered savings and loan association, a wholly owned subsidiary of Ahmanson, and a member of the affiliated group for which Ahmanson was the common parent corporation.

5. On October 1, 1998, Home was merged with and into Washington Mutual Bank, a Federal Association (formerly known as Washington Mutual Bank, FA). Washington Mutual Bank, a Federal Association, is a wholly owned subsidiary of Washington Mutual.

6. For the tax year ending December 31, 1991, and December 31, 1994, Savings of America, Inc. was a wholly owned subsidiary of Ahmanson and a member of the affiliated group for which Ahmanson was the common parent corporation. Pursuant to section 8 of Rev. Proc. 2002-43 and Treas. Reg. § 1.1502-77A, Savings of America, Inc. has been designated the substitute agent for Ahmanson. Savings of America, Inc. is a wholly owned subsidiary of Washington Mutual.

7. Defendant is the United States of America.

## JURISDICTION

8. Plaintiffs bring this complaint in accordance with the requirements of section 7422 of the United States Internal Revenue Code (the "Code"), 26 U.S.C. § 7422, for recovery of federal income taxes erroneously collected from Ahmanson for the tax years ending December 31, 1991, and December 31, 1994 (the "years at issue").

9. This Court has jurisdiction over this action under 28 U.S.C. § 1491 and 28 U.S.C. § 1346(a).

10. Plaintiffs are filing this complaint within the period of time specified in section 6532 of the Code.

## GENERAL ALLEGATIONS

11. Plaintiffs seek to recover the sum of at least $83,429,228, together with interest as the law provides, which sum represents an overpayment by Ahmanson of federal income taxes for the years at issue.

12. Ahmanson timely filed a federal income tax return for both of the years at issue with the Internal Revenue Service Center in Fresno, California.

13. Ahmanson paid the full amount of income taxes shown on its federal income tax returns for both of the years at issue. Ahmanson's federal income tax returns for years at issue were examined by the Internal Revenue Service, and Ahmanson paid the additional amounts assessed in those examinations.

14. This action arises out of the attached administrative claims for refund that Plaintiffs submitted for the years at issue. In those administrative claims for refund, Plaintiffs claimed deductions for amortization and abandonment losses with respect to the intangible assets that Home obtained pursuant to agreements with the Federal Savings and Loan Insurance Corporation ("FSLIC"), an agency of the United States government, and with the Federal Deposit Insurance Corporation ("FDIC"), an agency of the United States government. Under those agreements, Home also acquired insolvent savings and loan associations located in Missouri, Florida, Illinois, Texas, New York, and Ohio.

15. Prior to December 17, 1981, Home was a California-chartered savings and loan association engaged in the business of taking deposits and making home loans in California.

16. From 1981 through 1989 (and before), FSLIC insured the customer deposit accounts of federal savings and loan associations, or "federal thrifts."

17. In 1985 and before, FDIC insured the customer deposit accounts of federal savings banks.

18. In the late 1970s and into the early 1980s, FSLIC faced a financial crisis. Interest rates increased during this period, requiring thrifts to pay higher rates to their depositors and other creditors. Federal thrifts also lost deposits to other financial intermediaries, such as money market mutual funds, during this period. The thrifts' income did not rise commensurately because their primary source of income was fixed-rate mortgages. Most thrifts incurred net losses during this period and many became insolvent.

19. By late 1981 FSLIC determined that it lacked the funds necessary to cover its deposit insurance liabilities with respect to insolvent federal thrifts. FSLIC decided to offer assistance to healthy thrifts ("FSLIC Assistance") to induce them to take over insolvent federal thrifts in transactions known as "supervisory mergers." FSLIC Assistance took a variety of forms including cash, guarantees against loan losses, capital notes, loans and other favorable financing, the right to acquire, maintain, and establish branch offices ("branches") outside of the acquiring thrift's home state, and certain rights with regard to the Regulatory Accounting Principles ("RAP") that govern federal thrift accounting.

20. From 1981 through 1989, the Federal Home Loan Bank Board ("FHLBB"), another agency of the United States government, was the federal agency that regulated federal thrifts. FHLBB was the operating head of FSLIC. FHLBB's approval was required before FSLIC could consummate a supervisory merger.

21. Prior to March 1981, FHLBB regulations generally prohibited a federal thrift from establishing branches in any state other than the state in which its home office was located. FHLBB amended its regulations in March and September 1981 to create an exception to this general prohibition that could be invoked only in supervisory mergers. That exception (1) allowed a federal thrift with its home office in one state to acquire through a supervisory merger one or more federal thrifts with home offices in a second state, and (2) allowed the acquiring thrift to establish additional branches in the state that it entered through the supervisory merger.

The Missouri-Florida Transaction

22. In December 1981, Security Federal Savings and Loan Association ("Security"), a federal savings and loan association with its home office in Missouri, was insolvent.

23. In December 1981, Hamiltonian Federal Savings and Loan Association ("Hamiltonian"), a federal savings and loan association with its home office in Missouri, was insolvent.

24. In December 1981, Southern Federal Savings and Loan Association ("Southern"), a federal savings and loan association with its home office in Florida, was insolvent.

25. On December 17, 1981, Home entered into an agreement with FSLIC to acquire the assets and liabilities of Security, Hamiltonian, and Southern through a supervisory merger (the "Missouri-Florida Transaction").

26. The Missouri-Florida Transaction was a two-step acquisition: Security and Hamiltonian merged into Southern, then Southern merged into Home. Prior to Southern's merger into Home, Home converted from a California-chartered savings and loan association to a federal savings and loan association.

27. To induce Home to acquire Security, Hamiltonian, and Southern, FSLIC executed an Assistance Agreement (the "Assistance Agreement") with Home.

28. The Assistance Agreement incorporated by reference a resolution and letter in which the FHLBB approved the establishment by Home of branch offices in Missouri and Florida. The incorporation of the resolution and letter into the Assistance Agreement gave Home the contractual right to maintain the acquired branches and establish additional branches in Missouri ("Missouri Branching Rights") and Florida ("Florida Branching Rights"), subject to the requirement that Home apply for and obtain the FHLBB's approval before opening any new branch.

29. The Assistance Agreement also incorporated an FHLBB resolution that approved Home's use of the "purchase method" of accounting for the supervisory merger. The incorporation of that resolution gave Home the contractual right (the "Missouri-Florida RAP Right") to treat the excess of the purchase price over the fair market value of the identifiable assets acquired from the Missouri and Florida thrifts as "supervisory goodwill," subject to amortization over 40 years, and to count the unamortized supervisory goodwill balance as an asset for purposes of meeting the FHLBB's regulatory capital requirements for federal thrifts. In this case, Home paid no cash for the acquired Missouri and Florida thrifts, and the purchase price was the assumption of the acquired thrifts' liabilities. Therefore, the Missouri-Florida RAP Right entitled Home to treat the excess of the fair market value of the acquired Missouri and Florida thrifts' liabilities over the fair market value of those thrifts’ identifiable assets as supervisory goodwill, to amortize that supervisory goodwill over 40 years, and to count the unamortized supervisory goodwill balance toward meeting Home’s regulatory capital requirements.

30. In addition to the Missouri and Florida Branching Rights and the Missouri-Florida RAP Right, the Assistance Agreement provided Home with a small amount of cash, a guarantee that FSLIC would reimburse Home in the event it incurred losses in connection with certain real estate owned by the acquired thrifts, and certain regulatory forbearances.

31. The Assistance Agreement also incorporated by reference resolutions in which the FHLBB made the findings necessary to qualify the merger of Security and Hamiltonian into

Southern, and the merger of the new Southern into Home as tax-free reorganizations under Code sections 368(a)(1)(G) and 368(a)(3)(D)(ii).

32. Home determined the excess of the fair market value of the failed Missouri thrifts' liabilities over the fair market value of their booked assets, and reduced the amount of the excess by the amount of cash received from FSLIC in connection with the failed Missouri thrifts. Of the remaining excess, a portion — $1,243,000 — was attributed to the core deposit base of the acquired Missouri thrifts. The remaining amount of $87,385,441 was treated as supervisory goodwill.

33. Home determined the excess of the fair market value of Southern's liabilities over the fair market value of its booked assets, and reduced the amount of the excess by the amount of cash received from FSLIC in connection with Southern. Of the excess, a portion — $2,444,000 — was attributed to the core deposit base of Southern. The remaining amount of $180,118,478 was treated as supervisory goodwill.

34. Under Code section 1012 and Treasury Regulation § 1.1012-1(a), or, alternatively, under Code sections 362(b) and 597, Home had a total tax basis of $67,519,000 (cost basis) or $74,000,000 (fair market value basis) in the Missouri-Florida RAP Rights.

<u>The Illinois-Texas Transaction</u>

35. In January 1982, Royal Federal Savings and Loan Association ("Royal"), a federal savings and loan association with its home office in Texas, was insolvent.

36. In January 1982, El Centro Federal Savings and Loan Association ("El Centro"), a federal savings and loan association with its home office in Texas, was insolvent.

37. In January 1982, Civic Federal Savings and Loan Association ("Civic"), a federal savings and loan association with its home office in Texas, was insolvent.

38. In January 1982, Republic Federal Savings and Loan Association ("Republic"), a federal savings and loan association with its home office in Texas, was insolvent.

39. In January 1982, Buffalo Federal Savings and Loan Association ("Buffalo"), a federal savings and loan association with its home office in Texas, was insolvent.

40. In January 1982, Hyde Park Federal Savings and Loan Association ("Hyde Park"), a federal savings and loan association with its home office in Illinois, was insolvent.

41. On January 15, 1982, Home entered into an agreement with FSLIC to acquire the assets and liabilities of Royal, El Centro, Civic, Republic, Buffalo, and Hyde Park through a supervisory merger (the "Illinois-Texas Transaction").

42. The Illinois-Texas Transaction was a two-step transaction. Civic, Republic, and Buffalo merged into El Centro. Royal, El Centro, and Hyde Park then merged into Home.

43. To induce Home to acquire Royal, El Centro, Civic, Republic, Buffalo, and Hyde Park, FSLIC executed an Assistance Agreement (the "Illinois-Texas Assistance Agreement") with Home.

44. The Illinois-Texas Assistance Agreement incorporated by reference a resolution and letter in which the FHLBB approved the establishment by Home of branch offices in Illinois and Texas. The incorporation of the resolution and letter into the Illinois-Texas Assistance Agreement gave Home the contractual right to maintain branches and establish additional branches in Illinois ("Illinois Branching Rights") and Texas ("Texas Branching Rights"), subject to the requirement that Home apply for and obtain the FHLBB's approval before opening any new branch.

45. The Illinois-Texas Assistance Agreement also incorporated an FHLBB resolution that approved Home's use of the "purchase method" of accounting for the supervisory merger. The incorporation of that resolution gave Home the contractual right (the "Illinois-Texas RAP Right") to treat the excess of the purchase price over the fair market value of the identifiable

assets acquired from the Illinois and Texas thrifts as "supervisory goodwill," subject to amortization over 40 years, and to count the unamortized supervisory goodwill balance as an asset for purposes of meeting the FHLBB's regulatory capital requirements for federal thrifts. In this case, Home paid no cash for the acquired Illinois and Texas thrifts, and the purchase price was the assumption of the acquired thrifts' liabilities. Therefore, the Illinois-Texas RAP Right entitled Home to treat the excess of the fair market value of the acquired Illinois and Texas thrifts' liabilities over the fair market value of those acquired thrifts' identifiable assets as supervisory goodwill, to amortize that supervisory goodwill over 40 years, and to count the unamortized supervisory goodwill balance toward meeting Home's regulatory capital requirements.

46. In addition to the Illinois and Texas Branching Rights and the Illinois-Texas RAP Right, the Illinois-Texas Assistance Agreement provided Home with cash, a guarantee that FSLIC would reimburse Home in the event it incurred losses in connection with certain real estate owned by the acquired thrifts, and certain regulatory forbearances.

47. The Illinois-Texas Assistance Agreement also incorporated by reference resolutions in which the FHLBB made the findings necessary to qualify the mergers of Civic, Republic, and Buffalo into El Centro, and the mergers of Royal, El Centro, and Hyde Park into Home as tax-free reorganizations under Code sections 368(a)(1)(G) and 368(a)(3)(D)(ii).

48. Home determined the excess of the fair market value of the failed Texas thrifts' liabilities over the fair market value of their booked assets. A portion of this amount — $1,555,000 — was attributed to the core deposit base of the acquired Texas thrifts. The remaining amount of $145,874,021 was treated as supervisory goodwill.

49. Home determined the excess of the fair market value of Hyde Park's liabilities over the fair market value of its booked assets. A portion of this amount — $702,000 — was

attributed to the core deposit base of Hyde Park. The remaining amount of $75,806,934 was treated as supervisory goodwill.

50. Under Code section 1012 and Treasury Regulation § 1.1012-1(a) or, alternatively, under Code sections 362(b) and 597, Home had a total tax basis of $75,806,934 in the Illinois Branching Rights.

51. Under Code section 1012 and Treasury Regulation § 1.1012-1(a) or, alternatively, under Code sections 362(b) and 597, Home had a total tax basis of $145,874,021 in the Texas Branching Rights.

52. Under Code section 1012 and Treasury Regulation § 1.1012-1(a) or, alternatively, under Code sections 362(b) and 597, Home had a total tax basis of $ 221,680,955 in the Illinois-Texas RAP Right.

53. The Illinois Branching Rights that Home obtained in the transactions had an indefinite life and were not amortizable.

54. In 1993, Home's management decided to terminate its branch banking operations in Illinois.

55. In 1994, Home engaged in transactions in which Home exchanged, sold, or otherwise disposed of its branches in Illinois.

56. With the disposition of its last Illinois branch in 1994, Home exited the Illinois branch-banking market with no intention of reestablishing branch offices in Illinois.

The Century Transaction

57. In August 1984, Century Federal Savings and Loan Association ("Century"), a federal savings and loan association with its home office in New York, was insolvent.

58. On August 10, 1984, Home entered into an agreement with FSLIC to acquire the assets and liabilities of Century through a supervisory merger (the "Century Transaction").

59. To induce Home to acquire Century, FSLIC executed an Assistance Agreement (the "Century Assistance Agreement") with Home.

60. The Century Assistance Agreement incorporated by reference a resolution in which the FHLBB approved the establishment by Home of branch offices in New York. The incorporation of this resolution into the Century Assistance Agreement gave Home the contractual right to maintain branches and establish additional branches in New York ("New York Branching Rights"), subject to the requirement that Home apply for and obtain the FHLBB's approval before opening any new branch.

61. The Century Assistance Agreement also incorporated an FHLBB resolution that approved Home's use of the "purchase method" of accounting for the supervisory merger. The incorporation of that resolution gave Home the contractual right (the "Century RAP Right") to treat the excess of the purchase price over the fair market value of Century's identifiable assets as "supervisory goodwill," subject to amortization over 40 years, and to count the unamortized supervisory goodwill balance as an asset for purposes of meeting the FHLBB's regulatory capital requirements for federal thrifts. In this case, Home paid no cash for Century, and the purchase price was the assumption of Century's liabilities. Therefore, the Century RAP Right entitled Home to treat the excess of the fair market value of Century's liabilities over the fair market value of Century's identifiable assets as supervisory goodwill, to amortize that supervisory goodwill over 40 years, and to count the unamortized supervisory goodwill balance toward meeting Home's regulatory capital requirements.

62. In addition to the New York Branching Rights and the Century RAP Right, the Century Assistance Agreement provided Home with certain regulatory forbearances and favorable financing in the form of a $700 million loan at a below-market interest rate.

63. The Century Assistance Agreement also incorporated by reference resolutions in which the FHLBB made the findings necessary to qualify the merger of Century into Home as a tax-free reorganization under Code sections 368(a)(1)(G) and 368(a)(3)(D)(ii).

64. Home determined the excess of the fair market value of Century's liabilities over the fair market value of Century's booked assets. Home made other adjustments to the excess and treated $126,745,842 as supervisory goodwill.

65. Under Code section 1012 and Treasury Regulation § 1.1012-1(a) or, alternatively, under Code sections 362(b) and 597, Home had a total tax basis of $126,745,842 in the New York Branching Rights and the Century RAP Right.

The Ohio Transaction

66. In May 1985, Home Federal Savings and Loan Association ("Home Fed"), a federal savings and loan association with its home office in Ohio, was insolvent.

67. In May 1985, Permanent Savings and Loan Association ("Permanent"), an Ohio-chartered savings and loan association with its home office in Ohio, was insolvent.

68. In May 1985, Oxford Savings and Loan Association ("Oxford"), an Ohio-chartered savings and loan association with its home office in Ohio, was insolvent.

69. In May 1985, American Savings Bank of Worthington ("American"), an Ohio-chartered savings and loan association with its home office in Ohio, was insolvent.

70. In June 1985, Savings One Association ("Savings One"), an Ohio-chartered savings and loan association with its home office in Ohio, was insolvent.

71. On May 22, 1985, Home entered into an agreement with FSLIC to acquire the assets and liabilities of Home Fed, Permanent, Oxford, and American through a supervisory merger. On June 20, 1985, Home entered into an agreement with FSLIC to acquire the assets

and liabilities of Savings One through a supervisory merger. These two transactions are referred to collectively as the "Ohio Transaction."

72. To induce Home to acquire Home Fed, Permanent, Oxford, American, and Savings One, FSLIC executed an Assistance Agreement (the "Ohio Assistance Agreement") with Home.

73. The Ohio Assistance Agreement incorporated by reference a resolution in which the FHLBB approved the establishment by Home of branch offices in Ohio. The incorporation of this resolution into the Ohio Assistance Agreement gave Home the contractual right to maintain branches and establish additional branches in Ohio ("Ohio Branching Rights"), subject to the requirement that Home apply for and obtain the FHLBB's approval before opening any new branch.

74. The Ohio Assistance Agreement also incorporated an FHLBB resolution that approved Home's use of the "purchase method" of accounting for the supervisory merger. The incorporation of that resolution gave Home the contractual right (the "Ohio RAP Right") to treat the excess of the purchase price over the fair market value of the identifiable thrift assets acquired as "supervisory goodwill," subject to amortization over 40 years, and to count the unamortized supervisory goodwill balance as an asset for purposes of meeting the FHLBB's regulatory capital requirements for federal thrifts. In this case, Home paid no cash for the acquired Ohio thrifts, and the purchase price was the assumption of the acquired Ohio thrifts' liabilities. Therefore, the Ohio RAP Right entitled Home to treat the excess of the fair market value of the acquired Ohio thrifts' liabilities over the fair market value of the Ohio thrifts' identifiable assets as supervisory goodwill, to amortize that supervisory goodwill over 40 years, and to count the unamortized supervisory goodwill balance toward meeting Home's regulatory capital requirements.

75. In addition to the Ohio Branching Rights and the Ohio RAP Right, the Ohio Assistance Agreement provided Home with certain regulatory forbearances and favorable financing in the form of a $200 million loan at a below-market interest rate.

76. The Ohio Assistance Agreement also incorporated by reference resolutions in which the FHLBB made the findings necessary to qualify the merger of Home Fed, Permanent, Oxford, and American into Home, and the merger of Savings One into Home as tax-free reorganizations under Code sections 368(a)(1)(G) and 368(a)(3)(D)(ii).

77. Home determined the excess of the fair market value of the failed Ohio thrifts' liabilities over the fair market value of their booked assets, and reduced the amount of the excess by the amount of cash received from FSLIC in connection with the failed Ohio thrifts. Home made other adjustments to the excess and treated $37,814,989 as supervisory goodwill

78. Under Code section 1012 and Treasury Regulation § 1.1012-1(a) or, alternatively, under Code sections 362(b) and 597, Home had a total tax basis of $37,814,989 in the Ohio Branching Rights and the Ohio RAP Right.

The Bowery Transaction

79. In August 1985, The Bowery Savings Bank ("Old Bowery"), an FDIC-insured, New York-chartered mutual savings bank with its home office in New York, was insolvent.

80. In or around August 1985, a group of private investors (the “Investors”) formed a corporation ("New Bowery") for the purpose of acquiring Old Bowery.

81. On August 7, 1985, New Bowery entered into an agreement with FDIC to acquire the assets and liabilities of Old Bowery through a supervisory merger (the "Bowery Transaction").

82. To induce New Bowery to acquire Old Bowery, FDIC executed an Assistance Agreement, dated August 7, 1985, (the "Bowery Assistance Agreement") with New Bowery.

83. The Bowery Assistance Agreement gave New Bowery the contractual right (the "Bowery RAP Right") to use the "purchase method" of accounting for the supervisory merger by treating the excess of the Old Bowery liabilities over the fair market value of the identifiable Old Bowery assets acquired as "goodwill," subject to amortization in accordance with Generally Accepted Accounting Principles ("GAAP"), and to count the unamortized goodwill balance as capital for purposes of meeting the FDIC's regulatory capital requirements.

84. In addition to the Bowery RAP Right, the Bowery Assistance Agreement provided New Bowery with approximately $170 million in cash, credit protection against losses from loans and investment securities, a $100 million loan at a below-market interest rate (the "Bowery Favorable Financing Right"), and certain regulatory forbearances.

85. On October 1, 1985, Old Bowery was converted from a mutual savings bank to a stock company and was merged into New Bowery in a tax-free reorganization under Code sections 368(a)(1)(G) and 368(a)(3)(D)(ii).

86. New Bowery determined the excess of the fair market value of Old Bowery's liabilities over the fair market value of Old Bowery's booked assets. The excess of $635,166,000 was treated as goodwill for regulatory accounting purposes.

87. Under Code section 1012 and Treasury Regulation § 1.1012-1(a), New Bowery had a total tax basis of $635,166,000 in the Bowery RAP Right and the Bowery Favorable Financing Right.

88. On January 29, 1988, Home, through a wholly owned subsidiary, acquired all the outstanding capital stock of New Bowery for a purchase price of $200 million in cash. New Bowery retained the Bowery RAP Right pursuant to an amended assistance agreement with the FDIC. Home did not make a Code section 338 election to treat the stock acquisition as an asset acquisition. Therefore, New Bowery's assets retained their historical tax basis when Home

acquired the stock of New Bowery. New Bowery became a member of Ahmanson's affiliated group.

89. Until 1992, New Bowery's books were separate from Home's books. In 1992, Home and New Bowery merged in a tax-free reorganization. Home received carryover basis in New Bowery's assets – including the Bowery RAP Right and the Bowery Favorable Financing Right – and counted the remaining New Bowery goodwill toward its regulatory capital requirements.

General Claims

90. Under Code section 167, Home is entitled to amortization deductions with respect to the Missouri-Florida RAP Right, Illinois-Texas RAP Right, Century RAP Right, and Ohio RAP Right (collectively, the "Non-Bowery RAP Rights").

91. Congress enacted the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA") in 1989. FIRREA phased out the use of supervisory goodwill to satisfy regulatory capital requirements over the five-year period 1990 through 1994. At the end of 1994, supervisory goodwill could no longer be treated as an asset for purposes of meeting a federal thrift's regulatory capital requirements.

92. Over the period 1990-1994, as required by FIRREA, Home phased out its use of supervisory goodwill to meet its regulatory capital requirements.

93. Although Home's Non-Bowery RAP Rights were previously amortizable on a straight-line basis for 40 years, the enactment of FIRREA shortened the useful life of the Non-

Bowery RAP Rights so that Home is entitled to amortize its remaining adjusted basis in the Non-Bowery RAP Rights on a straight-line method from 1989 through 1994.

94. Alternatively, because Home acquired the right to amortize the Non-Bowery RAP Rights over 40 years, Home is entitled to (1) an amortization deduction for 1991 equal to one-fortieth of Home's basis in the Missouri-Florida RAP Right and (2) an amortization deduction for 1994 equal to one-fortieth of Home's basis in the Non-Bowery RAP Rights.

95. Alternatively, because FIRREA disallowed the use of supervisory goodwill after 1994, Home is entitled to a deduction in 1994 to the extent of any remaining unamortized basis in the Non-Bowery RAP Rights under section 165.

96. Under Code section 167, Home is entitled to amortization deductions with respect to the Bowery RAP Right.

97. Although the Bowery RAP Right was previously amortizable in accordance with GAAP, the enactment of FIRREA and the 1992 Home-Bowery merger shortened the useful life of the Bowery RAP Right so that Home is entitled to amortize its remaining adjusted basis in the Bowery RAP Right on a straight-line method from 1992 through 1994.

98. Alternatively, because Home acquired the right to amortize the Bowery RAP Right in accordance with GAAP, Home is entitled to amortization deductions for 1994 equal to the original GAAP amortization (before any adjustments for FIRREA) for that year.

99. Alternatively, because FIRREA disallowed the use of supervisory goodwill after 1994, Home is entitled to a deduction in 1994 to the extent of any remaining unamortized basis in the Bowery RAP Right under section 165.

100. Home is entitled to an amortization deduction for 1994 with respect to the Bowery Favorable Financing Right under Code section 167.

101. Home is entitled to an abandonment loss in 1994 under Code section 165 with respect to its Illinois Branching Rights because Home suffered a loss for which Home was not covered by insurance or otherwise compensated.

102. Plaintiffs timely filed with the IRS claims for refund (attached) with respect to each of the tax years at issue. In those claims Plaintiffs claimed the abandonment losses and amortization deductions summarized above and set forth in the detailed counts below.

103. Plaintiffs are the sole owners of the claims for refund and have made no assignment or transfer of any part of these claims. There is no other suit or process by Plaintiffs pending in any other court on these claims. No action on the claims has been taken by the Congress of the United States or by any departments of the United States government, other than the actions by the IRS on September 21, 2005 and January 17, 2006, denying the claims in full.

**COUNT ONE**
**(1991 TAX YEAR)**

104. Washington Mutual incorporates herein by reference and realleges all allegations in paragraphs 1-103 of this Complaint.

105. On or before September 15, 1992, Ahmanson timely filed a Form 1120 federal income tax return for its 1991 tax year with the IRS at Fresno, California, reporting total tax in the amount of $202,074,655. The name, address, and identification number appearing on that return were as follows:

H.F. Ahmanson & Co. and Subsidiaries
4900 Rivergrade Road
Irwindale, California, 91706
EIN 95-0479700

106. The IRS subsequently examined Ahmanson's federal income tax return, and pursuant to that examination, Ahmanson paid an additional $3,132,136 in tax and $2,501,502 in interest. Ahmanson paid in full to the Fresno, California Service Center (for the payments made

before 2001) or the Ogden, Utah Service Center (for the payments made after 2001) its originally reported tax and those subsequent assessments as follows:

a) $36,000,000 of estimated tax paid on April 15, 1991;

b) $3,685,722.66 of overpayment credit elect from prior year credited on April 15, 1991;

c) $50.34 of overpayment credit elect from prior year credited on April 15, 1991;

d) $36,000,000 of estimated tax paid on June 17, 1991;

e) $48,000,000 of estimated tax paid on September 16, 1991;

f) $66,000,000 of estimated tax paid on December 16, 1991;

g) $25,000,000 of estimated tax paid on March 16, 1992;

h) $1,004,192.58 of overpayment offset from 1988 credited on June 29, 1994;

i) $1,959,042 and $1,446,457 of cash bond payments on May 4, 1999;

j) $367,726.97 of subsequent payment on account on December 8, 1999;

k) $1,880.74 of subsequent payment on account on February 1, 2000; and

l) $1,034,188.15 of subsequent payment on account on September 15, 2006.

107. For the reasons described in paragraph 93, Home is entitled to additional amortization deductions under section 167 for its 1991 tax year in the amount of $9,283,683 (cost basis) or $10,175,000 (fair market value) with respect to the RAP Rights it acquired pursuant to the Missouri-Florida Transaction.

108. Alternatively, for the reasons described in paragraph 94, Home is entitled to amortization deductions under section 167 for its 1991 tax year in the amount of $1,687,975

(cost basis) or $1,850,000 (fair market value) with respect to the RAP Rights it acquired pursuant to the Missouri-Florida Transaction.

109. Ahmanson is entitled to an additional net operating loss carryback deduction of $234,185,928 arising from its 1994 tax year. The additional carryback results from abandonment loss deductions, additional amortization deductions, or, alternatively, certain adjustments in the amount of gain or loss on the sale of branches in the 1994 tax year. These additional deductions and adjustments are described in paragraphs 118 through 135 of Count Two of this Complaint.

110. On June 28, 2005, Washington Mutual timely filed an amended return on Form 1120X with the IRS in Seattle, Washington, seeking a refund of tax for Ahmanson's 1991 tax year on the basis that: (1) Home is entitled to the deductions for amortization of the Missouri-Florida RAP Right as described in paragraph 93; or, in the alternative, that (2) Home is entitled to a deduction for amortization of the Missouri-Florida RAP Right as described in paragraph 94.

111. The IRS disallowed that claim in full on January 17, 2006.

112. On June 30, 2006, Washington Mutual timely filed an amended return on Form 1120X, seeking a refund of tax for Ahmanson's 1991 tax year on the basis of net operating loss carrybacks from 1994 described in paragraph 109. As of the date of the filing of this Complaint, the IRS has not taken action on that amended return.

113. This complaint is timely because the IRS and Washington Mutual executed Form 907 agreements to extend the statute of limitations for filing suit on the refund claims in the June 2005 amended return until March 31, 2008, and more than six months have passed since Washington Mutual filed the refund claim on June 30, 2006.

114. As a result of the claims described in paragraphs 110 and 112, Ahmanson overpaid its federal income tax for the 1991 tax year and Washington Mutual is entitled to a refund of at least $82,872,567, plus statutory interest as the law provides.

**COUNT TWO**
**(1994 TAX YEAR)**

115. Plaintiffs incorporate by reference and reallege all allegations in paragraphs 1-103 of this Complaint.

116. On or before September 15, 1995, Ahmanson timely filed a Form 1120 federal income tax return for its 1994 tax year with the IRS at Fresno, California, reporting total tax in the amount of $450,942. The name, address, and identification number appearing on that return were as follows:

H.F. Ahmanson & Co. and Subsidiaries
4900 Rivergrade Road
Irwindale, California, 91706
EIN 95-0479700

117. The IRS subsequently audited Ahmanson, and pursuant to that audit, Ahmanson paid an additional $105,719 of tax and $1,374,722 of interest. Ahmanson paid in full to the Fresno, California Service Center (for the payments made before 1998) or the Ogden, Utah Service Center (for the payments made after 1998) the tax reported to be due on its 1994 return and those subsequent assessments as follows:

a) $140,825.13 in overpayment credit from prior year on April 15, 1994;

b) $600,000 of overpayment offset from 1992 on October 27, 1994;

c) $662,845 of advance payment of deficiency on April 14, 2005;

d) $783,938 of designated interest payment on April 14, 2005;

e) $9,942.39 of subsequent payment of tax on July 7, 2005;

f) $23,099.64 of subsequent payment of tax on February 7, 2006; and

g) $616.05 of subsequent payment of tax on May 3, 2006.

118. For the reasons described in paragraph 93, Home is entitled to additional amortization deductions under section 167 for its 1994 tax year in the amount of $9,283,683 or $10,175,000 with respect to the Missouri-Florida RAP Right.

119. Alternatively, for the reasons described in paragraph 94, Home is entitled to amortization deductions under section 167 for its 1994 tax year in the amount of $1,687,975 or $1,850,000 with respect to the Missouri-Florida RAP Right.

120. Alternatively, for the reasons described in paragraph 95, Home is entitled to a deduction under section 165 for its 1994 tax year in the amount of Home's remaining unamortized basis in the Missouri-Florida RAP Right.

121. For the reasons described in paragraph 93, Home is entitled to additional amortization deductions under section 167 for its 1994 tax year in the amount of $30,481,131 with respect to the Illinois-Texas RAP Right.

122. Alternatively, for the reasons described in paragraph 94, Home is entitled to amortization deductions under section 167 for its 1994 tax year in the amount of $5,542,024 with respect to the Illinois-Texas RAP Right.

123. Alternatively, for the reasons described in paragraph 95, Home is entitled to a deduction under section 165 for its 1994 tax year in the amount of Home's remaining unamortized basis in the Illinois-Texas RAP Right.

124. For the reasons described in paragraph 93, Home is entitled to additional amortization deductions under section 167 for its 1994 tax year in the amount of $18,483,769 with respect to the Century RAP Right.

125. Alternatively, for the reasons described in paragraph 94, Home is entitled to amortization deductions under section 167 for its 1994 tax year in the amount of $3,168,646 with respect to the Century RAP Right.

126. Alternatively, for the reasons described in paragraph 95, Home is entitled to a deduction under section 165 for its 1994 tax year in the amount of Home's remaining unamortized basis in the Century RAP Right.

127. For the reasons described in paragraph 93, Home is entitled to additional amortization deductions under section 167 for its 1994 tax year in the amount of $5,672,248 with respect to the Ohio RAP Right.

128. Alternatively, for the reasons described in paragraph 94, Home is entitled to amortization deductions under section 167 for its 1994 tax year in the amount of $945,375 with respect to the Ohio RAP Right.

129. Alternatively, for the reasons described in paragraph 95, Home is entitled to a deduction under section 165 for its 1994 tax year in the amount of Home's remaining unamortized basis in the Ohio RAP Right.

130. For the reasons described in paragraph 97, Home is entitled to additional amortization deductions under section 167 for its 1994 tax year in the amount of $99,805,230 with respect to the Bowery RAP Right.

131. Alternatively, for the reasons described in paragraph 98, Home is entitled to amortization deductions under section 167 for its 1994 tax year in the amount of $47,964,330 with respect to the Bowery RAP Right.

132. Alternatively, for the reasons described in paragraph 99, Home is entitled to a deduction under section 165 for its 1994 tax year in the amount of Home's remaining unamortized basis in the Bowery RAP Right.

133. For the reasons described in paragraph 100, Home is entitled to an amortization deduction of $6,666,667 under section 167 for its 1994 tax year with respect to the Bowery Favorable Financing Right.

134. Because Home made the affirmative decision to leave the Illinois market and it sold or otherwise divested itself of all of its remaining Illinois branches in 1994, Home suffered a loss of its Illinois Branching Rights for which Home was not covered by insurance or otherwise compensated. Home is entitled to an abandonment loss deduction of $75,806,934 for its 1994 tax year under Code section 165 with respect to the Illinois Branching Rights.

135. Alternatively, to the extent Home is not entitled to recover the basis of the Illinois Branching Rights and the Illinois RAP Right branches as loss deductions under Code section 165 in 1994, or through amortization deductions under Code section 167, such basis amount of $75,806,934 is includible in the adjusted basis of the Illinois branches sold or otherwise disposed of by Home, and Home is entitled – for its 1994 tax year – to a corresponding adjustment to the gain or loss recognized under Code section 1001 on the 1994 Illinois branch sales.

136. On December 19, 2002, Washington Mutual timely filed an amended return on Form 1120X with the IRS in Seattle, Washington, seeking a refund of tax for its 1994 tax year, on the basis that Home was entitled to abandonment and amortization deductions relating to the RAP Right acquired in connection with the acquisition of the Texas thrifts in January 1982.

137. The IRS denied the December 19, 2002 claim for the 1994 tax year in full on September 21, 2005.

138. On June 28, 2005, Washington Mutual filed an amended return on Form 1120X with the IRS in Seattle, Washington. The amended return seeks a refund of tax for Ahmanson's 1994 tax year, on the basis that (1) Home is entitled to the additional amortization deductions for RAP Rights as described in paragraphs 118, 121, 124, 127, and 130; (2) Home is entitled to an abandonment loss deduction for Illinois Branching Rights as described in paragraph 134; and (3) Home is entitled to amortization deductions for the Bowery Favorable Financing Right as described in paragraph 133. The amended return seeks a refund of tax for Ahmanson's 1994 tax year on the alternative bases that: (1) Home is entitled to additional amortization deductions for

the RAP Rights on the basis described in paragraphs 119, 122, 125, 128, and 131; (2) Home is entitled to additional loss deductions for the RAP Rights on the basis described in paragraphs 120, 123, 126, 129, and 132; and (3) Home is entitled to an adjustment to the gain or loss recognized on the sale or other disposition of the Illinois branches under Code section 1001 as described in paragraph 135.

139. The IRS disallowed the June 28, 2005 claim for the 1994 tax year in full on January 17, 2006.

140. On June 30, 2006, Plaintiffs timely filed three amended returns on Forms 1120X with the IRS in Seattle, Washington. The amended returns were filed for Ahmanson by Washington Mutual as successor in interest to Ahmanson, by Washington Mutual Bank, FA, as successor in interest to Home, and by Savings of America, Inc. as the designated substitute agent for Ahmanson. The amended returns seek a refund of tax for Ahmanson's 1994 tax year, on the basis that (1) Home is entitled to the additional amortization deductions for RAP Rights as described in paragraphs 118, 121, 124, 127, and 130; (2) Home is entitled to an abandonment loss deduction for Illinois Branching Rights as described in paragraph 134; and (3) Home is entitled to amortization deductions for the Bowery Favorable Financing Right as described in paragraph 133. The amended returns seek a refund of tax for Ahmanson's 1994 tax year on the alternative bases that: (1) Home is entitled to additional amortization deductions for the RAP Rights on the basis described in paragraphs 119, 122, 125, 128, and 131; (2) Home is entitled to additional loss deductions for the RAP Rights on the basis described in paragraphs 120, 123, 126, 129, and 132; and (3) Home is entitled to an adjustment to the gain or loss recognized on the sale or other disposition of the Illinois branches under Code section 1001 as described in paragraph 135.

141. This complaint is timely because the IRS and Washington Mutual executed Form 907 agreements to extend the statute of limitations for filing suit on the June 28, 2005 claim for the 1994 tax year until March 31, 2008, and more than six months have passed since the

amended refund claims were filed on June 30, 2006. The IRS has also extended the statute of limitations for filing suit on the December 19, 2002 claim for the 1994 tax year until April 30, 2008.

142. As a result of the claims described in paragraphs 138 and 140, Ahmanson overpaid its federal income tax for the 1994 tax year and Plaintiffs are entitled to a refund of at least $556,661, plus statutory interest as the law provides, and a net operating loss carryback from 1994 of at least $234,185,928.

**RELIEF REQUESTED**

WHEREFORE, Plaintiffs pray for judgment against the United States of at least the sum of $83,429,228 representing overpayments in tax by Ahmanson, plus statutory interest as the law provides, and such costs and attorneys' fees as are available, and such other and further relief that this Court deems equitable and proper.

DATED: June 2, 2008.

Signed: s/ Thomas D. Johnston

Date: June 2, 2008__________

Thomas D. Johnston
Counsel of Record
c/o Shearman & Sterling LLP
801 Pennsylvania Avenue N.W.
Washington, DC 20004
Telephone: (202) 508-8022
Facsimile: (202) 508-8100

**OF COUNSEL**

**SHEARMAN & STERLING** LLP
Steven R. Dixon
801 Pennsylvania Ave., NW
Washington, D.C. 20004-2634
Telephone: (202) 508-8000
Fax: (202) 508-8100

**MILLER & CHEVALIER** Chartered
Maria O'Toole Jones
Trever K. Asam
655 15th St., NW, Suite 900
Washington, D.C. 20005
Telephone: (202) 626-5800
Fax: (202) 626-0858